IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| EYIOMA UZAZURIKE, NOAH SHANNON, NELSON BRANDS, TONY CASSIOPPI, JIREHL BROCK, HUNTER DEKKERS, ISIAH LEE, ARLAND BRUCE IV, DODGE SAUSER, DESHAWN HANIKA, ARHON ULIS, AARON BLOM, JACK JOHNSON, JAKE REMSBURG, JEREMIAH WILLIAMS, HARRY BRACY, HOWARD BROWN, KEATON ANTHONY, JACOB HENDERSON, GEHRIG CHRISTENSEN, BENJAMIN TALLMAN, ABE ASSAD, COBE SIEBRECHT, CULLAN SHRIEVER, PATRICK KENNEDY, JAKE ENGLISH, | Case No. 4:24-cv-00146-RGE-SBJ |
| Plaintiffs, | |
| v. | **BRIEF SUPPORTING DEFENDANTS' PRE-ANSWER MOTION TO DISMISS** |
| STATE OF IOWA, IOWA DEPARTMENT OF PUBLIC SAFETY, IOWA DIVISION OF CRIMINAL INVESTIGATION, and STEPHAN BAYENS, PAUL FEDDERSEN, DAVID JOBES, TROY NELSON, AND BRIAN SANGER, individually and in their official capacities with the STATE OF IOWA, IOWA DEPARTMENT OF PUBLIC SAFETY, IOWA DIVISION OF CRIMINAL INVESTIGATION, | |
| Defendants. | |

State of Iowa, Iowa Department of Public Safety, Iowa Division of Criminal Investigation, and Stephan Bayens, Paul Feddersen, David Jobes, Troy Nelson, and Brian Sanger in their individual and official capacities ("State Defendants") provide the following brief in support of their pre-answer motion to dismiss:

## Table of Contents

INTRODUCTION ................................................................................................ 4

FACTS ................................................................................................................. 7

I.    Regulatory Background. ............................................................................. 8

II.   Regulatory Compliance and Geolocation Monitoring. ............................. 9

III.  Plaintiffs' Illicit Gambling Activities. .................................................... 13

IV.   Defendants' Investigation. ....................................................................... 15

V.    Suspensions and Criminal Charges. ........................................................ 20

ARGUMENT ..................................................................................................... 21

I.    Plaintiffs failed to plead plausible claims against Defendants Jobes, Nelson, and Sanger in Counts I (unreasonable search) and II (unreasonable seizure). ................................................... 22

   a.   Plaintiffs lack standing to allege a constitutional violation. ............................................. 22

   b.   Plaintiffs failed to plead or establish (1) a violation of a constitutional or statutory right that was (2) clearly established. ............................................................................. 25

      i.   Plaintiffs failed to plead a constitutional violation; their claims in Counts I and II against Jobes, Nelson, and Sanger fail. .......................................................... 26

         1. Fourth Amendment "searches"—general principles; Plaintiffs had no reasonable or actual expectation of privacy in their location data. ........................................... 27

         2. Narrow technological surveillance of voluntarily disclosed location and movement data is not a Fourth Amendment Search. ................................................................ 28

         3. The third-party doctrine defeats Plaintiffs' claims. ..................................... 30

         4. Defendants here did not conduct a CSLI search like the officers in *Carpenter v. United States*; the third-party doctrine applies. ........................................................... 32

         5. Defendants did not conduct a typical geofence search. ................................ 37

         6. No Defendant conducted a warrantless search of a cellphone or accessed private personal information. ................................................................................... 39

         7. Regardless of whether a "search" occurred, once provided to third-party companies, Plaintiffs location data was in an unprotected digital space. ............................... 39

         8. No warrant was required for a search and seizure of location data; gambling is a closely regulated industry, which lessens expectations of privacy. .......................... 40

         9. No unconstitutional seizure occurred. .......................................................... 47

10. Waiver—even if a "search" occurred, Plaintiffs consented to it. .............................. 50

ii.     Even if a constitutional violation occurred, the alleged right was not clearly established; qualified immunity protects Jobes, Nelson, and Sanger. .................................. 52

II.    *Monell* liability does not lie against the State or its agencies, and the claims are not properly pled against the state officials, but they enjoy qualified immunity in any event; Counts III–VI must be dismissed. ..................................................................................................................... 56

III.    Plaintiffs are not entitled to damages, and their claims are neither cognizable nor causally linked to a constitutional violation.............................................................................................. 62

a.   Plaintiffs cannot show Defendants caused their damages. ................................................. 62

b.   Plaintiffs do not have cognizable claims. ......................................................................... 64

c.   Plaintiffs cannot recover for their own illegal activity. .................................................... 66

CONCLUSION.................................................................................................................... 67

## INTRODUCTION

In 2019, Iowa legalized online sports wagering. And the computer or smartphone became—in essence—the front door to the casino. But territory restrictions apply to online gamblers—they must be in Iowa to place bets. So Iowa law required online Sportsbooks to monitor geolocation activity. This enables them to reject bets attempted outside permitted boundaries. But gambling regulations also require monitoring to detect fraud and other suspicious wagering, which Sportsbooks must report to the Iowa Racing and Gaming Commission ("IGRC").

To comply with these requirements, online Sportsbooks use the services of a company called GeoComply. GeoComply is a licensed vendor in Iowa, and its technology enables Sportsbooks to geolocate a device at certain intervals when a Sportsbook application is open. The company also supplies a software tool called Kibana, which can render geolocation data viewable on a pindrop map. This viewable data is anonymized. The Sportsbooks notify their users that location data is monitored and may be shared for various reasons with third parties, the government, or law enforcement. The Sportsbooks give this notice through their user agreements, terms and conditions, or privacy policies.

Plaintiffs were college athletes who gambled on sporting events in violation of NCAA rules or Iowa law. Using the online Sportsbooks, they voluntarily shared their location data so they could gamble online. Although not disclosed in their Complaint, some Plaintiffs fraudulently used other peoples' Sportsbook accounts to evade detection.

Defendants are the State of Iowa, Iowa Department of Public Safety ("DPS"), Iowa Division of Criminal Investigation ("DCI"), the Commissioner of DPS Stephan Bayens, the Director of DCI Paul Feddersen, Assistant Director of DCI David Jobes, DCI Special Agent in charge of DCI's Sports Wagering Unit Troy Nelson, and DCI Special Agent Brian Sanger. DCI is "the primary criminal investigative and

4

enforcement agency for the purpose of enforcement of" Iowa Code chapter 99F, which governs Iowa's sports wagering regulations. Iowa Code § 80.25A.

In about September 2023, the IRGC authorized DCI to monitor Sportsbooks' geolocation data. The authorization was limited in scope to the purposes of Iowa Code section 99F.12(2)(*b*), which requires Sportsbooks to report *inter alia* "any abnormal wagering activity or patterns that may indicate a concern about the integrity of an authorized sporting event" or "any other conduct with the potential to corrupt a wagering outcome of an authorized sporting event . . . for purposes of financial gain." The section identifies concerns about "match fixing, and suspicious or illegal wagering activities, including the use of funds derived from illegal activity, wagers to conceal or launder funds derived from illegal activity, use of agents to place wagers, or use of false identification." *Id.*

In reviewing location data, DCI officers observed wagering activity in college athletic facilities where members of the public are barred from entry. But law forbids coaches, athletic trainers, officials, players, and certain others from sports wagering. So out of concern for match fixing and cheating, DCI subpoenaed the Sportsbooks for identifying information associated with these bets, and it discovered Plaintiffs involvement. DCI subpoenaed schools for player contact information and ultimately obtained search warrants for Plaintiffs phones.

Upon learning of Plaintiffs illicit gambling activities, Plaintiffs' colleges and universities suspended them from athletic participation. Some Plaintiffs were also charged with violations of Iowa gambling laws. Several Plaintiffs pleaded guilty to criminal charges and admitted they fraudulently used other peoples' gambling accounts.

Here, under 42 U.S.C. section 1983, Plaintiffs' allege that Defendants' Jobes, Nelson, and Sanger violated their 4th and 14th Amendment rights, premised on an alleged illegal search and seizure. Against the State, DPS, DCI, Bayens, and

Feddersen, they allege policy-and-custom claims and failure-to-train-or-supervise claims premised on illegal and warrantless searches and seizures. But all claims fail.

First, Defendants did not violate Plaintiffs constitutional rights. Plaintiffs had no reasonable expectation of privacy in the location data they voluntarily shared with third-party Sportsbooks. No illegal search or seizure occurred, and the third-party doctrine defeats their claims. Several Plaintiffs lack standing because the allegedly-searched accounts weren't even theirs. Yet even if a search occurred, Plaintiffs consented to disclosure of their location data to the government or law enforcement.

This is not a case where police retrieved involuntarily- and mass-collected Cell Site Location Information ("CSLI") to reconstruct a complete picture of anyone's historic location and movements. Instead, Plaintiffs knowingly and voluntarily shared their locations through their betting applications so they could gamble online. The narrow holding of *Carpenter v. U.S.*, 585 U.S. 296 (2018), does not apply here.

Second, Plaintiffs cannot show that a right to be free from a warrantless review of location data voluntarily shared with third-party betting companies to comply with territorial gambling regulations and gamble online was clearly established. Qualified immunity shields Defendants from suit.

Third, Plaintiffs' policy-and-custom claims cannot lie against the State. Iowa and its agencies are not suable as persons under section 1983. Plaintiffs also cannot maintain claims against Bayens and Feddersen in their official capacities, yet the Complaint only alleges facts related to their official duties as supervisors. Even so, policy-and-custom claims cannot lie against Bayens and Feddersen as individuals.

Fourth, Plaintiffs' fail to state any failure-to-train-or-supervise claim, because they cannot show Baynes or Feddersen directly participated in a constitutional violation to establish individual liability—*respondeat superior* is unavailable in this context. Yet none of their subordinates violated any constitutional rights. And qualified immunity would also shield them from suit, because Plaintiffs had no clearly

6

established constitutional rights associated with the location data here.

Fifth, Defendants did not cause Plaintiffs damages. The colleges and universities suspended Plaintiffs; Defendants did not. To the extent they allege damages in or because of their criminal convictions, those claims fail under the *Heck* doctrine, because they have not shown any of those convictions were overturned.

Finally, Plaintiffs demand a civil recovery for their own criminal activity—and that's just wrong as a matter of public policy. Even if Plaintiffs rights were infringed, and even if they could link their damages to Defendants acts, they have unclean hands. "No court will lend its aid to a party who founds his claims for redress upon an illegal act." *The Fla.*, 101 U.S. 37, 43, 25 L. Ed. 898 (1879). Plaintiffs want to make bad law that rewards criminal behavior. Their Complaint should be dismissed.

## FACTS

Although Defendants recite some pleaded facts from the complaint, they do so under the standards applying to motions to dismiss; they do not concede the veracity of the alleged facts. *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (When reviewing Rule 12(b)(6) motions, courts "accept the factual allegations of the complaint as true.")

But some critical facts were missing from the Complaint—like some Plaintiffs gambling fraudulently on other peoples' online accounts to evade detection. This raises standing problems—addressed later—which doom these Plaintiffs' claims from the start. But the goal of qualified immunity is to protect Defendants not only from judgment but also from suit. *T.S.H. v. Green*, 996 F.3d 915, 918 (8th Cir. 2021). So where facts are publicly available or appear in documents contemplated by the complaint, the Court should consider them when ruling on Defendants' motion to dismiss.[1]

---

[1]When deciding a motion to dismiss, the Court may consider materials outside

## I.   **Regulatory Background.**

Online sports wagering was illegal in Iowa until just several years ago. *See, e.g.,* 2019 Iowa Acts ch. 132, § 5 (codified at Iowa Code § 99F.3). In 2019, the Iowa General Assembly legalized "[a] system of wagering on a gambling game and sports wagering" conducted by licensees under Iowa Code chapter 99F (Gambling Games and Sports Wagering Regulation). *Id.* This followed a U.S. Supreme Court ruling that invalidated a federal law that forbid states from authorizing sports gambling schemes, because it violated "the system of 'dual sovereignty' embodied in the Constitution." *New Jersey Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 458 (2018).

Under Iowa's new legislation, "[s]ports wagering" was "the acceptance of wagers on an authorized sporting event by any system of wagering as authorized by the [Iowa Racing and Gaming C]ommission." Iowa Acts ch. 132, § 3 (codified at Iowa Code § 99F.1(23)); 491 Iowa Admin. Code r. 13.1. Iowa law allowed "advance deposit sports wagering," which was "a method of sports wagering in which an eligible individual may . . . deposit moneys into [an account established with a licensee] and use the account balance to pay for sports wagering." Iowa Acts. Ch. 132, § 3 (now codified at Iowa Code § 99F.9(4)(a)(1)). And the new Iowa Code section 99F.7 authorized internet gambling as one such method.

Section 99F.7 authorized licensees to "enter into operating agreements with

_____

the pleadings that "are part of the public record or do not contradict the complaint." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)); *Illig*, 652 F.3d at 976. The court also considers those documents that are "integral to the claim[s]" or "contemplated by or expressly mentioned in the complaint" when their authenticity is unquestioned. *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013); *Porous Media Corp.*, 186 F.3d at 1079 (Courts "may consider 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1357, at 299 (1990))).

one or two entities to have up to a total of two individually branded internet sites to conduct advance deposit sports wagering for the licensee." 2019 Iowa Acts ch. 132, § 10 (codified at Iowa Code § 99F.7A(3)). The law anticipated this wagering would occur through an "internet site or mobile application." *See id.* (codified at Iowa Code § 99F.7(2)(a)–(b) (2019)). And only "individual[s] who [are] at least twenty-one years of age or older who [are] located in the state" qualified as "eligible individual[s]" who could make a sports wager. Iowa Code § 99F.9(4)(*a*)(3).

Because personal computers or smart phones essentially became the front door to the casino, unique regulatory challenges emerged, not only for the territorial boundaries of the law, but also for problems like fraud, cheating, money laundering, and others.

## II.    Regulatory Compliance and Geolocation Monitoring.

Given these regulatory challenges, the Commission placed many affirmative obligations on "advance deposit sports wagering operators [and] licensees"—which include online Sportsbooks like FanDuel and DraftKings. 491 Iowa Admin. Code r. 13.5(3). Some regulations apply to the "conduct of all sports wagering." *Id.* r. 13.2. These regulations imposed "the affirmative responsibility and continuing duty" on Sportsbooks to adopt and comply with "internal controls" and "reasonable methods" to prohibit or require several activities. *Id.* r. 13.2(7).

For example, regulations required Sportsbooks "to prohibit wagering by coaches, athletic trainers, officials, players, or other individuals who participate" along with "persons employed in a position with direct involvement" with them. 491 Iowa Admin. Code r. 13.2(7)(*a*); Iowa code § 99F.7A(4)). They required Sportsbooks "[t]o identify and suspend accounts" opened by underage persons. 491 Iowa Admin. Code r. 13.2(7)(*b*). And they required Sportsbooks "[t]o promptly report to the commission any criminal or disciplinary proceedings commenced against the licensee or its employees." *Id.* r. 13.2(7)(*c*).

9

Iowa regulations also required Sportsbooks to "promptly report to the commission. . . any abnormal wagering activity or patterns that may indicate a concern about the integrity of an authorized sporting event or events, and any other conduct with the potential to corrupt a wagering outcome of a sporting event for purposes of financial gain." *Id.* r. 13.2(7)(*d*). This could include "match fixing, and suspicious or illegal wagering activities, including the use of funds derived from illegal activity, wagers to conceal or launder funds derived from illegal activity, use of agents to place wagers, account sharing, or use of false identification." *Id.* "Integrity-monitoring procedures" required "the sharing of information" with certain entities, including "governing authorities." *Id.* And Iowa law requires the Commission to share this information "with the division of criminal investigation" and "any other law enforcement entity upon request" in addition to "any regulatory agency the commission deems appropriate." Iowa Code § 99F.12(2)(*b*).

The controls also required "[w]ritten notification" of "any incident where there is a violation involving criminal activity, Iowa Code chapter 99F, a commission rule or order, or an internal control within 72 hours of detection." *Id.* r. 13.2(7)(*e*). Rules also prohibited operators from "[p]ermitting cheating, failing to discover cheating that should have been discovered with reasonable inquiry, or failing to take action to prevent cheating." *Id.* r. 13.2(2)(*c*). And they could not deny "a commissioner or commission representative, upon proper and lawful demand, information, documents, or access to inspect any portion of the sports wagering operation." *Id.* r. 13.2(2)(*f*). Sportsbooks like FanDuel make their users aware of potential monitoring or disclosures. [App. 37, 49; *see also* DraftKings, App. 12, 13].[2]

As to advance deposit sports wagering specifically, regulations required

---

[2]The Kraft Kings Privacy Policy or Terms and Conditions often has similar language. For space and convenience, Defendants primarily discuss the FanDuel policy and provide parallel citations as appropriate. Where the information is known, the chart on pages 20–21 identifies which Sportsbook individual Plaintiffs used.

Sportsbooks to "submit controls, approved by the commission," for the "operation of an account." *Id.* r. 13.5(3). These included "[l]ocation detection procedures to reasonably detect and dynamically monitor the location of a player attempting to place any wager or perform other account activities as identified by the advance deposit sports wagering operator or licensee." *Id.* r. 13.5(3)(*b*). The Commission required "[a]ccount activity-based location detection controls" to "be informed by industry best practices and any commission guidelines for the detection of fraud [or] other unauthorized or illegal activity." *Id.* The rule required Sportsbooks to reject "[a] player outside the permitted boundary attempting to make a wager" with notice given to the player. *Id.* And it required Sportsbooks to "utilize and monitor geolocation activity to detect potential fraudulent and suspicious activity." *Id.* The rule also incorporated the same reporting requirement contained in rule 13.2(7)(*d*) above concerning "suspicious or illegal wagering activities," which the commission must ultimately share with DCI. *Id.*; Iowa Code § 99F.12(2)(*b*).

To comply with these requirements, licensed Sportsbooks in Iowa track their users' device locations through the services of a geolocation company called GeoComply. [Doc. 1 ¶¶41–44; App. 235–236]. GeoComply's technology captures a user's device location at certain intervals to ensure the device—and presumably the device user—is in Iowa when they place a wager with a Sportsbook. [App. 122, 125, 235–236, 237]. It does not continually monitor a person's device; it only records users' locations at certain intervals while their betting application is open. [*Id.*]. GeoComply's "products and services are not designed to track the general movements or record the website habits of people on the internet."[3] GeoComply obtains and verifies the physical location of users "when their geolocation products and services are used." *Id.* Gamblers voluntarily share their location data with Sportsbooks when they open their betting

---

[3]GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

applications to gamble. *Id.*; [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].

The Sportsbook may provide the GeoComply data to third-parties. [App. 11, ¶4; App. 12 ¶4; App. 39 ¶6.8]. FanDuel's User Terms and Agreements, for example, notify users of this in several ways. They advise the following:

- underage gaming and facilitating the same "will be reported to law enforcement and will be subject to other legal penalties," noting also that this is "a criminal offense;"

- certain participants are prohibited from betting: "No coach, athletic trainer, official, player or other individual who participates in an authorized sporting event may place a wager on such authorized sporting event," and "[n]o person who is employed in a position with direct involvement with coaches, players, athletic trainers, officials, athletes or participants in an authorized sporting event may place a wager on such authorized sporting event;"

- Violations will be reported: "We may refer the matter to the police, guardians or family members, or any other appropriate regulatory authority;"

- "[Users] will consent to the monitoring and recording by the IRGC[—Iowa Racing and Gaming Commission—]of any wagering communications and geographic location information;" and

- "[Users] acknowledge that BIU[—the parent company of FanDuel—]reserves the right to report unusual or suspicious activity to the proper authorities."

[App. 61].

Under the user agreements, gamblers also know they may wager only with their own accounts. Users "agree to provide accurate registration information when opening [their] account;" they "acknowledge [they] are opening a non-transferrable Account with FanDuel Sportsbook solely for [their] personal use, and are acting as a principle and not as an agent on behalf of a third party;" they agree they "will not attempt to sell or otherwise transfer the benefit of [their] Account to any third party" or "attempt to acquire an Account which has been opened in the name of a third party;" and users agree they "are not prohibited for any reason from betting with [the Sportsbook] or from using the Services." [App. 36; *see also* DraftKings, App. 22].

The user agreement also advises that BIU "may access, use, preserve, transfer

and disclose [user] information (including Device Identifiers and Personal Information) to third parties: . . . to satisfy any applicable law, regulation, subpoenas, governmental requests or legal process if in our good faith opinion such is required or permitted by law," and "to detect, prevent or otherwise address fraud, security or technical issues." [App. 130; *see also* DraftKings, App. App. 6–9, 11–13, 15].

BIU may also "use IP address or other Device Identifiers to identify users, and may do so in cooperation with third parties such as copyright owners, internet service providers, wireless service providers and/or law enforcement agencies, including disclosing such information to third parties, all in our discretion, subject to applicable law." [App. 130; *see also* DraftKings, App. 12].

The FanDuel User Agreement also discloses BIU's "location-based information" policy. This explains that they "use location-based services in order to locate you so we may verify your location," and enable targeted "content and ads based on your location" and "share your location with our vendors as part of the location-based services we offer." [App. 127; *see also* DraftKings, App. 12]. It even warns, "You should consider the risks involved in disclosing your location information to other people." [*Id.*].

BIU uses personal information collected for other reasons as well, like "manag[ing] risk, or detect[ing], prevent[ing], and/or remediat[ing] fraud or other potentially prohibited or illegal activities" and "compl[ying] with our legal and regulatory obligations," among many other business, marketing, or other purposes. [App. 129; *see also* DraftKings App. 12, 13].

## III.   Plaintiffs' Illicit Gambling Activities.

The complaint does not explain when, where, and how—indeed, even *whether*—each of the 26 named Plaintiffs placed sports wagers. And Plaintiffs omit that a subset of them fraudulently wagered on other peoples' accounts. Because Iowa law, User Agreements, and NCAA rules forbid these athletes from gambling, their

covert wagering was an obvious attempt avoid detection. Other Plaintiffs were underage or otherwise gambling illegally. Several Plaintiffs admitted these violations in their criminal cases:

- **Plaintiff Aaron Blom:** "On January 28, 2021 in Johnson County, Iowa, I placed a sports bet on a college basketball game between Texas Christian University and Kansas University in the amount of $40." [App. 144].

- **Plaintiff Arhon Ulis:** "On or about February 20, 2021, in Johnson County, Iowa, I did knowingly place bets on sporting events while under the age of 21." [App. 228].

- **Plaintiff Arland Bruce IV:** "On or about March 12, 2021, in Johnson County, Iowa, I did knowingly place bets on sporting events while under the age of 21." [App. 170].

- **Plaintiff Dodge Sauser:** "I used Amanda Sauser's DraftKings' account, with her permission, to place in excess of 100 sports wagers on DraftKings from April 21, 2022 – April 29, 2023. I was under the age of 21 for at least one of the wagers placed on Amanda Sauser's DraftKings' account. The sum total of my wagers totaled more than $3,075.00 and my wagers included four Iowa State football games I did not play in, totaling less than $100." [App. 221].

- **Plaintiff Gehrig Christensen:** "On or about November 7, 2022, in Johnson County, in the State of Iowa, Defendant did knowingly place bets on sporting events while under the age of 21." [App. 178].

- **Plaintiff Harry Bracy:** "On or about February 3, 2022, in Johnson County, Iowa, I did knowingly place bets on sporting events while under the age of 21." [App. 151].

- **Plaintiff Howard Brown:** "From the dates of October 25, 2022 to April 24, 2023 in Story County, in the State of Iowa, Defendant did knowingly place bets on sporting events while under the age of 21, and used Anthony Barner Jr.'s identity and account to place 67 sports wagers on FanDuel. The sum total of wagers totaled more then $800.00; and Mr. Brown placed one wager, as part of a parlay, on an Iowa State sanctioned sports Contest." [App. 164].

- **Plaintiff Hunter Dekkers:** "I used Jami Dekkers' DraftKings' account, with her permission, to place in excess of 250 sports wagers on DraftKings from November 7, 2021 to April 22, 2023. I was under the age of 21 for at least one of the wagers placed on Jami Dekkers' DraftKings' account. The sum total of my wagers totaled more than $2,700.00; and my wagers included a wager on Iowa State football while a member of the football team." [App. 186].

- **Plaintiff Jack Johnson:** "On or about September 3, 2021, in Johnson County, Iowa, I did knowingly place bets on sporting events while under the age of 21." [App. 203].

- **Plaintiff Jake Remsburg:** "I used Keri Meis' DraftKings and FanDuel's account, with her permission, to place in excess of 250 sport wagers on DraftKings and FanDuel. I was under the age of 21 for at least one of the wagers placed on Keri Meis' DraftKings' account. The sum total of my wagers totaled more than $1,108.00; and my wagers included six wagers on NCAA sanctioned sports contests." [App. 214].

- **Plaintiff Jeremiah Williams:** "I used Courtney martin's Fan Duel' account, with her permission, to place approximately 15 wagers on FanDuel. I was under the age of 21 at the time that I placed at least one of the wagers. The sum total of my wagers totaled more than $1,000.00. My wagers included wagers on college basketball games sponsored by the NCAA." [App. 245].

## IV.  Defendants' Investigation.

In response to the new online gambling laws, DCI created the "Sports Wagering Unit" to investigate fraud and other crimes. [Doc. ¶48, 51]. And in 2022, GeoComply became a licensed vendor in Iowa to provide Geolocation services for Sportsbooks operating within the State. [Doc. 1 ¶¶41–44; App. 235–236].[4]

In 2022, GeoComply also provided a software tool called Kibana to DCI to detect fraudulent gambling activity and review criminal or disciplinary proceedings involving licensees conducting sports wagering or advance deposit sports wagering. [App. 236; Doc. 1 ¶¶ 64–66, 68–70]. Kibana is a mapping tool that enables users to view GeoComply's time-and-location data points by displaying them on a map, showing where a gamblers device accessed the Sportsbook in the State. [App. 236]. These datapoints are anonymized—they do not reveal personal identifying information but electronic identification numbers. [*Id.*; Doc. 1 ¶76].[5] Kibana works as a filtration tool that allows users to zoom in on specific data points or draw boundaries around them to sift out surrounding data. [App. 236; Doc. 1 ¶69].

After providing the Kibana software to the DCI sports betting unit, GeoComply

---

[4]*See also* Terms and Conditions, FANDUEL, https://d38ayms4az88sz.cloud-front.net/SB/IA/2023-12-05T09-00-00.html [https://perma.cc/HA2A-E7LN].

[5]*See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN] ("Location data that GeoComply collects is depersonalized and used to verify for security and fraud risk prevention.")

provided training on it to Agent Sanger and others. [App. 237; Doc. 1 ¶¶67–68, 70]. GeoComply did not disclose any restrictions on Kibana's use during the training or require any trainee to review or sign off on any User Terms and Conditions [App. 237, ¶10].

Licensees must report—and DCI must investigate—"abnormal wagering activity or patterns that may indicate a concern about the integrity of an authorized sporting event." Iowa Code § 99F.12(2)(b). These may include "match fixing, and suspicious or illegal wagering activities, including the use of funds derived from illegal activity, wagers to conceal or launder funds from illegal activity, use of agents to place wagers, or use of false identification." *Id.* Iowa law requires the Commission to "share any information received" under this rule "with the division of criminal investigation, any other law enforcement entity upon request, or any regulatory agency the commission deems appropriate." *Id.* The Division of Criminal investigation is "the primary criminal investigative and enforcement agency for the purpose of enforcement of chapter . . . 99F." *Id.* § 80.25A.

The FanDuel User Agreements authorize the IRGC to monitor geolocation data. [App. 37].[6] The IRGC authorized DCI to review the data under Iowa Code

---

[6]The DraftKings privacy notice advises they track users' geolocation to "meet [their] legal obligations" and "prevent [their] services from being used to commit harmful or unlawful activities, including fraud." [App. 7]. They use service providers "to provide threat detection, user authentication, and fraud prevention services," "in order to monitor for potential threats and bad actors." [App. 8]. These services providers may automatically collect certain information about the users' device, including among others "[their] IP address" and the "device's unique identifiers." [*Id.*]. DraftKings advises they share information with Service Providers for a variety of other reasons as well, including geolocation, identity verification, and prevention of harmful or unlawful uses, including fraud. [App. 12]. DraftKings vendors may collect user data from DraftKings's services to provide advertising. [App. 9]. And DraftKing may collect geolocation information to determine whether the user is permitted to use their services, to comply with legal obligations, to protect their legal rights and to address disputes. [App. 9]. Users Acknowledge DraftKings may report prohibited

section 99F.12(2)(*b*). [Doc. 1 ¶¶64–66]. Plaintiffs state the initial goal was to "investigate[] various fraud organizations," which fell within IRGC's authorization under section 99F.12(2)(*b*). [Doc. 1 ¶51]. That section also seeks to ensure "the integrity of an authorized sporting event." Iowa Code § 99F.12(2)(b).

Asserting for Plaintiffs *en masse*, the Complaint alleges Agent Sanger used the GeoComply technology without a warrant to review sports betting location data at Iowa State University, University of Iowa, and other colleges. [Doc. 1 ¶¶71, 72, 74]. This review found randomized unique identifiers, which did not identify the account holders. [App. 236; Doc. 1 ¶76].[7] With these identifiers in hand, Agent Sanger and DCI then subpoenaed the Sportsbooks to identify the account holders. [Doc. 1 ¶77, Att. 237, ¶14]. DCI officials and agents then applied to the court for search warrants, and once authorized, they seized Plaintiffs' phones. [Doc. 1 ¶¶87, 88]. And after obtaining this information, prosecutors throughout the state arrested "the Plaintiffs for underage gambling and identity theft" and other crimes. [Doc. 1 ¶78, 89].

Defendants here state additional facts to illustrate in more detail an example of how the GeoComply review discovered illegal gambling activity by one plaintiff, Eyioma Uwazurike.

Agent Sanger used Kibana to view anonymized historical data points at Iowa State University Athletic Department training facilities and found data points within

---

users to an applicable sports governing body. [App. 15]. They share earnings information with taxing authorities. [App. 12]. And DraftKings advises they may "disclose personal information" in good faith "to comply with relevant laws" like gaming regulations, "to respond to discovery requests, subpoenas, or warrants served on DraftKings," "in connection with any legal investigation," to protect or defend the rights or property of [DraftKings] or [its users]," "to investigate or assist in preventing any violation or potential violation of law, this notice, or our Terms of Use," or for an emergency justifying disclosure. [App. 13].

  [7] *See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN] ("Location data that GeoComply collects is depersonalized and used to verify for security and fraud risk prevention.")

them. [App. 236, 237]. With the Kibana tool, he drew a boundary around the facilities to filter the data and include only those data points that existed in the facilities. [*Id*.]. These points exist only when a FanDuel or DraftKings application is opened, and per the above, users know the applications capture their location at these times to ensure territorial compliance. [*Id*.]

Because the Iowa State University Athletic Department training facilities do not allow unrestricted public access, only certain people can be in those facilities: only coaches, athletes, athletic trainers, officials, and players—or other employees directly involved with such individuals. [App. 237, ¶12]. Iowa law and the User Agreements forbid these individuals from sports wagering, but Agent Sanger located several data points in these secure facilities. [*Id*.].

The reason Agent Sanger viewed these historical data points was out of concern for match fixing and cheating. [App. 237, ¶13]. When he reviewed the data, he did not have specific information or tips suggesting these crimes were afoot, but given the location of the datapoints, he suspected the possibility. [*Id*.]. Due to his training and experience, Agent Sanger knew fraud is a common method of circumventing regulatory schemes like those in Iowa Code section 99F and Iowa Administrative Code rule 491–13. [*Id*.]. So Agent Sanger subpoenaed FanDuel to obtain the account information associated with the GeoComply user numbers made viewable by Kibana. [App. 237, ¶14].

In response to a subpoena for account number 1373550, FanDuel provided records for an account registered under the name, date of birth, and social security number of Rachel Francis. [App. 237, ¶15]. But the Francis account was linked to financial accounts in the name of Eyioma Uwazurike. [App. 238, ¶16] Four hundred seventy-seven deposits were made into the Francis FanDuel account from Uwazurike's financial account. [*Id*.]. Agent Sanger knew the disparity in account holders here may reveal fraud. [*Id*.].

Through further investigation, Agent Sanger discovered that Uwazurike knew Rachel Francis—his girlfriend—and she created the account for Uwazurike's use. [App. 238, ¶17]. Once made, Uwazurike was the main user of the Francis account. [*Id.*]. Although he had permission to use the account, Uwazurike directed Francis to create an account under her name—but for his use—intending to conceal his sports-betting activity. [*Id.*]. So he wagered under Francis' identification information without FanDuel's knowledge or permission in direct violation of FanDuel's Terms of Use. [*Id.*].

Most of the account's wagers were linked to Uwazurike's location and device. [App. 238, ¶18]. Agent Sanger learned through the Iowa State University Athletics website that Uwazurike played football for Iowa State University during the 2016–2022 seasons. [App. 238, ¶19]. But Iowa State and NCAA policies prohibit athletes from engaging in sports wagering on NCAA sanctioned events, including NCAA basketball and football. [App. 238, ¶20]. Iowa Code 99F.7A(4) and Iowa Administrative Code rule 13.2(7) forbid athletes from wagering through sportsbooks entirely.

Agent Sanger then subpoenaed Iowa State University for player contact information and the training materials on sports wagering given to players by Iowa State University and the NCAA. [App. 238, ¶21]. The subpoena response confirmed Uwazurike was trained on compliance with NCAA sports wagering rules. [*Id.*].

By using the Francis account, Uwazurike evaded detection from the State of Iowa, Iowa State University, FanDuel, and the NCAA. [App. 238, ¶22]. He fraudulently used Francis's information to place sports bets and obtain winnings exceeding $1,500. [*Id.*]. Uwazurike gambled on NCAA sanctioned events in violation of NCAA rules. [*Id.*]. This activity also falsified FanDuel's records, which incorrectly identified Francis as the gambler. [*Id.*]. So Uwazurike deceived not only FanDuel but any other entity inspecting the account. [*Id.*]. He sought to conceal his violations of the NCAA rules and Iowa's regulatory schemes. [*Id.*]; *see also* Iowa Code ch. 99F; Iowa Admin.

19

Code r. 13.7.

## V. Suspensions and Criminal Charges.

Plaintiffs claim they experienced various damages, mainly from suspensions. But they neglect to explain how they were suspended, who made those decisions, or how such decisions could have been controlled by Defendants. Defendants' investigations led to criminal charges, but Plaintiffs suspensions do not stem from those. Some of the criminally-charged Plaintiffs' suspensions predate their criminal charges. And some of the suspended Plaintiffs were not criminally charged at all. But in many instances, Plaintiffs fail to reveal in their complaint precisely when their suspensions began, sometimes claiming in conclusory manner it was because of the investigation and/or charges, but they reveal little else. The following chart[8] organizes some relevant facts about these Plaintiffs:

| PLAINTIFF | DATE OF CRIMINAL CHARGE | DISPOSITION | ACCOUNT |
|---|---|---|---|
| Eyioma Uwazurike | 8/1/23 | 3/1/24 – Dismissed | FanDuel Rachel Louise Francis |
| Noah Shannon | | NCAA suspension | |
| Nelson Brands | | NCAA suspension | |
| Tony Cassioppi | | NCAA suspension | |
| Jirehl Brock | 8/10/13 | 3/1/24 – Dismissed | FanDuel Lindzey Paysen |
| Hunter Dekkers | 8/1/23 | 9/9/23 – Guilty Plea | DraftKings Scott Dekkers |
| Isaiah Lee | 8/10/23 | 3/1/24 – Dismissed | FanDuel Kayla Coggeshall Cameron |
| Arland Bruce IV | 8/10/23 | 9/15/23 – Guilty Plea | DraftKings Vincent Bruce |
| Dodge Sauser | 8/1/23 | 9/7/23 – Guilty Plea | DraftKings Amanda Sauser |
| DeShawn Hanika | 8/10/23 | 10/2/23 – Dismissed | DraftKings Kim Hanika |
| Ahron Ulis | 8/1/23 | 9/18/23 – Guilty Plea | FanDuel Anton Porter |
| Aaron Blom | 3/1/23 | 9/12/23 – Guilty Plea | DraftKings Michelle Blom |
| Jack Johnson | 8/10/23 | 9/19/23 – Guilty Plea | DraftKings Jill Johnson |
| Jake Remsburg | 8/10/23 | 9/7/23 – Guilty Plea | FanDuel Keri Meis |

---

[8]Facts here come from the division of Plaintiffs' Complaint discussing allegations specific to each Plaintiff on pages 13–29, and Plaintiffs' criminal documents and guilty pleas included in Defendants Appendix supporting their Motion to Dismiss at pages 140–246.

| | | | |
|---|---|---|---|
| Jeremiah Williams | 8/18/23 | 9/20/23 – Guilty Plea | FanDuel Courtney Martin |
| Harry Bracy | 8/10/23 | 9/15/23 – Guilty Plea | DraftKings Arland Richard Bruce IV |
| Howard Brown | 8/18/23 | 9/18/23 – Guilty Plea | FanDuel Anthony Barner, Jr. |
| Keaton Anthony | | Missed game | |
| Jacob Henderson | | Missed game | |
| Gehrig Christensen | 8/1/23 | 9/12/23 – Guilty Plea | DraftKings Jill Mingles |
| Benjamin Tallman | | Missed game | |
| Abe Assad | | NCAA suspension | |
| Cobe Siebrecht | | NCAA suspension | |
| Cullan Shriever | | NCAA suspension | |
| Patrick Kennedy | | NCAA suspension | |
| Jake English | 8/24/23 | 1/24/24 – Guilty Plea | FanDuel Matt English |

## ARGUMENT

In Counts I and II, Plaintiffs do not plead any plausible claims against Jobes, Nelson, and Sanger for unreasonable search or seizure under the Fourth and Fourteenth Amendments.[9] No constitutional violation occurred. And the alleged constitutional rights were not clearly established. Plaintiffs also fail to state plausible policy-or-custom and failure-to-train-or-supervise claims against the remaining defendants in Counts III–VI. Finally, Plaintiffs' claims suffer causation problems. Some plaintiffs have no cognizable claims under the *Heck* doctrine. And Plaintiffs cannot win a civil recovery for their illegal activity.

***Motion to dismiss standard.*** Plaintiffs fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also id.* r. 8(a)(2) (Plaintiffs did not state a "claim showing that [they] are entitled to relief"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[9]"[T]he Fourth Amendment is enforceable against the States through the Fourteenth Amendment." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967). Plaintiffs do not raise any Fourteenth Amendment claims independent of the Fourth Amendment in any of their causes of action in Counts I–VI of their Complaint. Regardless, they state no plausible claim under either Amendment. Their Complaint should be dismissed entirely.

(quoting "*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But this demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* And the tenant that courts accept factual allegations as true "is inapplicable to legal conclusions." *Id.*

## I.   Plaintiffs failed to plead plausible claims against Defendants Jobes, Nelson, and Sanger in Counts I (unreasonable search) and II (unreasonable seizure).

### a.   Plaintiffs lack standing to allege a constitutional violation.

To evade detection, some Plaintiffs admit they used other peoples' gambling accounts to place sports bets online. [App. 144, 151, 164, 170, 178, 186, 203, 214, 221, 228].[10] They had no reasonable or actual expectation of privacy in gambling accounts they didn't own. So inspection of these third-party accounts did not invade their personal privacy rights, and they lack standing to challenge the alleged acts. The remaining Plaintiffs do not establish a privacy expectation in any accounts used. They lack standing, too.

Standing generally "involves two inquiries: first, whether the proponent of a particular legal right has alleged 'injury in fact,' and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties." *Rakas v. Ill.*, 439 U.S. 128, 139 (1978). The exclusionary rule enforces these rights where people have a reasonable expectation of privacy, but "only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968).

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *Rakas,* 439 U.S. at 133; *Presley v. United States*, 895 F.3d 1284, 1289 (11th

---

[10]Where known, the chart on pages 20–21 shows which Plaintiffs used other people's online Sportsbook accounts to place bets.

Cir. 2018)) ("Privacy is personal," so "Plaintiffs must demonstrate that their own privacy rights are at stake"); *Crosby v. Paulk*, 187 F.3d 1339, 1345 n.10 (11th Cir. 1999)) (Plaintiffs may not "assert[] Fourth Amendment rights of third parties who were subject to searches."); *see also U.S. v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) ("An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1988))). And people have no "reasonable expectation of privacy in another's belongings." *Lenz v. Winburn*, 51 F.3d 1540, 1549 (11th Cir. 1995).

"A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. So "[i]f a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Barragan*, 379 F.3d at 529–530 (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

Aware they were violating NCAA rules, some Plaintiffs used others' people's gambling accounts to place bets and avoid detection. [App. 144, 151, 164, 170, 178, 186, 203, 214, 221, 228]. Even with their own accounts at stake, Plaintiffs had no reasonable expectation of privacy in location data they voluntarily shared with third parties, especially because they consented to disclosure of that information to the government or law enforcement. [App. 36; *see also* DraftKings, App. 9, 11–13]. No Fourth Amendment search occurred. But Plaintiffs lack standing to challenge geolocation monitoring of other people's accounts at the outset—even if that monitoring were a "search."

These standing principles apply to digital accounts. Parties have no privacy interests in digital accounts they don't own, so courts dismiss these challenges for

lack of standing. *United States v. Davis*, No. 21-cr-0101, 2022 WL 3009240, at *7–8 (M.D. Ala. July 1, 2022) (where Google gave to police "identifying account information for a Gmail account that did not belong to" the defendant, but belonged to another person's device in the defendant's getaway car, the defendant lacked standing to challenge the search, because he didn't show his "own privacy rights [were] at stake."). And this avoids the "quagmire" of Fourth Amendment questions plaguing this evolving area of law. *Id.*

Plaintiffs fail to plead "a sufficiently close connection" to the accounts Defendants monitored to prove standing. *Barragan*, 379 F.3d at 529–530 (quoting *Gomez*, 16 F.3d at 256). Plaintiffs cannot assert privacy interests vicariously. *Rakas*, 439 U.S. at 133.

Also, when someone disassociates himself from property, they lose standing to challenge a search of that property. *U.S. v. Boruff*, 909 F.2d 111, 116 (5th Cir. 1990). Plaintiffs here "did everything [they] could to disassociate [themselves] from the" accounts to mask their illicit conduct. [App. 144, 151, 164, 170, 178, 186, 203, 214, 221, 228]. This voluntary denial of ownership "forfeit[ed] any reasonable expectation of privacy in [the accounts]." *U.S. v. Magnum*, 100 F.3d 164, 170 (D.C. Cir. 1996) (Defendant "disclaimed ownership of [a] bag" and so "abandoned" his property and waived any legitimate privacy interest in it"); *see also U.S. v. Green*, 275 F.3d 694, 699 (8th Cir. 2001) (Defendant could not "show any possessory or privacy interest in" another person's car, and, "[i]n fact, he ha[d] denied such an interest").

And expectations of privacy are even lower when a person is not "'legitimately on [the] premises'" of another's property. *See U.S. v. Douglas*, 774 F.3d 1065, 1070 (8th Cir. 2014) (quoting *Rakas*, 439 U.S. at 148)); *Cross v. Mokwa*, 547 F.3d 890, 894 n.4 (8th Cir. 2008) ("A person who is 'wrongfully on the premises' may not object to the legality of a search." (citation omitted)). But even where there is "common authority" and "mutual use of [] property," owners are "held to have a lower expectation of

privacy in the area searched." *U.S. v. Risse*, 83 F.3d 212, 216 n.3 (8th Cir. 1996). Yet here, some Plaintiffs weren't even the owners of the accounts. [App. 144, 151, 164, 170, 178, 186, 203, 214, 221, 228]. And they fail to show they enjoyed a "right to exclude" or had lawful possession, control, ownership, or other legitimate privacy interests in in these third-party accounts. *See Byrd v. U.S.*, 584 U.S. 395, 406 (2018).

Next, the other Plaintiffs did not identify the accounts they used or that Defendants monitored. They have not shown a sufficient privacy expectation in these accounts. And they allege only "privacy interest in the phones" that would be "protected by *Carpenter v. U.S.*, 585 U.S. 296 (2018)." [Doc. 1 ¶249]. But the below analysis will show Plaintiffs had no *Carpenter*-protected privacy interest in voluntarily shared location data. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].

Without "a sufficiently close connection to the" accounts, Plaintiffs lack "standing to claim [the accounts and location data] were searched or seized illegally." *Douglas*, 744 F.3d at 1071 (quoting *Barragan*, 379 F.3d at 529–530). Plaintiffs cannot maintain this action against Jobes, Nelson, and Sanger without standing to allege a Fourth Amendment violation. *See Mokwa*, 547 F.3d at 894 n.4.

### b. Plaintiffs failed to plead or establish (1) a violation of a constitutional or statutory right that was (2) clearly established.

Geolocation monitoring here was not a Fourth Amendment Search. But even if it was, it was permissible. Yet no clearly established law says otherwise, so Jobes, Nelson, and Sanger are immune from suit. "[G]overnment officials performing discretionary functions [are entitled to] a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

"State actors are entitled to qualified immunity from suits under 42 U.S.C. § 1983 'unless (1) they violated a federal statutory or constitutional right, and (2) the

unlawfulness of their conduct was 'clearly established at the time.'" *T.S.H.*, 996 F.3d at 918 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 23, 236 (2009). Courts may evaluate the prongs in any order. *Pearson*, 555 U.S. at 236. These are "purely legal" questions that should be resolved "at the earliest stage in the litigation" in Defendants' favor. *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023) (quoting *Pearson*, 555 U.S. at 232).

### i. Plaintiffs failed to plead a constitutional violation; their claims in Counts I and II against Jobes, Nelson, and Sanger fail.

Even where Plaintiffs used their own gambling accounts, they had no reasonable expectation of privacy in the location data they voluntarily shared to gamble online. [App. 6, 9, 11–13, 37, 49, 122, 125, 130, 235–236, 237].[11] Monitoring of that data was not a Fourth-Amendment "search." For many reasons, Plaintiffs cannot establish a constitutional violation:

- Plaintiffs had no reasonable or actual expectation of privacy in their location data.
- Narrow technological surveillance of voluntarily-shared location and movement data is not a Fourth Amendment "search."
- Under the Third-Party Doctrine, Plaintiffs have no reasonable expectation of privacy in location data they voluntarily gave to third-parties.
- The data review here was not like the search of mass-collected, Cell-Site Location Information ("CSLI") in *Carpenter v. U.S.*; this case is distinguishable, and the third-party doctrine applies.
- An inspection of voluntarily-provided location data is not a typical Geofence search.
- No Defendant conducted a warrantless search of a cellphone.
- The review of location data here was analogous to a search of an open field; no warrant was required.
- Even if a search occurred, "special needs" justified a departure from the

---

[11]*See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

warrant requirement.

- Defendants did not seize Plaintiffs' location data, and they later seized the cell phones in good-faith reliance on valid warrants.

- Plaintiffs waived a Fourth Amendment challenge, because they consented to the review and disclosure of their location data.

Counts I and II must be dismissed.

**1. Fourth Amendment "searches"—general principles; Plaintiffs had no reasonable or actual expectation of privacy in their location data.**

No Fourth-Amendment "search" occurred here, so Defendants did not violate Plaintiffs' constitutional rights. Only when a person has an "expectation of privacy" that "society is prepared to recognize as reasonable" do government intrusions into that sphere "qualify as a search," requiring a warrant supported by probable cause. *Smith v. Md.*, 442 U.S. 735, 740, 746 (1979). This is an objective inquiry. *Id.* at 740. But the party must subjectively "seek[] to preserve [something] as private" as well. *Id.* Plaintiffs had no expectation objectively or subjectively.

Historically, the fourth amendment protects "the privacies of life" against "arbitrary power" in order "to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305. It braced against "arbitrary invasions by government officials" into "the privacy and security of individuals," especially from "the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.'" *Id.* at 303 (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)).

But the location data review here was nothing like that. Plaintiffs knowingly and voluntarily shared their location data with third parties to gamble online. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].[12] They also authorized disclosure of that data to the government or law enforcement, either explicitly or implicitly. [App. 130; *see also* DraftKings, App. 7–9, 11–13, 15]. And the third-party doctrine defeats

---

[12]*See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

Plaintiffs claims.

Although the Supreme Court declined to extend the third-party doctrine to mass-collected, Cell Site Location Information ("CSLI") automatically generated by cell phones in *Carpenter v. U.S.*, 585 U.S. 296 (2018), this case is distinguishable. It lies at the intersection of two streams of authority—location/movement tracking authorities and third-party doctrine authorities—but it falls outside the *Carpenter* exception.

The following will analyze these authorities first and then show the *Carpenter* exception does not reach user generated location information—like the data here; so the third-party doctrine applies. Plaintiffs had neither an objective nor a subjective expectation of privacy in their location data.

Finally, aside from certain conclusory references to Defendants' "improper use of GeoComply," [*E.g.*, Doc. 1 ¶40], Plaintiffs' complaint focuses on the actions of Defendant Sanger. [Doc. 1 ¶¶72–80]. Specific unconstitutional acts alleged against Defendants Jobes and Nelson are less clear. But no Defendant violated Plaintiffs' constitutional rights.

**2. Narrow technological surveillance of voluntarily disclosed location and movement data is not a Fourth Amendment Search.**

Plaintiffs had no reasonable expectation of privacy in their location data here. When "voluntarily conveyed to anyone who want[s] to look," people generally lack a privacy interest in their physical location and movements. *See United States v. Knotts*, 460 U.S. 276 at 287. This is especially so when location and movements occur in public spaces. *Id.* at 281–82.

But Plaintiffs have revealed neither their locations nor their privacy interest in them at the time they access the online Sportsbooks. And that matters. But their voluntarily disclosures of their locations to online Sportsbooks only diminished their expectations of privacy further.

Even where police surreptitiously track someone's movements, they do not intrude on a Fourth Amendment privacy interest. In *United States v. Knotts*, 460 U.S. 276, 277–280 (1983), police tracked a defendant's interstate movements by monitoring the signal of a discretely planted beeper in a container placed in his vehicle. Police there "relied not only on visual surveillance, but on the use of the beeper to signal the" defendant's presence. *Id.* at 282. But the Court held "[n]othing in the Fourth Amendment prohibited the police from augmenting the[ir] sensory faculties" with the "enhancement as science and technology afforded them." *Id.*

So *Knotts* involved (1) a surreptitiously planted beeper, (2) without the defendant's knowledge or (3) consent, which (4) continuously tracked the Defendant's location (5) over a long course of travel. That was constitutional. But it was more invasive than the alleged "search" here.

In this case, Plaintiffs (1) voluntarily (2) shared their location data to (3) comply with territorial gambling regulations, while (4) knowingly (5) consenting to monitoring by third parties and disclosure to the government, plus (6) the location data was not continually collected but (7) only recorded at certain intervals while the betting application was open. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].[13] The "enhancement" that "science and technology afforded" the officers here was far less suspect than the secret tracking in *Knotts*.

Unlike *Knotts* and this case, continual, long-term tracking can raise privacy concerns. *United States v. Jones*, 565 U.S. 400, (2012). In *United States v. Jones*, the FBI remotely tracked the movements of the defendant's vehicle with a GPS tracking

---

[13]*See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN] ("Location data that GeoComply collects is depersonalized and used to verify for security and fraud risk prevention. . . . Our products and services are not designed to track the general movements or record the website habits of people on the internet. . . . When our geolocation products and services are used, we obtain and verify the physical location of where users are for customers.")

device for 28 days. *Id.* Although the majority focused on physical trespass, 565 U.S., at 404–405, five concurring Justices questioned continual tracking of a device like a cell phone, because it captures "every movement" someone makes, and "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.* at 415 (Sotomayor, J., concurring), *id.* at 430 (Alito, J. concurring).

But this case involves no continual monitoring. GeoComply registers a person's location only at certain intervals while the betting application is open. [App. 122, 125, 235–236, 237].[14] That is when their location matters legally—they must be in the State to gamble online. It does not record people's "every movement." The data collected is narrow—its sweep is not unnecessarily broad to "impinge on expectations of privacy;" it only snapshots user locations while their betting applications are open. [*Id.*]. And this case involves no heightened Fourth Amendment concern raised by physical trespass. *See Jones*, 565 U.S., at 404–405. And Plaintiffs do not sufficiently plead any expectation of privacy in their locations at the time they were gambling.

**3. The third-party doctrine defeats Plaintiffs' claims.**

Plaintiffs also have "no legitimate expectation of privacy in information [they] voluntarily turn[ed] over to third parties." *Smith*, 442 U.S. at 743–744. That is so "even if the information is revealed on the assumption that it will be used only for a limited purpose." *United States v. Miller*, 425 U.S. 435, 433 (1976). Plaintiffs have not shown they had a subjective expectation of privacy in their location data when gambling online; but even if they did, it was not "one that society is prepared to recognize as 'reasonable.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)).

Sharing information with third parties defeats an objectively reasonable

---

[14]*See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN] (location verification occurs "when [GeoComply's] geolocation products and services are used," which "are not designed to track the general movements" of users).

expectation of privacy in that data. In *United States v. Miller*, the Supreme Court rejected a Fourth Amendment challenge where the government subpoenaed the defendant's bank for copies of his checks and bank records to investigate fraud and tax evasion. 425 U.S. at 436–437. These records were not "private papers" the defendant placed into "a constitutionally protected area." *Id.* at 440 (quoting *Hoffa v. United States*, 385 U.S. 293, 301–302 (1966)). The defendant could "assert neither ownership nor possession" over the documents; they were instead "business records of the bank." *Id.* The records were "not confidential communications but negotiable instruments to be used in commercial transactions." *Id.* at 442.

Further, the documents all "containe[ed] only information voluntarily conveyed to the banks," which were "exposed to their employees in the ordinary course of business." *Id.* So the defendant had "tak[en] the risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the government." *Id.* at 443.

That assumption of risk was far more obvious here where Plaintiffs consented in writing to their location data and communications being monitored by third-party Sportsbooks and others and disclosed to the government or law enforcement. [App. 49; see also *DraftKings*, App. 9, 11–13]. Especially where sharing location data is a legal prerequisite for online gambling, the gambler assumes the risk that their data will be shared with law enforcement, even without explicit, contractual agreements. Yet the User Agreement here even warn users of the risk. [*Id.*] *Miller* also shows Plaintiffs have diminished expectations of privacy in business records and commercial transactions, which are analogous to the data inspected in this case.

Likewise, in *Smith*, 442 U.S. at 736, the Supreme Court held the warrantless installation of a pen register—a device that surreptitiously recorded the number dialed on a telephone—was not a Fourth Amendment "search." Because telephone users know they must "'convey' [the] phone numbers" they dial to third parties—

telephone companies—they entertain no "actual expectation of privacy in the numbers they dial." *Id.* at 742. Phone users are subjectively aware this data is used for several purposes by the third-party company, including billing, detecting fraud, preventing violations of law, and keeping records of toll calls, among others. *Id.*

And objectively, people have "no legitimate expectation of privacy in information [they] voluntarily turn[] over to third parties." *Id.* at 743–44. Following *Miller*, the court held the defendant "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business," and thereby "assumed the risk that the company would reveal to police the numbers he dialed." *Id.* at 744.

Like numbers voluntarily conveyed to a phone company, Plaintiffs' location data enabled the services of a third-party, and Plaintiffs knew these third-party companies used this data for several purposes, including legal compliance. [App. 9, 11–13, 49]. And even if they hadn't consented to that data being monitored by—or disclosed to—the government, they "assumed the risk that the [online sportsbooks] would reveal to police the" location data they shared. *Id.* at 744; *cf United States v. Shipton*, 5 F.4th 933, 936 (8th Cir. 2021). They had no objective or subjective expectation of privacy.

### 4. Defendants here did not conduct a CSLI search like the officers in *Carpenter v. United States*; the third-party doctrine applies.

The data review here was not a search of involuntarily collected Cell-Site Location Information ("CSLI"), which can invade certain expectations of privacy under *Carpenter v. United States*, 585 U.S. 296 (2018), because of the expansive and involuntary nature of its collection. This case rather involves voluntarily shared location data. That is more like User Generated Location Information ("UGLI"), which does not trigger the privacy concerns assessed in *Carpenter*. *See United States v. Bledsoe*, 630 F.Supp.3d 1, 8–17 (D.D.C. 2022). This case does not come within *Carpenter's*

narrow holding; the third-party doctrine applies and defeats Plaintiffs' claims.

**A. *Carpenter's* holding was narrow and concerned only sweeping police reviews of CSLI, which is generated automatically, shared involuntarily, and collected on a mass scale.** *Carpenter* held states do not have "unrestricted access to a wireless carrier's database of physical location information." 585 U.S. at 320. A State's access to these historical records—when they "provide a comprehensive chronicle of the user's past movements"—amounts to a "search" under the Fourth Amendment. *Id.* at 300.

But this case doesn't involve that. Plaintiffs voluntarily shared their location data with third-party Sportsbooks to comply with territorial gambling regulations. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237]. For many reasons, this is unlike the search in *Carpenter*.

Voluntarily shared location data does not implicate the privacy concerns of the CSLI in *Carpenter*. Under the above, there is little expectation of privacy in a person's location and movements made available to "anyone who wanted to look." *Knotts*, 460 U.S. at 281. But further, neither the GeoComply technology nor the Sportsbook applications amount to "almost a 'feature of human anatomy.'" *Id.* at 311 (quoting *Riley*, 573 U.S. at 385). They do not "track[] nearly exactly the movements of its owner," *id.* at 311, but only very specific location snapshots, and only at specific intervals while the betting application is open on a device. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].[15]

Defendants did not access a wireless company's "deep repository of historical location information at practically no expense" to "achieve[] near perfect surveillance," like attaching "an ankle monitor to the phone's user." *Id.* at 311–312. Voluntary location disclosures through online Sportsbooks are nothing like "being tailed

---

[15]*See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

every moment of every day for five years," where the police may "call upon the results of that surveillance" at any time. *Id.* at 312. Defendants did not reconstruct a complete "record of [Plaintiffs'] physical movements as captured through CSLI." *Carpenter*, 585 U.S. at 309–10.

These are not "location records [that] 'hold for many Americans the "privacies of life."'" *Id.* (quoting *Riley*, 573 U.S. at 403). No "time-stamped data provides an intimate window into [Plaintiffs'] li[ves], revealing not only [their] particular movements, but through them [their] 'familial, political, professional, religious, and sexual associations.'" *Id.* (quoting *Jones*, 565 U.S. at 415). The data here is not a "chronicle [people's] past movements through [a] record of [their] cell phone signals" captured on a society-wide scale, *id.* at 305, 309, but location snapshots at specific intervals only when a gambling application is open on a device. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].[16]

The location data is not "continually logged for all of the 400 million devices in the United States," amounting to a "tracking capacity [that] runs against everyone." *Carpenter*, 585 U.S. at 312; [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237]. Cellphones are a ubiquitous feature of modern life; online Sportsbooks are not. The location data here is voluntarily shared by the subset of the population who chooses to gamble online in the state of Iowa and only at certain intervals when their betting applications are open. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].

The CSLI in *Carpenter* was generated automatically, inescapably, and therefore involuntarily. *Id.* at 315. But Plaintiffs' voluntary disclosure of their location

---

[16]GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN]. ("Location data that GeoComply collects is depersonalized and used to verify for security and fraud risk prevention. . . . Our products and services are not designed to track the general movements or record the website habits of people on the internet. . . . When our geolocation products and services are used, we obtain and verify the physical location of where users are for customers.")

information is limited, controlled by the user, and voluntary. The nature and limits of the data collection here are more like *Smith* (pen registers) and *Miller* (banking records) than *Carpenter*. "There is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today." *Carpenter*, 585 U.S. at 314.

Carpenter itself recognized the distinction this case presents: *Carpenter* held it was not a case "about 'using a phone' or a person's movement at a particular time"— that's *this* case. 585 U.S. at 315. Instead, *Carpenter* was "about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id.* Indeed, "[s]uch a chronicle implicates privacy concerns far beyond those considered in *Smith* and *Miller*." *Carpenter*, 585 U.S. at 315. "[T]he deeply revealing nature of CSLI, its depth, breath, and comprehensive reach, and the inescapable and automatic nature of its collection" distinguish it from the voluntary disclosures here.

**B. Courts do not apply Carpenter's *holding to voluntarily shared location information.*** In *United States v. Bledsoe*, the District Court for the District of Columbia assessed the scope of Fourth Amendment interests "in non-content information derived from user-generated content of a highly public event that reveals . . . user-generated location information ("UGLI")." 630 F.Supp.3d at 9. Without a warrant, police there acquired identification information on Facebook accounts belonging to people who live-streamed or posted content on Facebook while storming the U.S. Capitol building during the January sixth riots. *Id.* at 3. The narrow holding of *Carpenter* did not apply; no Fourth-Amendment search occurred. *Id.* at 8–17.

Bledsoe distinguished *Carpenter* at length and emphasized the limited scope of its holding. *Bledsoe* observed *Carpenter* assessed not only "the act of sharing" under the third-party doctrine, but also the "nature of the particular document sought" in determining whether a legitimate expectation of privacy attached to its contents. *Id.*

at 11. And unlike the limited disclosures of personal information in UGLI, the CSLI in *Carpenter* gave "a detailed chronicle of a person's physical presence complied every day, every moment, over several years." *Id.* But UGLI, like the data disclosures here, lack the "comprehensive and intimate nature" of CSLI, which enables "a much deeper intrusion into an individual's privacy than previous third-party doctrine cases." *Id.*

And the act of "sharing" in prior third-party cases involved "voluntary exposure," which *Carpenter* "found to be absent in the context of CSLI records." *Id.* "[T]he nature of the activity" that generates CSLI is involuntary, because cell-phones generate the "cell-site records 'without any affirmative action on the part of the user beyond powering up.'" *Id.* (quoting *Carpenter*, 585 U.S. at 315). So "[u]sers cannot voluntarily assume the risk of exposure of the location information when its generation is essential, automatic, and inescapable." *Id.* at 11–12. That is unlike the voluntary disclosures here and with other UGLI. *Carpenter's* holding was "a narrow one" and it was "context-specific," "even in cases involving CSLI." *Id.* at 12.

And *Bledsoe* highlighted the key distinction between this case and *Carpenter*: "the information at issue here is affirmatively and voluntarily generated by the user, not automatically and unavoidably created simply by powering up a cell phone." *Id.*; [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].[17] Specifically, "[t]he volitional aspect of the UGLI data at issue in this case 'places the conduct into the heartland of the third-party doctrine.'" *Bledsoe*, 630 F.Supp.3d at 9. Plaintiffs here voluntarily shared their locations by opening their online Sportsbooks.

"Facebook's Data Policy" further diminished reasonable expectations of privacy, and it warned users that Facebook will "access, preserve and share information when [it] has a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect [Facebook], [the user] and others, including as

---

[17]GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

part of investigations; or to prevent death or imminent bodily harm." *Id.* at 16. "By agreeing to Facebook's Data Policy, defendant voluntarily 'assumed the risk' that the company's records 'would be divulged to police' should Facebook have a good faith belief that such disclosure is necessary to address illegal activity." *Id.* Under materially similar language in the Sportsbooks' User Agreements here, Plaintiffs assumed the same risk that their location information would be disclosed to law enforcement. [App. 9, 11–13, 49].

"The third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another." *Carpenter*, 585 U.S. at 314. Plaintiffs knowingly and voluntarily shared their location data with third-parties and consented to its disclosure to the government or law enforcement. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237]. This case is distinguishable from *Carpenter*; the third-party doctrine applies.

### 5. Defendants did not conduct a typical geofence search.

This case also does not involve a typical geofence search of CSLI. Those are searches under "geofence warrants," which "authorize[] the seizure of location data collected from smartphones of individuals within a particular area over a specified range of time." *United States v. Rhine*, 652 F.Supp.3d 38, 66 (D.D.C. 2023). It is a search of CSLI or other location data (like "Google Location History") mass collected from smart phones, *id.* at 67, which gives law enforcement access to all recorded location data within the specified temporal and geographic boundary. *Id.* at 77–78. And it is a "sweeping search[]" of that mass-collected data. *United States v. Kirkendoll*, 2024 WL 1016049, at *1 (D.N.M. Mar. 8, 2024) ("Geofencing is a process whereby law enforcement 'specifies a location and period of time, and, after judicial approval, companies conduct sweeping searching of their location databases and provide a list of cell phones and affiliated users found at or near a specific area during a given timeframe[.]'" (quoting Note, *Geofence Warrants and the Fourth Amendment*, 134

HARV. L. REV. 2508, 2509 (2021))).

The above *Carpenter* analysis applies and needn't be repeated. No Defendant accessed sweeping, mass-collected data to reconstruct a complete picture of anyone's movements. This case is distinguishable.

This case also does not involve the geofence warrant concerns. The "technological advances" in "expanded law enforcement surveillance capabilities" combined with "corporate data collection practices" raise special Fourth Amendment issues. *Rhine*, 652 F.Supp.3d at 66. But voluntarily provided location disclosures from individual users are unlike sweeping police reviews of historic, mass-collected location data. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].

Geofence warrants can be overbroad and lack particularity by, among others, authorizing a search of location data for persons other than the target subject with unnecessarily large time and location parameters. *Rhine*, 652 F.Supp.3d at 73–77. The "geofence boundary" can "potentially include the data for cell phone users having nothing to do with the alleged criminal activity." *Id.* at 79 (quoting *In re Search of Info. That is Stored at the Premises Controlled by Google ("Kansas")*, 542 F.Supp.3d 1153, 1158 (D. Kan. 2021)).

That's not this case. Online Sportsbook users purposely disclose their location data when they gamble; the data is not passively and inescapably shed from their phone, mass-collected by tech and wireless companies, and then retrieved and searched by law enforcement. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].[18] The location data here is individual to the user who gambles; GeoComply does not collect location data on all cell phones. [*Id.*]. And the location data here is captured only at the relevant time when gamblers have betting applications open; GeoComply does not continuously capture location data like tracking an ankle monitor. [*Id.*].

---

[18]GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

**6. No Defendant conducted a warrantless search of a cellphone or accessed private personal information.**

This case is also unlike the cell phone search in *Riley v. California*, 573 U.S. 373 (2014). This case concerns voluntarily shared location data, disclosed to third-party Sportsbooks to enable online gambling; *Riley* involved unconsented, wholesale rummaging through a phone's contents incident to an arrest. *Id.* at 378–380.

*Riley* held "officers must generally secure a warrant before" searching a cell phone incident to an arrest. *Id.* But that was based on privacy concerns not implicated here. *Riley* observed that cell phones differ quantitatively and qualitatively from inspecting the physical "contents of an arrestee's pockets." *Id.* at 395. They have "immense storage capacity" that "collects in one place many distinct types of information," and "[t]he sum an individual's private life can be reconstructed through a thousand photographs" and other data stored on the phone. *Id.* at 393, 394. Because cell phones "hold for many Americans 'the privacies of life,'" the Court's "answer to the question of what police must do before searching a cell phone seized incident to an arrest [was] simple—get a warrant." *Id.* at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 625 (1886)).

But that is quantitatively and qualitatively different from the voluntary location disclosures here. [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237]. No Defendant rummaged through a vast store of information reflecting Plaintiffs' "privacies of life" without a warrant. *Riley*, 573 U.S. at 403. *Riley's* rationale does not extend to this case.

**7. Regardless of whether a "search" occurred, once provided to third-party companies, Plaintiffs location data was in an unprotected digital space.**

The review of Plaintiffs location data here was analogous to a search of an "open field." "The Fourth Amendment protects the curtilage of an individual's residence, but not surrounding open fields." *U.S. v. Mathias*, 721 F.3d 952, 955 (8th Cir.

2013) (quoting *United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006)). "Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (quoting *Boyster*, 436 F.3d at 991).

Although Plaintiffs did not plead facts about their locations when they gambled, Plaintiffs nevertheless placed their location data outside of any protected "curtilage." To gamble, they put their location in the open. That is a digital space that no reasonable individual could expect "should be treated as the home itself." *Id.* at 956 (quoting *United States v. Dunn*, 480 U.S. 294, 304 (1987)). Any inspection of the digital space created by GeoComply resembled a search of an open field where Fourth Amendment protections do not extend.

**8. No warrant was required for a search and seizure of location data; gambling is a closely regulated industry, which lessens expectations of privacy.**

Regardless of whether Defendants acts amounted to a "search," "special needs" would justify a departure from the warrant requirement here. The Supreme Court allows exceptions to the warrant requirement when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 350 (1985) (Blackmun, J. concurring).

A State's "supervision of a regulated industry" is such a "special need" that allows "in certain circumstances government investigators [to] conduct[] searches pursuant to a regulatory scheme," without "warrant or probable-cause requirements so long as their searches meet 'reasonable legislative or administrative standards.'" *Griffin v. Wis.*, 483 U.S. 868, 873 (1987) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967)); *see also New York v. Burger*, 482 U.S. 691, 702–703 (1987); *Donovan v. Dewey*, 452 U.S. 594, 602 (1981); *United States v. Biswell*, 406 U.S. 311, 316 (1972). "[T]he Fourth Amendment does not proscribe all searches and seizures,

but only those that are unreasonable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989). "When faced with special needs, [the Supreme Court] has not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Id.* at 619–620.

Because "[s]earches of this sort can affect an infinite number of people and places," *Rivera-Corraliza v. Morales*, 794 F.3d 208, 216 (1st Cir. 2015), Courts look for certain criteria to ensure the warrantless inspection is reasonable under the Fourth Amendment. *Burger*, 482 U.S. at 702.

But here, as reflected in the user agreements and privacy policies, Sportsbooks either explicitly or implicitly allowed the IRGC or the government to monitor geolocation data. [App. 6–9, 11–13, 15, 37, 49, 122]. Iowa law requires the IRGC to disclose to DCI "abnormal wagering activit[ies] or patterns that may indicate a concern about the integrity of an authorized sporting event." Iowa Code § 99F.12(2)(b). And the IRGC authorized DCI to review data under Iowa Code section 99F.12(2)(*b*). [Doc. 1 ¶64–66].

Consent dispenses with the warrant requirement. *See, e.g., U.S. v. Mendoza-Gonzalez*, 363 F.3d 788, 795 (8th Cir. 2004) (warrants are unnecessary when persons voluntary consent to a search). But the *Burger* test factors that courts assess under the special-needs doctrine arrive at the same result.

**A.** "First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* In our context here, "[t]he regulation of gambling enterprises lie at the heart of the state's police power." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999). "Formulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens." *Id.* "The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens." *Id.*

41

"State gaming policies reflect a delicate trade-off between the economic boon of increased tax revenue and enhanced employment on the one hand and the risk of moral rot, human exploitation, and political corruption on the other." *Id.*

So the Commission's policy is "to require that all industry participants conduct sports wagering in a manner suitable to protect the health, safety, morals, good order, and general welfare of the state." 491 Iowa Admin. Code r. 13.2(1) "Responsibility for selecting, implementing, and maintaining suitable methods of operation rests with the facility, vendor, and advance deposit sports wagering operator." *Id.* "Willful or persistent use or toleration of methods of operation deemed unsuitable in the sole discretion of the commission will constitute grounds for disciplinary action, up to and including revocation." *Id.*

Reporting requirements aim to ensure "the integrity of an authorized sporting event or events," keeping the wagering enterprise free of corruption, and promoting "proper standards of custom, decorum, and decency" to avoid "any type of conduct that reflects negatively on the state or commission or acts as a detriment to the sports wagering industry." *Id.* r. 13.2(2)(*d*); *id.* r. 13.2(7)(*d*).

The unique enterprise of sports wagering presents "special needs" that go "beyond normal law enforcement." *Cf. Skinner*, 489 U.S. at 620. Substantial government interests inform Iowa Code chapter 99F and Iowa Administrative Code chapter Code 491–13; *Morales*, 794 F.3d at 220 (1st Cir. 2015) (finding gambling regulations serve an important state interest).

**B.** "Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme.'" *Burger*, 482 U.S. at 702. As to this factor, courts recognize the warrant requirement can frustrate the goals of a regulatory scheme "to detect and thus to deter safety and health violations." *Id.* at 702–703. That frustration of purpose can negate the warrant and probable cause requirements. *See id.* Indeed, to "serve as a credible deterrent," inspections may need to be "unannounced, even frequent." *Id.*

at 710 (quoting *Dewey*, 452 U.S. at 600).

Here, rules include many reporting requirements and forbid licensees from denying lawful demands for review of certain information. *See, E.g.,* 491 Iowa Admin. Code r. 13.2(2)(*f*); *id.* r. 13.2(2)(7)(*d*). For example, the Commission requires licensees to implement "internal controls" that report "suspicious or illegal wagering activities" and include "integrity-monitoring procedures" that require the "sharing of information" with "governing authorities." 491 Iowa Admin. Code. r. 13.2(7).

Administrative rule 13.5—which governs advance deposit sports wagering—incorporates this reporting requirement for licensees and requires geolocation monitoring to "detect potential fraudulent and suspicious activity." *Id.* r. 13.5(3)(b). Iowa law then requires the Commission to share this information "with the division of criminal investigation." Iowa Code § 99F.12(2)(b). In apparent compliance with these sections, Sportsbooks' user agreements either explicitly authorize or acknowledge geolocation monitoring by the IRGC or otherwise warn users their data may be disclosed to government or law enforcement. [App. 6–9, 11–13, 15, 37, 49, 122].

These requirements help to protect not only the wagering enterprise from corruption but also "the integrity of an authorized sporting event or events." 491 Iowa Admin. Code. r. 13.2(7)(*d*). They also promote "proper standards of custom, decorum, and decency" to avoid "any type of conduct that reflects negatively on the state or commission or acts as a detriment to the sports wagering industry." *Id.* r. 13.2(2)(*d*); *id.* r. 13.2(7)(*d*). Well-regulated and well-monitored online gambling can deter the "moral rot, human exploitation, and political corruption" that can assail the "quality of life" of Iowa citizens because of gambling. *Johnson*, 199 F.3d at 720.

But a warrant requirement would interfere with these goals. Due to the elusive and disbursed nature of online gambling, authorities would rarely have sufficient reasonable suspicion or probable cause for a warrant to look for "abnormal wagering activity or patterns" to address the "concern about the integrity of an authorized

sporting event." Iowa Code § 99F.12(2)(b). And Licensees could disregard internal controls and integrity-monitoring regulations undetected while the wagering enterprise suffers corruption.

*C.* The final *Burger*-test factor requires "the statute's inspection program, in terms of the certainty and regularity of its application, [to] provid[e] a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702. This means "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id. at 703.*

To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 703 (quoting *Dewey,* 452 U.S., at 600). As to this pervasiveness factor, in *United States v. Burger*, the Supreme Court held a junkyard was closely regulated and found the following persuasive: "The regulatory scheme required junkyard owners to get licenses and registration numbers from the state; display the registration numbers prominently at the businesses; keep books recording purchases and sales of autos and auto parts; and make the books and autos available for inspection." *Morales*, 794 F.3d at 218 (citing *Burger*, 482 U.S. at 704). Plus "[j]unkyard owners could also get hit with criminal penalties, license revocation, and civil fines if they failed to comply." *Burger*, 482 U.S. at 704; *see also Morales*, 794 F.3d at 217–218 (finding gambling regulations were pervasive enough to qualify the gambling industry as closely regulated).

Here, regulation of gambling in Iowa is more pervasive than that. Iowa Code section 99F and 491 Iowa Administrative Code chapter 13 lay out a comprehensive scheme regulation. This cannot be fully reproduced here. But law and regulations not

only require "specific authorization from the commission to conduct advance deposit sports wagering," but also prohibit many activities in "the conduct of all sports wagering," *id.* 13.2(3); they require Sportsbooks to submit "internal controls" of their operations, and many rules govern the "operation of an account" by advance-deposit-sports-wagering licensees', *id.* r. 13.2(7), 13.5(3), they require geolocation monitoring according to "industry best practices" and detection and reporting of "suspicious or illegal wagering activities" including fraud, which the IRGC must report to DCI. *id.* r. 13.2(7)(*d*), 13.5(3)(*b*).

Along with these reporting requirements and other audits, rules also forbid licensees from denying lawful commission demands for "information, documents, [and] access to inspect any portion of the sports wagering operation." *Id.* r. 13.2(2)(*f*). Licensees must give "[w]ritten notification" of "any incident where there is a violation involving criminal activity, Iowa Code chapter 99F, a commission rule or order, or an internal control within 72 hours of detection." *Id.* They must "provide all information requested by the commission" pertaining to their books and records, and "[a]ll records pertaining to the accounts of persons who registered or have account activity in Iowa shall be available to allow for audits and investigations." *Id.* r. 13.2(13).

The rules also warn that violations of law or commission rules "may constitute an unsuitable method of operation, subjecting the licensee to" fines or adverse actions against their licenses. *Id.* r. 13.7(8). "The commission has the discretion to suspend mobile gaming operations of its licensees by written order if necessary." *Id.*

This incomplete summary shows Iowa's gambling regulations are "sufficiently comprehensive" and licensees know they are subject to government inspection. *Burger*, 482 U.S. at 703. For example, FanDuel's user agreement states users "consent to the monitoring and recording by the IRGC of any wagering communications and geographic location information." [App. 37].

As to the second warrant function, the statute must be "carefully limited in

time, place, and scope" to limit the discretion of inspectors. *Biswell,* 406 U.S., at 315. But context matters. "Time restrictions," for example, may not be "feasible" for some operations. *See, e.g., United States v. Ponce–Aldona*, 579 F.3d 1218, 1225–26 (11th Cir. 2009). These factors cannot "render the entire inspection scheme unworkable and meaningless." *See U.S. v. Dominguez-Prieto*, 923 F.2d 464, 469–470 (6th Cir. 1991).

Geolocation inspections are unique, because they do not involve a physical intrusion upon the licensee's premise, but a computerized review of historic location data generated by betting application users. [App. 237]. Time and place concerns are less probative in this context, although some mandatory disclosure rules include reasonable timeframes to report certain violations. *E.g.,* 491 Iowa Admin. Code r. 13.2(7)(*e*) (requiring notification to the commission "within 72 hours of detection.") Yet regulations here are properly limited in scope, and the scheme satisfies the *Burger* test.

Iowa law and regulations require licensees to report geolocation data. And regulatory concerns include activity that is abnormal, illegal, suspicious, unauthorized, or fraudulent, with special concern for "the integrity of an authorized sporting event." *Id.* r. 13.2(7)(*d*); *id.* r. 13.5(3)(*b*); Iowa Code § 99F.12(2)(b). These kinds of disclosures enable the State to verify licensees' compliance with the regulatory scheme, which promotes public health and safety by deterring corrupt gambling.

Sportsbooks either explicitly or implicitly authorize or acknowledge government monitoring, [App. 6–9, 11–13, 15, 37, 49, 122, 130], which tracks with their regulatory obligations to report suspicious or "abnormal wagering activity" to the commission. Iowa Code § 99F.(12)(2)(b); Iowa Admin. Code r. 13.2(7)(*d*), 13.5(3)(*b*). Iowa law requires the commission to report this information to DCI. Iowa Code § 99F.12(2)(b). And the Commission authorized DCI to review geolocation data within the scope of Iowa Code 99F.12(2)(*b*). [Doc. 1 ¶¶64–66]. That statute expressly identifies the concern that "abnormal wagering activity or patterns" can "indicate a concern

about the integrity of an authorized sporting event." *Id.* The review of geolocation data with GeoComply's software either followed a lawful request from DCI or the IRGC's authorization under Iowa law, administrative rules, and Sportsbooks user agreements. [App. 6–9, 11–13, 15, 37, 49, 122, 130; Doc. ¶64–66]. The full statutory, regulatory, contractual, and factual context clarifies the limited scope of geolocation inspections here.

Gambling is a highly regulated industry, and only recently, Iowa allowed people to gamble online. The smartphone became—in essence—the front door to the casino. Geolocation monitoring helps ensure regulatory compliance under Iowa's gambling laws and protect the integrity of authorized sporting events. It is reasonable for Iowa's agencies to supervise this, especially since the State opened casinos to everyone in the state with an internet connection.

### 9. No unconstitutional seizure occurred.

No unlawful seizure occurred, either; Count II must be dismissed. Defendants did not "seize" Plaintiffs location data. And Plaintiffs' cell phones were seized under a valid warrant. Plaintiffs rely on only one theory to challenge the warrant—fruit of the poisonous tree. But no "search" occurred; that theory fails. And Plaintiffs identify no false statements in the warrant affidavit. Their claim fails under the *Franks* doctrine, and regardless, Defendants relied on the warrant in good faith.

Under the above, no search occurred, or it was otherwise valid. So the evidence the warrant uncovered was not "fruit of the poisonous tree." No illegal search *or seizure* occurred; Counts I and II must be dismissed.

Nobody unlawfully seized location data. Aware of government monitoring, Plaintiffs voluntarily shared their location data with third-parties and implicitly or explicitly authorized disclosure to the government or law enforcement. [App. 6–9, 11–13, 15, 37, 49, 122, 130]. And some Plaintiffs didn't own the accounts from which the data was allegedly "seized," so they lack standing at the outset. There was no

impermissible search and seizure; the "seizure" claim cannot stand vis-à-vis location data.

Further, location data monitoring did not deprive Plaintiffs of dominion over their property. Plaintiffs do not even allege as much, perhaps because they shared that data with third parties, and the claim wouldn't make sense. *PPS, Inc. v. Faulkner County, Ark.*, 630 F.3d 1098, 1102 (8th Cir. 2011) ("The Fourth Amendment protects against two distinct governmental actions—unreasonable searches and unreasonable seizures. 'A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her . . . property.'" (quoting *Horton v. Cal.*, 496 U.S. 128, 133 n.5 (1990))).

But beyond that, it is unclear how Plaintiffs owned or possessed the location data to begin with. *Cf. Thompson v. Cockrell*, 2024 WL 1908522, at *2–3, 9–10 (E.D. Mo., May 1, 2024) ("Simply check[ing] the VIN numbers on [a] motorcycle" and mistakenly allowing third parties to take it from Plaintiffs residence was not an unlawful seizure by officer-defendants— "taking" the VIN number data was not a "seizure").

And the data wasn't taken from Plaintiffs like contraband at a crime scene. *See id.* Unlike *Riley*, when the data was monitored, Plaintiffs weren't physically deprived of the data. And even when the phones were eventually seized, that was under a valid warrant.

Plaintiffs' consent to geolocation monitoring was like leaving their data in "plain view," so even if a "seizure" occurred, it was reasonable. *PPS, Inc.*, 630 F.3d at 1103 ("[T]he Fourth Amendment does not prohibit all unwarranted seizures, only *unreasonable* ones"). Through users' consent to geolocation monitoring, the Sportsbook enabled—indeed, required—GeoComply to record Plaintiffs' locations. And that same consent permitted Sportsbooks to share location data with third-parties, including the government or law enforcement. [App. 6–9, 11–13, 15, 37, 49, 122, 130]. The legal and contractual context of online betting gave officers "a prior justification" for

being in the digital space where Plaintiffs shared their data, where they are "lawfully in a position from which [to] view the [data]." *Id.* (quoting *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010)).

Next, officers acted in good faith reliance on a warrant when they seized the phones; there was no unreasonable seizure of those either.

Law enforcement seized the phones under valid warrants. A seizure of property is authorized when executed under a valid warrant supported by probable cause. U.S. Const. amend. 4. The Fourth Amendment requires a warrant (1) to "be issued by neutral, disinterested magistrate," *Dalia v. U.S.*, 441 U.S. 238, 256 (1979); (2) to be supported by "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense," *id.*, (quoting *Warden v. Hayden*, 387 U.S. 294, 307 (1967)); and (3) "particularly describe the '"things to be seized,"' as well as the place to be searched," *id.* (quoting *Stanford v. Tex.*, 379 U.S. 476, 481 (1965)).

But Plaintiffs do not challenge the validity of the warrant except to claim it was "issued based on fruits of the poisonous tree." [R. Doc. 1 ¶ 262]. But the above shows that is false. There was no illegal search.

Defendants also reasonably relied on the warrant. Count II fails under the *Franks* doctrine and the good-faith exception. Plaintiffs did not identify any false statements in the warrant affidavit, much less any made knowingly, intentionally, or with reckless disregard for the truth. *Franks v. Del.*, 438 U.S. 154, 155–156 (1978).

Although the exclusionary rule will bar "evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate,"[19] the good-faith exception holds evidence should not be suppressed when "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.*

---

[19]*U.S. v. Leon*, 468 U.S. 897, 908–909 (1984) (quoting *Delaware*, 438 U.S. at 171).

at 909 (quoting *Illinois v. Gates*, 462 U.S. 213, 255 (1983)). "The exclusionary rule does not apply 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope'." *United States v. Saddler*, 19 F.4th 1035, 1040 (8th Cir. 2021) (quoting *U.S. v. Leon*, 468 U.S. 897, 920 (1984)). But Plaintiffs do not assail the information supplied by affiants, the magistrate's role in approving the warrants, sufficiency of probable cause, or the facial validity of the warrants. *See Saddler*, 19 F.4th at 1040 (quoting *Leon*, 468 U.S. at 923). And they do not show that any warrant was subsequently invalidated. *Leon*, 468 U.S. at 908–909 (quoting *Franks*, 438 U.S. at 171).

No illegal search occurred, and no valid theory assails the warrant. Plaintiffs cannot maintain this civil action where no evidence would have been suppressed.

### 10. Waiver—even if a "search" occurred, Plaintiffs consented to it.

Through the Sportsbooks user agreements or privacy policies, Plaintiffs either explicitly consented to geolocation monitoring by the IRGC and authorized data disclosures to law enforcement or the government; even if a "search" occurred, Plaintiffs waived their right to challenge it. [App. 6–9, 11–13, 15, 37, 49, 122, 130].

A "search" that is "conducted pursuant to a valid consent is constitutionally permissible" and "wholly valid." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Under the FanDuel agreement, Plaintiffs explicitly "consent[ed] to the monitoring and recording by the IRGC of any wagering communications and geographic location information," and they further "acknowledge[d] that BIU reserves the right to report unusual or suspicious activity to the proper authorities." [App. 37]. The DraftKings policies and contracts contain other disclosure language, including acknowledgement that DraftKings may "disclose personal information" in good faith "to comply with relevant laws" like gaming regulations, "to respond to discovery requests, subpoenas, or warrants served on DraftKings," "in connection with any legal investigation," to protect or defend the rights or property of [DraftKings] or [its users]," "to investigate

50

or assist in preventing any violation or potential violation of law, this notice, or our Terms of Use," or for an emergency justifying disclosure. [App. 13].

A valid consent must be voluntary, "not the product of police coercion." *Bustamonte*, 412 U.S. at 229. But no law enforcement officer coerced Plaintiffs' consent or their voluntary decision to gamble. And no Plaintiff even alleges as much. Plaintiffs instead voluntarily consented to inspection of their location data by third parties and the government so they could place online sports wagers. And Plaintiffs who gambled fraudulently on other people's accounts functionally consented to monitoring and disclosure, adding waiver to the standing problem this created.

Consent may even be implied in some cases when people engage in regulated activities. *Missouri v. McNeely*, 569 U.S. 141, 161 (2013) (plurality opinion) (discussing states' "implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk driving offense."); *South Dakota v. Neville*, 459 U.S. 553, 559, 563–564 (1983) (discussing a similar implied-consent law and a defendant's choice to submit to BAC testing); *see also Mitchell v. Wis.*, 588 U.S. 840, 843–844 (2019) (upholding an implied consent law that allowed a warrantless blood draw from an unconscious motorist suspected of drunk driving).

And in analogous contexts, courts hold that implied consent may also be "inferred 'from surrounding circumstances indicating that the [party] knowingly agreed to the surveillance.'" *Griggs-Ryan v. Smith*, 904 F.2d 112, 116–117 (1st Cir. 1990). Although it "will vary from case to case," implied consent "may be deduced from 'the circumstances prevailing' in a given situation," and the inference is especially strong when "language or act . . . tend to prove" the person "knows of, or assents to, encroachments on the routine expectation" of privacy. *Id.* at 117; *see also United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987) (in the context of prison monitoring, finding implied consent where defendant "knowingly agreed to the surveillance"); *United*

*States v. Bonanno*, 487 F.2d 654, 658 (2d Cir. 1973) ("[A]lthough a person having a telephone conversation with another in regard to criminal activities generally does not expect that the latter will reveal this to the police, he has no "justifiable" expectation . . . that the latter may not do so or may not have consented to a government agent's listening in or making a recording" (citation omitted)).

So even without explicit consent, Plaintiffs implicitly consented to geolocation monitoring. Gambling is a highly regulated activity. When done online, geolocation monitoring is necessary to ensure territorial compliance, among other concerns. Plaintiffs voluntarily shared their locations under this regulatory scheme to place online sports wagers. And user Agreements reflect Plaintiffs' acknowledgment of geolocation monitoring. Plaintiffs had no "justifiable expectation" the Sportsbooks would not reveal the data to the police in this context. *Bonanno*, 487 F.2d at 658. They impliedly consented to geolocation inspection.

### ii. Even if a constitutional violation occurred, the alleged right was not clearly established; qualified immunity protects Jobes, Nelson, and Sanger.

No unreasonable search or seizure occurred. But Plaintiffs cannot show any "unlawfulness of [Defendants'] conduct was 'clearly established at the time'" anyway. *T.S.H.*, 996 F.3d at 918. It is not well-established that the Fourth Amendment protected Plaintiffs' location data in the Sportsbook accounts here. Defendants are immune from suit.

A right is not "clearly established" unless "'every reasonable official' would have known the conduct was unlawful at the time of the alleged violations." *Id.* Although courts do not "define clearly established law at a 'high level of generality,'" the "specificity of the rule is especially important in the Fourth Amendment Context." *Green*, 996 F.3d at 918. (quoting *Wesby*, 583 U.S. at 63). The "crucial question" is only "whether the official acted reasonably in the particular circumstances." *Id.* (quoting

*Wesby*, 583 U.S. at 63–64).

"A plaintiff must identify either 'controlling authority' or 'a robust "consensus of cases of persuasive authority"' that 'placed the statutory or constitutional question beyond debate' at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–742 (2011)). "As the Supreme Court has reiterated, 'qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."'" *Ryno*, 58 F.4th at 1004–1005 (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)); *see also Wesby*, 583 U.S. 63–64.

This case involves a warrantless review of location information knowingly and voluntarily supplied to gambling companies through online betting applications to ensure territorial compliance with Iowa law where users control the disclosure of their location data through their use of the betting application, and where they authorize the Sportsbook's disclosure of this information to third parties, the government, or law enforcement through user agreements. [App. 6–9, 11–13, 15, 37, 49, 122, 130].

To the extent this question is not decisively resolved in Defendants' favor by existing Fourth-Amendment principles—particularly the third-party doctrine—this would be an issue of first impression before the U.S. Supreme Court. It is *per se* not clearly established—especially at the time of the events. Defendants "cannot be expected to predict the future course of constitutional law;" Plaintiffs claims fail. *Procunier v. Navarette*, 434 U.S. 555, 562 (1968); *see also Harlow v. Fitzgerald*, 547 U.S. 800, 818 (1982).

Plaintiffs argue the data review here was a typical geofence search. But that is inaccurate. And the above analysis doesn't need to be repeated. Yet even if this kind of data sharing amounted to standard geofence searching, that law is not clearly established. And courts evaluating the issue have pointed this out.

For example, the U.S. District Court for the District of Columbia observed that "technological advances coupled with corporate data collection" has presented "new and consequential Fourth Amendment questions, the answers to which are not neatly directed by existing precedent." *Rhine*, 652 F.Supp.3d at 66. In only January 2023, the district court there observed the "state of the law" on this "important topic" was "evolving," and ultimately held "based on the unique facts at issue" there that "suppression [was not warranted] in [that] particular case." *Id.*

Another court held a defendant lacked a privacy expectation in location data associated with an account he did not own—the same standing problem plaguing this case, too—so the court therefore avoided a "journey into the quagmire of geofence search warrants." *Davis*, 2022 WL 3009240, at *8–9. That judge lamented that *Carpenter* left important questions open, leaving courts to decide "just how long is a piece of string." *Id.* at *7 (quoting *United States v. Howard*, 426 F.Supp.3d 1247, 1254 (M.D. Ala. 2019)). This shaky territory is a "new area of law," *Rhine*, 652 F.Supp.3d at 75, and its contours are not clearly defined. *Id.* at 66. And this court should not "journey into [that] quagmire" either. *Id.* at 74–75. Courts are "in 'uncharted territory'" when they evaluate geofence issues. *Davis*, 2022 WL 3009240, at *7.

Another court observed, "[w]hether geofencing falls within the strictures of the Fourth Amendment has been the subject of some debate," and "Courts have reached varying conclusions" while "some prominent legal scholars have questioned whether the access of geofence information constitutes a search under the Constitution." *Kirkendoll*, 2024 WL 1016049, at *1 n.1. It added that courts "have assumed without deciding that a warrant is required for the government to obtain geofence location information," yet "the question of whether geofence warrants impede on an individual's reasonable expectation of privacy remains 'an open question.'" *Id.* at *2 (quoting *Geofence Warrants and the Fourth Amendment*, 134 HARV. L. REV. 2508, 2510 (2021)).

Even when a right is "clearly established," it may be "difficult for [the defendant] to determine how the relevant legal doctrine . . . will apply to the factual situation the [defendant] confronts." *Saucier*, 533 U.S. at 205. So if a "mistake as to what the law requires is reasonable . . . the [defendant] is entitled to the immunity defense." *Id.* "The reasonableness inquiry is objective, evaluating 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011) (quoting *Grahm v. Connor*, 490 U.S. 386, 397 (1989)); *see also Howard v. Kansas City Police Dept.*, 570 F.3d 984, 989 (8th Cir. 2009) ("[T]he question is whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances, without regard to their underlying intent or motivation." (quoting *Graham*, 490 U.S. at 396–97)).

So even if Plaintiffs could show a warrantless review of geolocation data under the contractual and regulatory scheme here overstepped Fourth Amendment bounds—they can't—a mistake in this counterfactual would not be unreasonable. Jobes, Nelson, and Sanger acted reasonably under the unique facts here—where betting app users not only knowingly and voluntarily share their locations to gamble online but also authorize certain disclosure of that data to government or law enforcement under a regulatory scheme that requires online Sportsbooks to disclose suspicious or abnormal wagering patterns to the IRGC, who then must report them to DCI. Iowa Admin. Code r. 13.5(3)(*b*); Iowa Code §99F.12(2)(b);[App. 6–9, 11–13, 15, 37, 49, 122, 130].

The inquiry must be "undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201. And here, the "contours of the right" to be free from government inspection of voluntarily shared geolocation data were not "sufficiently clear" so that every "reasonable official would understand that what [they are] doing violates that right." *Anderson*, 483 U.S. at 640. Officers may inspect data where they have

knowing and voluntary consent, and clearly established law says Plaintiffs have no expectation of privacy in data they share with third parties. "[I]n the light of pre-existing law[,] the unlawfulness [was not] apparent." *Id.*

Also, the "existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable officer would find that conduct constitutional." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994); *see also Meehan v. Thompson*, 763 F.3d 936, 945 (8th Cir. 2014). Regulations require online Sportsbooks to monitor geolocation data—enabled by GeoComply—to detect fraudulent or other suspicious wagering activity; they require Sportsbooks to report this to the IGRC; they require the IGRC to share this information with DCI; and the IGRC authorized DCI's review under Iowa Code section 99F.12(2)(*b*). Iowa Admin. Code r. 13.5(3)(*b*); Iowa Code §99F.12(2)(*b*); [Doc. 1 ¶64–66]. And that's on top of the contractual context where certain disclosures to government are authorized by agreement. [App. 6–9, 11–13, 15, 37, 49, 122, 130].

The full legal, contractual, and factual context allowed geolocation monitoring. That defeats legitimate expectations of privacy. It also justified DCI's reasonable understanding that they could review geolocation data.

Under "[t]he 'clearly established' standard," "[t]he rule must be settled law," the contours of which are "so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted," and thus "with a high degree of specificity," "clearly prohibits the officer's conduct in the particular circumstances before him." *Wesby*, 583 U.S. at 63–64.

Considering the "relevant legal authority" and the low likelihood the Supreme Court would rule for Plaintiffs, *see Elder v. Holloway*, 510 U.S. 510, 512, 516 (1994), neither Jobes, Nelson, nor Sanger violated a clearly established right. They are immune from suit. Counts I and II must be dismissed.

**II.    *Monell* liability does not lie against the State or its agencies, and**

**the claims are not properly pled against the state officials, but they enjoy qualified immunity in any event; Counts III–VI must be dismissed.**

42 U.S.C. section 1983 authorizes suits against "persons" who deprive plaintiffs of certain rights while acting "under color of" law. But Iowa and its agencies are not "persons" under Section 1983. Plaintiffs' claims against them fail.

"Section 1983 does not abrogate a state's Eleventh Amendment immunity." *Alsbrook v. City of Maumell*, 184 F.3d 999, 1010 (8th Cir. 1999). *Monell v. Department of Soc. Services*, 436 U.S. 658 (1978), held that cities, counties, or other local government entities are "persons" under Section 1983. But *states* are not "persons." *Will v. Mich. Dept. of State Police*, 496 U.S. 58, 64 (1989).

*Monell* limited its holding "to local government units" that were not "part of the State for Eleventh Amendment purposes." 436 U.S. at 690 n. 54. And the Supreme Court later confirmed "that a State is not a person within the meaning of § 1983," so the section "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will*, 491 U.S. at 64, 66. A state's agencies are also "not 'persons' within the meaning of section 1983,"[20] so Counts III–VI must be dismissed against the State of Iowa, DPS, and DCI.

Likewise, "state officials in [their] official capacity" are not Section-1983 persons; suits against them are rather "suit[s] against the official's office," and so they are "different from [suits] against the State itself." *Will*, 491 U.S. at 71. Although the complaint nominally charges Defendants Stephan Bayens and Paul Feddersen in their individual capacities, *see Hafer v. Melo*, 502 U.S. 21, 23 (1991), the *substance* of these *Monell*-claims are "no different from [suits] against the State itself," *Will*, 491

---

[20]*Alsbrook*, 184 F.3d at 1010; *see also Howlett v. Rose*, 496 U.S. 356, 365 (1990) ("States and arms of the state"—like state agencies— "are not subject to suit under § 1983."); *Will*, 496 U.S. at 70 (same); *P.R. Aqueduct Sewer Auth. V. Metcalf Eddy, Inc.*, 506 U.S. 139, 144 (1993) ("Absent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court.'" (quoting *Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 480 (1987))).

U.S. at 71, so these claims also fail. The pleaded facts only describe them acting in their official capacities and performing official duties as supervisors. Plaintiffs cannot plead around these defects with a nominal gloss.

Counts IV and VI are pure *Monell*-claims based on policy and custom. But those claims are not individual in nature; they are allegations that *Iowa* and its *agencies* maintained an unconstitutional policy or practice for searches and seizures. *E.g., Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214–15 (8th Cir. 2013) (analyzing *Monell* claims as lying against *governmental bodies*, not the individuals they employ).

Policy-or-custom *Monell* claims for municipal liability lie against the *government body*, not its employees in their individual capacities. *See id.* "[I]t is well established 'that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor.'" *Id.* (quoting *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007)). Distinguishing vicarious liability in this context would be senseless if the policy-or-custom claim could lie against the employees directly.

Indeed, the Supreme Court holds "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." (quoting *Springfield v. Kibbe*, 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting))) (emphasis original). And a government body cannot "be liable under § 1983 if one of its employees happen[s] to apply [a] policy in an unconstitutional manner, for liability would then rest on *respondeat superior*." *Harris*, 489 U.S. at 387.

Plaintiffs also failed to identify a policy or custom that "evince[d] 'deliberate indifference' to the [Plaintiffs'] constitutional right" and was "the moving force behind

the constitutional violation." *Edgerly v. City & County of San Francisco*, 599 F.3d 946, 960 (9th Cir. 2010); *Atkinson*, 709 F.3d at 1216. The complaint is unclear about what "statement of the municipal policy" Plaintiffs contend was unconstitutional. *See Szabla*, 486 F.3d at 390. They instead allege a failure to *establish* a policy to their liking. [*E.g.*, Doc. 1 ¶318]. But that's not enough. "As [courts] have explained," the "*failure to have a policy*" argument is unpersuasive; a facially constitutional policy that "fails to give detailed guidance that might have averted a constitutional violation by an employee[] does not itself give rise to municipal liability." *Szabla*, 486 F.3d at 393; *Atkinson*, 709 F.3d at 1216 (holding the plaintiff's "bare allegations that 'the absence of a binding, written policy . . . demonstrated deliberate indifference on the part of the City'" was "patently insufficient"). So even if Plaintiffs had sued a municipality, they still fail to state a claim.

Because the policy-or-custom claims can lie only against the governmental bodies—here, the State and its agencies, which are not suable as person under Section 1983—Counts IV and VI must be dismissed as to Bayens and Feddersen. The claims cannot lie against them individually. So Counts IV and VI must be dismissed as to all plaintiffs.

Counts III and V allege failure to train or supervise on searches and seizures. Plaintiffs failed to plead individual claims against Bayens and Feddersen here also— they establish no injury traceable to Bayens and Feddersen's *own* conduct. And they again allege claims against them only in their official capacities despite nominally claiming otherwise. Yet qualified immunity would protect them from suit anyway.

Plaintiffs have not shown Bayens or Feddersen "(1) had 'notice of a pattern of unconstitutional acts committed by subordinates;'" "(2) [were] deliberately indifferent to or tacitly authorized those acts;" and "(3) failed to take 'sufficient remedial action;'" which "(4) proximately caus[ed] injury to' the plaintiffs." *Sturgeon v. Faughn*, 36 F.4th 804, 809 (8th Cir. 2022) (quoting *Livers v. Scheneck*, 700 F.3d 340, 355 (8th Cir.

2012)).

"The failure to train or supervise the officer must 'reflect[] a deliberate or conscious choice." *Id.* (quoting *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012)). "[D]eliberate indifference is a subjective standard that 'entails a level of culpability equal to the criminal law definition of recklessness.'" *Id.* (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)); *Robbins v. City of Des Moines*, 984 F.3d 673, 682 (2021) (A failure to train or supervise "must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact," requiring "proof the municipality disregarded a known or obvious consequence of its action or inaction." (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011))).

In conclusory manner, Plaintiffs allege Defendants' training and supervision "were not adequate" with regard to lawful searches and seizures. [Doc. 1 ¶¶277, 278, 304, 305]. But that's not enough, especially when the Fourth–Amendment rights here are unclear. The pleaded facts state no plausible claim against Defendants even approximating the deliberate indifference standard, much less in their individual—rather than their official—capacities. *See id.*

But the 8th Circuit has even questioned the existence of supervisor liability under section 1983. *Ellis v. Houston*, 742 F.3d 307, 327–328 (8th Cir. 2014) (Loken, J. concurring). The *Ellis* concurrence observed *Ashcroft v. Iqbal* overruled older authority finding supervisor liability on mere "proof that the defendant was deliberately indifferent" to their subordinate's harassing conduct. *Id.* "Masters do not answer for the torts of their servants" in section 1983 suits, so "the term 'supervisory liability' is a misnomer." *Id.* (quoting *Iqbal*, 556 U.S. at 677). *Iqbal* clarified that "[a]bsent vicarious liability, each Government official" can be liable only for "his or her own misconduct," their "title notwithstanding." *Id.* (quoting *Iqbal*, 556 U.S. at 677). So "purpose rather than knowledge is required to impose [section 1983] liability on . . . an official

charged with violations arising from his or her superintendent responsibilities." *Id.* (quoting *Iqbal*, 556 U.S. at 677).

Plaintiffs do not show how Bayens or Feddersen can be liable for their "own misconduct" separate from their official capacities or vicariously in their status as supervisors. *Id.* (quoting *Iqbal*, 556 U.S. at 677); *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." (quoting *Iqbal*, 556 U.S. at 676)). Neither Bayens nor Feddersen "directly participated in [a] constitutional violation;" vicarious liability is not enough. *Parrish*, 594 F.3d at 1001.

And Plaintiffs challenges to the State's training and supervision are inadequate. [Doc. 1 ¶¶ 277–278, 304–305]. Regardless of whether Bayens and Feddersen "administered" the training programs, [Doc. 1 ¶¶ 277, 304], Plaintiffs still do not show how they directly participated in a constitutional violation. Even where a training program has "been negligently administered," that will not "suffice to prove [the violation] could have been avoided if an officer [had] better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Harris*, 489 U.S. at 391.

Besides summarily naming Bayens and Feddersen alongside State agencies, the facts do not connect a failure to train or supervise to Bayens or Feddersen directly and individually. "[T]he causal link is too tenuous,"[21] and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Plaintiffs have not shown Bayens and Feddersen "directly participated in the constitutional violation" or that they "caused the deprivation." *Parrish*, 594 F.3d at 1001. They have not "satisfy[ied] the 'linkage requirement,'" which requires Plaintiffs to "link each named Defendant with some

---

[21]*Parrish*, 594 F.3d at 1000.

affirmative act or omission that demonstrates a violation of Plaintiffs federal rights." *Brown v. Cnty. Of Mariposa*, 2019 WL 1993990, at *3 (E.D. Cal. May 6, 2019).

But qualified immunity protects them anyway. Neither Bayens nor Feddersen violated (1) a constitutional right that was (2) "'clearly established' at the time of the challenged conduct." *Ellis*, 742 F.3d at 324. Any review of geolocation data in the factual, regulatory, and contractual context here by Jobes, Nelson, or Sanger was constitutional, or, if not, it infringed no clearly established Fourth Amendment right at the time of the conduct. Bayens and Feddersen cannot have Section-1983 liability for the *lawful* conduct of their subordinates. This defeats both the failure-to-train and policy-and-custom claims as to all defendants in Counts III–VI.

### III.   Plaintiffs are not entitled to damages, and their claims are neither cognizable nor causally linked to a constitutional violation.

To prevail, Plaintiffs must sufficiently allege (1) an unlawful search and seizure (2) was causally linked[22] to "an 'actual, compensable injury.'" *Waters v. Madson*, 921 F.3d 725, 740 (8th Cir. 2019) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 n.7 (1994)). They accomplish none of this. Certain causation problems have already been discussed. And the above shows Defendants violated no part of the Fourth Amendment. But regardless, Plaintiffs do not allege an actual, compensable injury causally linked to Defendants' allegedly unconstitutional conduct. To the extent Plaintiffs connect their alleged damages to wrongful convictions, they have no compensable injury under the *Heck* doctrine.

### a.  Plaintiffs cannot show Defendants caused their damages.

Plaintiffs' claims fail on causation. Plaintiffs may recover compensatory damages only when they prove "actual injury caused by the denial of [their] constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 309 (1986). "[N]o compensatory damages [may] be awarded for violation of [constitutional] right[s] absent

---

[22]*Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 309 (1986).

proof of actual injury." *Id.*; *see also Carey v. Piphus*, 435 U.S. 247, 264 (1978) (also holding damages are unavailable for mere deprivations). "[T]he abstract value of a constitutional right may not form the basis for § 1983 damages." *Id.*

Even if a Defendant ran afoul the Fourth Amendment, that deprivation did not cause Plaintiffs' injuries. First, Plaintiffs caused their own injuries by violating the law and NCAA rules. But second, the *colleges and universities*—not Defendants—sanctioned Plaintiffs.

Although Plaintiffs presumably believe their injuries would not have occurred but for Defendants' geolocation monitoring, Defendants did not control university officials after they subpoenaed Plaintiffs' information. The universities' independent discretion to discipline Plaintiffs is a supervening cause. *See Payne v. City of LaSalle*, 610 F.Supp. 606, 608 n.4 (N.D. Ill. 1985) (explaining "*Monell* did not set any new and different standards of proximate cause," including the defenses of intervening or supervening causes). Plaintiffs cannot overcome that break in the causal chain; this defect dooms their complaint. *See Imbler v. Pachtman,* 424 U.S. 409, 418 (1976) (courts must read section 1983 "in harmony with general principles of tort immunities and defenses rather than in derogation of them"); *see also Martinez v. State of Cal.*, 444 U.S. 277, 285 (1980) (liability is barred when the link between the defendant's conduct and the plaintiff's deprivation are "too remote").

Although some Plaintiffs were criminally charged, in several instances, the school suspensions predated those charges. So the criminal charges did not proximately cause the suspensions; the universities' discipline did. *See Payne*, 610 F.Supp. at 608 n.4. Even if Defendants violated the Fourth Amendment, Plaintiffs have no injuries casually linked to it. *Id.* Constitutional rights "do not exist in a vacuum," and "[w]here no injuries [caused by Defendants] [are] present, no 'compensatory' damages [can] be awarded." *Memphis Community Sch. Dist.*, 477 U.S. at 308.

Next, punitive damages are not available against the State or its officials

acting in their official capacity. The above shows states are not persons under Section 1983. But even if they could be sued like municipalities, such bodies are not liable for punitive damages. *Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1985). And punitive damages are available against officials only in their personal capacities. *Id.* Yet the above shows Plaintiffs claims do not lie against any Defendant individually. Despite the nominal gloss in their pleading, Plaintiffs' brought official capacity suits in essence.

Even if Plaintiffs could establish nominal damages, they would not be guaranteed attorney fees. "In some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." *Farrar v. Hobby*, 506 U.S. 103, 115 (1992). "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." *Id.* (citation omitted). Even if "technical[ly]" a "prevailing party," "'the degree of the plaintiff's overall success [must] go[] to the reasonableness' of a fee award." *Id.* at 114 (quoting *Hensley v. Eckerhart*, 461 U.S. 424 (1983)).

Here, Plaintiffs' own rules violations caused their suspensions and related injuries. Plaintiffs should not gain from their own illicit activity, and "fee awards under § 1988 were never intended to '"produce windfalls to attorneys."'" *Id.* (quoting *Riverside v. Rivera*, 477 U.S. 561, 580 (1986)).

### b. Plaintiffs do not have cognizable claims.

Although unclear, some Plaintiffs at times appear to link their injuries to convictions or "charges levied" against them. But if so, their claims are barred by the *Heck* doctrine. Yet even if not, the above shows a supervening cause stands between Defendants and Plaintiffs' alleged injuries. Plaintiffs' complaint cannot survive either horn of the dilemma.

Under *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), a Section-1983 claim is not cognizable when it implies the invalidity of a criminal conviction that has not been

overturned. *Crawford v. Van Buren Cnty., Ark.*, 678 F.3d 666, 670 (8th Cir. 2012). Although search-and-seizure infractions may not necessarily imply the invalidity of a conviction—"due to doctrines such as independent source, inevitable discovery, and harmless error"—search and seizure claims are not categorically beyond the *Heck* rule. *See Smith v. Ham*, 2021 WL 3674093, at *3, 3 n.4 (W.D. Ark. July 21, 2021). *Heck* explained, "In order to recover compensatory damages, . . . the §1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, which, we hold today, does not encompass the 'injury' of being convicted and imprisoned (until his conviction has been overturned)." *Heck*, 512 U.S. at 487 n.7.

For example, in *Smith v. Ham*, a Section-1983 Plaintiff's plea of "guilty to computer child pornography based upon images on his cell phone that were recovered in [a] search" doomed his claim, because "[a] determination that the search was invalid would undermine the validity of his conviction, in direct contravention of *Heck*." 2021 WL 3674093, at *4. Likewise here, several Plaintiffs pleaded guilty to various illegal gambling charges. But if geolocation monitoring is per se invalid as Plaintiffs claim, then this "would undermine the validity of [their] convictions [too], in direct contravention of *Heck*." *Id.* No potential applications of doctrines like independent source, inevitable discovery, or harmless error rescue their claims in the context of this case. *See id.*

To the extent these Plaintiffs allege injury in—or because of—their criminal convictions, their claims are not cognizable under *Heck*. No Plaintiff showed their conviction was overturned in a subsequent proceeding, and this is especially obvious for those who pleaded guilty to illegal gambling charges.

But even if *Heck* does not apply, Plaintiffs cannot show Defendants proximately caused their injuries. University officials suspended or disciplined Plaintiffs, but these actions superseded Defendants authority, control, or discretion. Plaintiffs

cannot establish causation and damages against Defendants.

### c. Plaintiffs cannot recover for their own illegal activity.

Plaintiffs want the State of Iowa to pay them because they gambled illegally and got caught. But that's bad public policy and bad law.

Longstanding legal doctrines preclude parties from obtaining civil remedies for their own illegal acts. For example, "[t]here is authority holding that a party cannot obtain redress under § 1983 for damages caused by its own illegal acts 'in pari delicto' with another." *L.L. Nelson Enterprises, Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 806 (8th Cir. 2012) (quoting *Dudley v. Stoneman*, 653 F.2d 125, 126 (4th Cir. 1981)). Relying on *Pinter v. Dahl*, 486 U.S. 622, 633–35 (1988), the 8th Circuit acknowledges the applicability of this defense in section 1983 actions. *L.L. Nelson Enterprises, Inc.*, 673 F.3d at 806. *Pinter v. Dahl* held that this "equitable defense . . . is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." 486 U.S. at 632. The 4th Circuit likewise holds *in pari delicto* is a defense to claims section 1983. *Stoneman*, 653 F.2d at 126 (applying *in pari delicto* and holding a "plaintiff may not recover under [§] 1983.")

Even if Plaintiffs rights were infringed, and even if they could link their damages to Defendants acts, they have unclean hands. *Cf. id.* (analogizing *in pari delicto* to the unclean-hands doctrine); 27A Am. Jur. 2d Equity § 23 ("Under the clean hands doctrine, one cannot maintain an action if, to establish the cause of action, the person must rely, in whole or in part, on any illegal or immoral act or transaction to which the person is a part.")

Similar doctrines like the wrongful conduct rule forbid such recovery because it is "wrong as a matter of public policy." *Tate v. Derifield*, 510 N.W.2d 885, 888 (Iowa 1994); *Julie Hansen Scheley v. Sioux County, et al.*, No. 22-2096, 2024 WL 3291798, at *6 (Iowa Ct. App. July 3, 2024) (holding "a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal

or immoral act or transaction to which he is a party, or to maintain a claim for damages based on his own wrong or caused by his own neglect, . . . or where he must base his cause of action, in whole or in part, on a violation by himself of the criminal or penal laws." (quoting *Tug v. Mingo: Let the Plaintiffs Sue–Opiod Addiction, The Wrongful Conduct Rule, and the Culpability Exception*, 34 W. Mich. U. T.M. Cooley L. Rev. 33, 52 (2017))).

"No court will lend its aid to a party who founds his claims for redress upon an illegal act." *The Fla.*, 101 U.S. 37, 43, 25 L. Ed. 898 (1879) "[T]he maxim, '*ex turpi causa non oritur actio*,' applies with full force." *Id.* Plaintiffs want to make bad law that rewards criminal behavior. Their Complaint should be dismissed.

## CONCLUSION

Defendants did not violate Plaintiffs constitutional rights. Plaintiffs had no expectation of privacy in location data they voluntarily shared with third-party Sportsbooks to gamble online. They fail to state any plausible claim against any Defendant under the 4th and 14th Amendments. All their claims fail. Defendants respectfully ask this Court to dismiss Plaintiffs Complaint in its entirety.

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

/s/ *Shannon Archer*
Shannon Archer
Assistant Attorney General

/s/ *Daniel Johnston*
Daniel Johnston
Assistant Attorney General

/s/ *Ryan Pell*
Ryan Pell
Assistant Attorney General

Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 281-8080 / (515) 281-5191
(515) 281-4209 (fax)
shannon.archer@ag.iowa.gov
daniel.johnston@ag.iowa.gov
ryan.pell@ag.iowa.gov

ATTORNEYS FOR STATE DEFENDANTS

*Original filed electronically.*
*Copy electronically served on all parties of record.*

| PROOF OF SERVICE |
| --- |
| The undersigned certifies that the foregoing instrument was served on each of the persons identified as receiving a copy by delivery as follows on July 12, 2024: |
| ☐ U.S. Mail    ☐ FAX<br>☐ Hand Delivery  ☐ Overnight Courier<br>☐ Federal Express  ☐ Other<br>☒ CM/ECF System Participant (Electronic Service) |
| Signature: */s/ Julie Sander* |