## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

|  |  |
|---|---|
| **PANIRO JOHNSON, TERRY ROBERTS, BRENNAN SWAFFORD, COREY CABANBAN, CAMERON "CAM" JONES, SAMUEL SCHUYLER, CARTER SCHMIDT, NATHAN SCHON, DREW WOODLEY, JEREMIAH "TREY" MATHIS III, AND EVAN SCHUSTER,** | **CASE NO.: 4:24-cv-00146-RGE-SBJ** |
| **PLAINTIFFS,** | |
| **vs.** | **INTERVENOR PLAINTIFFS' COMPLAINT AND JURY DEMAND** |
| **BRIAN SANGER, CHRISTOPHER SWIGART, CHRISTOPHER ADKINS, PHILLIP KENNEDY, HEATHER DUENOW, DAVID JOBES, AND TROY NELSON,** | |
| **DEFENDANTS.** | |

**COME NOW**, Paniro Johnson, Terry Roberts, Brennan Swafford, Corey Cabanban, Cameron "Cam" Jones, Samuel Schuyler, Carter Schmidt, Nathan Schon, Drew Woodley, Jeremiah "Trey" Mathis III, and Evan Schuster, the Intervenor Plaintiffs, and for their Complaint and Jury Demand, state:

1

## PARTIES

### A.  Plaintiffs

1.     Plaintiff Paniro Johnson was at all times material hereto residing in the State of Iowa and was a member of the Iowa State University wrestling team.

2.     Plaintiff Terry Roberts was at all times material hereto residing in the State of Iowa and was a member of the University of Iowa football team.

3.     Plaintiff Brennan Swafford was at all times material hereto residing in the State of Iowa and was a member of the University of Iowa wrestling team.

4.     Plaintiff Corey Cabanban was at all times material hereto residing in the State of Iowa and was a member of the Iowa State University wrestling team.

5.     Plaintiff Cameron "Cam" Jones was at all times material hereto residing in the State of Iowa and was a member of the Iowa State University track team.

6.     Plaintiff Samuel Schuyler was at all times material hereto residing in the State of Iowa and was a member of the Iowa State University wrestling team.

7.     Plaintiff Carter Schmidt was at all times material hereto residing in the State of Iowa and was a member of the Iowa State University wrestling team.

8.     Plaintiff Nathan Schon was at all times material hereto residing in the State of Iowa and was a member of the Iowa State University wrestling team.

9.     Plaintiff Drew Woodley was at all times material hereto residing in the  State of Iowa and was a member of the Iowa State University wrestling team.

10.     Plaintiff Jeremiah "Trey" Mathis III was at all times material hereto residing in the State of Iowa and was a member of the Iowa State University football team.

11.     Plaintiff Evan Schuster was at all times material hereto residing in the State of Iowa and was the equipment manager of the University of Iowa basketball team.

12.     Hereinafter, unless individually named, all of the aforementioned Plaintiffs shall be hereby referred to collectively as "Plaintiffs."

**B.     Defendants**

13.     Defendant Brian Sanger was at all times material hereto believed to be a citizen and resident of Dubuque County, Iowa, and was employed as an Iowa Division of Criminal Investigation ("DCI") Special Agent under the control and supervision of the State of Iowa, the Iowa Department of Public Safety ("DPS"), DCI, DPS Commissioner Stephan Bayens, and Defendant David Jobes. At all times relevant to the events complained of herein, Defendant Sanger worked as a member of the DCI's Sports Wagering Unit and contributed to the investigation into Plaintiffs, was a primary person in charge of the investigation and the violation of each of the Plaintiffs' Fourth Amendment rights. Defendant Sanger is being sued in his individual capacity.

14.     Defendant Christopher Swigart was at all times material hereto believed to be a citizen and resident of Marshall County, Iowa, and was employed as a DCI Special Agent under the control and supervision of the State of Iowa, DPS, DCI, Stephan Bayens, and Defendant David Jobes. At all times relevant to the events complained of herein, Defendant Swigart worked as a member of the DCI's Sports Wagering Unit and contributed to the investigation into Plaintiffs, was a primary person in charge of the investigation and the violation of each of the Plaintiffs' Fourth Amendment rights. Defendant Swigart is being sued in his individual capacity.

15.     Defendant Christopher Adkins was at all times material hereto believed to be a citizen and resident of Johnson County, Iowa, and was employed as a DCI Special Agent under the control and supervision of the State of Iowa, DPS, DCI, Stephan Bayens, and Defendant David Jobes. At all times relevant to the events complained of herein, Defendant Adkins worked as a member of the DCI's Sports Wagering Unit and contributed to the investigation into Plaintiffs,

was a primary person in charge of the investigation and the violation of each of the Plaintiffs' Fourth Amendment rights. Defendant Adkins is being sued in his individual capacity.

16.     Defendant Phillip Kennedy was at all times material hereto believed to be a citizen and resident of Pottawattamie County, Iowa, and was employed as a DCI Special Agent under the control and supervision of the State of Iowa, DPS, DCI, Stephan Bayens, and Defendant David Jobes. At all times relevant to the events complained of herein, Defendant Kennedy worked as a member of the DCI's Sports Wagering Unit and contributed to the investigation into Plaintiffs, was a primary person in charge of the investigation and the violation of each of the Plaintiffs' Fourth Amendment rights. Defendant Kennedy is being sued in his individual capacity.

17.     Defendant Heather Duenow was at all times material hereto believed to be a citizen and resident of Winnebago County, Iowa, and was employed as a DCI Special Agent under the control and supervision of the State of Iowa, DPS, DCI, Stephan Bayens, and Defendant David Jobes. At all times relevant to the events complained of herein, Defendant Duenow worked as a member of the DCI's Sports Wagering Unit and contributed to the investigation into Plaintiffs, was a primary person in charge of the investigation and the violation of each of the Plaintiffs' Fourth Amendment rights. Defendant Duenow is being sued in her individual capacity.

18.     Defendant David Jobes was at all times material hereto believed to be a citizen and resident of Polk County, Iowa, and was employed as Assistant Director of DCI under the control and supervision of the State of Iowa, DPS, and DCI. At all times relevant to the events complained of herein, Defendant Jobes contributed to the investigation into Plaintiffs and was a primary person in charge of the investigation and the violation of each of the Plaintiffs' Fourth Amendment rights. Defendant Jobes is being sued in his individual capacity.

19.     Defendant Troy Nelson was at all times material hereto believed to be a citizen and resident of Woodbury County, Iowa, and was employed as the DCI Special Agent in Charge of DCI's Sports Wagering Unit, under the control and supervision of the State of Iowa, DPS, DCI, and Defendant Jobes.  At all times relevant to the events complained of herein, Defendant Nelson contributed to the investigation into Plaintiffs and was a primary person in charge of the investigation and the violation of each of the Plaintiffs' Fourth Amendment rights. Defendant Nelson is being sued in his individual capacity.

20.     Hereinafter, unless individually named, all of the aforementioned Defendants shall be hereby referred to collectively as "Defendants."

## JURISDICTION AND VENUE

21.     Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343(a)(3).

22.     The events and actions referenced in this Complaint occurred in the Southern District of Iowa, therefore venue is proper under 28 U.S.C. §1391(b)(2).

23.     Venue is further proper in the Southern District of Iowa under 28 U.S.C. §1391(b)(1), as this is a district in which some of the Defendants reside, and all Defendants are residents of the State in which this district is located.

## GENERAL FACTUAL ALLEGATIONS

**A.     Division of Criminal Investigation's Use of GeoComply.**

24.     Initially formed in 2011, GeoComply Solutions, Inc. ("GeoComply") is a Canadian corporation licensed to operate in Iowa.

25.     GeoComply contracts and provides geolocation services to various large sports wagering companies, including DraftKings and FanDuel, to ensure user compliance with State laws and regulations on online sports wagering.

26.     When users such as Plaintiffs register with online wagering companies, the companies request access to the users' location data for the stated purpose of verifying that online sports wagering is available in the state and area where the users are located.  Once users consent to share their location data with a respective online sports wagering company, the companies share users' location data with GeoComply, who in turn provides verification back to the companies. Part of the information users agree to share is location data that tracks users' locations every time they open the online sports wagering application ("app"). This information is captured by a software tool called Kibana.

27.     Kibana, and in return GeoComply, collects location data when a user opens or uses the app, regardless of who is the account holder.

28.     In recent years, GeoComply has worked with various law enforcement agencies nationwide, including here in Iowa.

**I.       Division of Criminal Investigation's Involvement.**

29.     In May 2019, the State of Iowa legalized online sports wagering for individuals twenty-one years or older.

30.     In July 2019, GeoComply presented to the Iowa Racing and Gaming Commission ("IRGC") on the technology, software, and tools utilized in their geolocation services.

31.     At all times material hereto, employees and agents of the IRGC expressed concerns and hesitancies surrounding the partnership with Defendants and GeoComply.

32.     Between the dates of February 2, 2020, and December 21, 2022, each of the Plaintiffs either opened their own online sports wagering applications or were authorized to use someone else's account by the person who created the account.

33.     The online sports wagering companies were electronic service providers as defined by 18 U.S.C. § 2510.

34.     The online sports wagering companies were remote computing service providers as defined by 18 U.S.C. § 2711(2).

35.     Each of the Plaintiffs utilized a password and/or facial recognition technology to restrict access from others to the accounts they created or had been authorized to use on these apps.

36.     Each of the Plaintiffs had been granted unfettered access and control over the accounts they created or had been authorized to use on these apps.

37.     Each of the Plaintiffs produced electronic communications through these apps.

38.     Each of the Plaintiffs had complete control over the accounts they created or had been authorized to use on these apps.

39.     The terms and conditions of FanDuel or DraftKings did not prohibit athletes from gambling, nor did they state that their geolocation data would be shared without meeting pre-requisites.

40.     In 2021, DCI launched a special unit within its division called the "Sports Wagering Unit" ("Unit"), in response to the legalization of online sports wagering in Iowa in May 2019.

41.     The Unit was led by Defendant Special Agent in Charge Troy Nelson.

42.     The Unit was made up of Defendant Nelson, along with Defendant Special Agent Brian Sanger, Defendant Special Agent Heather Duenow, Defendant Special Agent Phillip Kennedy, Defendant Special Agent Christopher Adkins, and Defendant Special Agent Christopher Swigart.

43.     In February 2021, Defendant Sanger emailed a GeoComply official asking for the "special sauce," used by GeoComply to collect data on sportsbooks and its users.

44.     Initially, the goal was to use GeoComply to facilitate assistance in collecting data as a part of a joint operation with the State of Illinois investigating various fraud organizations.

45.     Later, GeoComply's Senior Vice President, Lindsay Slade, told Defendant Sanger that GeoComply had found more "data points," for the investigators in Iowa and Illinois. Ms. Slade suggested to Defendant Sanger that GeoComply's software could be used to assist in future investigations, telling Defendant Sanger, "Perhaps it's best we discuss on the phone to determine how to move forward…"

46.     Following the call with Ms. Slade, Defendant Sanger wrote a report titled "Why GeoComply should be licensed in Iowa," in which he explained how the current methods of investigating sports wagering were inadequate and how GeoComply could improve the State of Iowa's efforts.

47.     In that report, Defendant Sanger stated, that the Unit would "be faced with many legal, investigate and funding challenges."

48.     Defendant Sanger also stated, "There are many legal and administrative challenges that must be overcome in order to obtain successful criminal convictions down the road."

**Your vision of the newly created sports betting/internet gaming unit.**

From my experience, this unit will be faced with many legal, investigative and funding challenges. This unit will hit many bumps and roadblocks along the way which will be out of the control and powers of the Iowa DCI. However, I truly believe this unit could be very successful if the right DCI agents are selected for this unit and the correct strategic vision is implemented from the start. Currently, our DCI agents do not have the necessary investigative tools, criminal charging codes, and administrative codes required to work a successful sports wagering case. There are many legal and administrative challenges that must be overcome in order to obtain successful criminal convictions down the road.

49.     Further, Defendant Sanger discussed search warrants and explicitly stated, "For criminal investigations, DCI may still have to follow-up with a subpoena."

According to GeoComply's Managing Director Lindsay Slader, GeoComply would prefer to be licensed by IRGC so GeoComply could share all their data, analysis, assist, and reports directly with state investigators without violating their sportsbook client contracts. If GeoComply was licensed, no subpoenas and/or search warrants would be required (by GeoComply) for obtaining any of the above mentioned data, analysis and reports. For criminal investigations, DCI may still have to follow-up with a subpoena. GeoComply would NOT have to inform their clients regarding the data/information release because they would be mandated to share this information per their IRGC license. Furthermore, GeoComply has the ability to collect, analysis, and generate a single report on devices/accounts across all their sportsbook clients' platforms which can paint a much clearer picture of an individual's device activity if they have account with multiple sportsbooks. GeoComply has many tools available to help investigate and prevent criminal activity on these sportsbooks' platforms but DCI does not have direct access to this tools because GeoComply is not licensed in Iowa.

50.     It was clear – back in early 2021 – that Defendant Sanger understood the legal issues he would be facing when investigating online gambling – including the necessity of obtaining warrants and issuing subpoenas based on probable cause when conducting criminal investigations.

51.     In June 2021, AD Jobes told DCI agents, including Defendant Sanger, that IRGC was following through with enacting a licensure requirement for GeoComply.

52.     In early 2022, GeoComply discussed with Defendant Sanger and Defendant Nelson, amongst others, how their partnership was to commence and the early goals of the use of GeoComply's software.

53.     Following these conversations, Defendant Nelson stated GeoComply would give DCI agents, including himself and Defendant Sanger, three training sessions on using GeoComply's tools and software.

54.     In or about May 2022, GeoComply emailed numerous law enforcement agencies around the country to propose monthly meetings into the information GeoComply was obtaining.

55.     In July 2022, Defendant Sanger attended one of the aforementioned meetings.

56.     Recapping what he had learned, Defendant Sanger informed DCI that GeoComply had obtained evidence of credit card and identity theft among online sports wagering users.

57.     As to how GeoComply obtained this information, GeoComply's tools were able to formulate "hot spots," which were single locations where a high number of accounts were separately placing sports wagers.

58.     Before the implementation of GeoComply's software by Defendants, GeoComply insisted the IRGC had to sign off on the use of GeoComply's technology.

59.     However, the IRGC was hesitant to this idea, stating they were unsure whether they could give Defendants access to GeoComply's technology.

60.     Upon continuous pressure by Defendant Nelson, the IRGC agreed to allow Defendants utilization of GeoComply's tools and software.

61.     On July 19, 2022, Defendant Sanger was aware that proxy wagering was not illegal in Iowa. Further, proxy wagering was not prohibited by DraftKings if done for individuals who were not exempt.

62.     On August 23, 2022, IRGC Administrator Brian Ohorilko emailed Danny Lawhon of the IRGC instructing him to inform GeoComply that the use of GeoComply software was restricted to Iowa Code § 99F.12(2)(b).

63.     Ohorilko then emailed Danny Lawhon of GeoComply on August 28, 2022 – and copied Defendant Nelson on the email – setting out that they were permitting DCI to utilize Kibana for use in both regulatory and criminal purposes.

64.     On September 15, 2022, Defendant Chris Swigart was told by Assistant Story County Attorney Tyler Grimm that **a search warrant would be required for geolocation data**.

**From:** Tyler J. Grimm
**Sent:** Thursday, September 15, 2022 2:53 PM
**To:** 'Swigart Chris' <swigart@dps.state.ia.us>
**Subject:** RE: DCI Subpoena

Hi Chris,

I can probably get a lot of what you're requesting with a court order, but I won't be able to get all of it. The location stuff in particular would require a warrant. If you don't think the location data is too important, I'll work on getting you an order. Do you have a narrative report completed? If so, can you send it over? In order to get more than the basic subscriber/account info, I'll need to submit something with my application to establish grounds for the order (18 USC 2703(d)).

65.     Defendant Swigart then relayed this information to members of Iowa Racing and Gambling – Tina Eick, the Director of Operations for the IRGC, Catherine Lucas with Iowa Department of Public Safety, and a person named Danny with IRGC.

66.     Defendant Swigart stated in the email, "Tyler, (at the Story County Attorney's Office) ran this past me regarding a subpoena I submitted specifically for **geolocation data** with PointsBet Inc. USA. Tyler conveyed to me, it's his understanding that anytime I request geolocation data from a sportsbook, I'll need a search warrant to secure these specific records." (emphasis in original).

On Thu, Sep 15, 2022 at 6:35 PM Swigart Chris <swigart@dps.state.ia.us> wrote:

Good afternoon; Tina, Danny and Catherine

Tyler, (at the Story County Attorney's Office) ran this past me regarding a subpoena I submitted specifically for **geolocation data** with PointsBet Inc. USA.  Tyler conveyed to me, it's his understanding that anytime I

request geolocation data from a sportsbook, I'll need a search warrant to secure these specific records.

67.    Beginning in September 2022, GeoComply gave its login credentials to various DCI agents, including Defendant Sanger and Defendant Nelson, which allowed them to continue utilizing GeoComply's software and tools.

68.    On September 29, 2022, Defendant Heather Duenow inquired from GeoComply who owned the geolocation data and was told that the player/end-user is the owner of the geolocation data when it is associated with their accounts or devices. The operator, e.g. sportsbooks, then provides authorization for GeoComply to process the location data on their behalf and the service agreements limit what they can do with that data.

69.    Defendant Swigart and Defendant Duenow went back and forth on what would require a search warrant – indicating that Defendants Swigart and Duenow understood search warrants were required, especially given what the Story County Attorney told Defendant Swigart in September.

70.     On October 7, 2022, Commissioner Bayens emailed the Department of Public Safety's 2022 Bill Request, which included making proxy wagering illegal under 99F.

71.     In November 2022, GeoComply sent officials to conduct an in-person training session for various DCI agents who were using their own laptops, now equipped with the software, to work on "live cases."

72.     At the in-person meeting, GeoComply showed DCI agents how to use GeoComply's Pindrop map, which displayed the aforementioned "hot spots," where a high number of centralizing sports wagering was occurring.

73.     Upon information and belief, each of Defendants Sanger, Nelson, Swigart, Duenow, Kennedy, and Adkins were present for this meeting.

74.     There, the DCI agents could zoom into various areas, using the technology, to highlight where several users were placing bets in a single location.

75.     In fact, GeoComply articulated how using this technology could allow Defendants to look for sports wagering activity in areas where sports wagering was prohibited, such as prisons and high schools.

76.     All of this occurred in the meeting without a warrant.

77.     On December 21, 2022, Defendant Swigart indicated that he was completing a search warrant template for obtaining geolocation points from GeoComply.

78.     This is clear evidence that Defenant Swigart was aware that search warrants were necessary for obtaining geolocation points from GeoComply – just as the Story County Attorney told him in September.

79.   On January 5, 2023, SA Swigart shared his Geolocation Warrant Template referencing a section in the template titled, "GENERAL BACKGROUND RELATING TO SPORTS BETTING GEOLOCATIONS AND RELEVANT TECHNOLOGY".

80.   The email, which was sent to multiple people by starting the email off with "All", was sent to InternetGaming@dps.state.ia.us.

81.   Upon information and belief, evidence in the possession of the Defendants will show that each of Defendants Nelson, Sanger, Duenow, Kennedy, and Adkins, Swigart were recipients of emails sent to the email address InternetGaming@dps.state.ia.us – including this email sent from Defendant Swigart regarding the geolocation warrant template.

82.   Defendant Sanger then turned his attention to the campuses of Iowa State University ("ISU") and the University of Iowa ("UI"), amongst other colleges.

83.   At no point did Defendant Sanger have any information on illegal sports wagering occurring at ISU or UI facilities.

84.   Nevertheless, in early 2023, Defendant Sanger utilized GeoComply's technology to draw a boundary around the ISU and UI athletic facilities to specifically identify individuals engaging in sports wagering activity while inside ISU and UI facilities.

85.   Defendant Sanger then used the Kibana tool to filter out all other data by drawing a boundary around those facilities. This enabled him to filter down the data to just the data points within the facilities.

86.   Defendant Sanger used Kibana to view historical data points at the ISU and UI Athletic Department training facilities, purportedly out of concern for match-fixing and sports wagering cheating.

14

87.     Defendant Sanger stated that he was concerned about match-fixing, yet Iowa State's last football game in 2022 was on November 26, 2022, and baseball season had not begun. Further, Iowa's last football game was on December 31, 2022.

88.     Defendant Sanger used the historical geolocation data points to identify electronic cellular devices and online sports wagering accounts opened and used throughout the ISU and UI athletic facilities during the previous several months.

89.     Defendant Sanger then utilized Kibana's software to produce reports detailing the exact dates, times, and precise locations—including in users' homes and specific areas within other States that allowed online sports wagering—in which each of those individually identified accounts or apps were opened or used during the past several years.

90.     The aforementioned data provided Defendant Sanger personal identifying information of the users of the individual online sports wagering accounts.

91.     Defendant Sanger admitted he did not obtain a warrant before utilizing GeoComply's software to investigate sports wagering activity occurring in ISU or UI athletic facilities.

92.     Further, at the time he viewed the historical data points, Defendant Sanger did not have any tips or information suggesting that match-fixing and sports wagering cheating were occurring at ISU or Iowa facilities.

93.     Defendant Sanger also testified that, before this investigation, he had never been involved in a case involving inside knowledge or manipulation of the game or fixing the outcome of a game.

94.     On January 19, 2023, Defendant Sanger sent Defendant Nelson an email stating, "Maybe this Iowa Hawkeye Football case could be a springboard to allow IRC and DCI access to

ALL Iowa sports wagering and DFS accounts so we can ensure no college coaches, athletes, officials, athletic trainers, individuals close/inside a college sports program, along with statewide barred patrons don't have Iowa sports wagering accounts…"

95.     Clearly, Defendant Sanger was using Kibana to complete a blanket search without probable cause or even reasonable suspicion that a crime had been committed with the hopes of searching "ALL" Iowa sports wagering accounts – in violation of the Fourth Amendment of the United States Constitution.

96.     On February 2, 2023, Defendant Chris Adkins emailed Defendant Nelson and Defendant Sanger – in an email titled "Thoughts from Yesterday" – wherein he admits, amongst other things, that "we don't necessarily have a crime on the books in Iowa, but I think it would be a good idea to report them to the University, the Big Ten, and the NCAAS. If they get suspended or get a scholarship taken away, so be it."

97.     Further, in this February 2, 2023 email, Defendant Adkins stated, "I think this is one of those things that would bring attention to our unit, not only in the public's eyes, but also as far as the commissioner and even possibly the legislatures."

98.     Defendant Adkins even stated, "And if we pursue this and it hits the media, which it would, and people start asking why nothing criminal was done – we can use that platform to hopefully push legislatures for code changes moving forward."

99.     Defendant Adkins admitted they did not have probable cause of criminal activity yet wanted to pursue investigations to build a platform to "push legislatures for code changes moving forward."

100.     This is a gross misuse of police authority in violation of the Fourth Amendment of the United States Constitution.

101.    In this email on February 2, 2023, Defendant Adkins made a reference to something "Heather said yesterday". This was a reference to Defendant Heather Duenow.

102.    Upon information and belief, the discussion on February 1, 2023 – the day before this email – included the team members of the Unit, including Defendant Nelson, Defendant Sanger, Defendant Duenow, Defendant Adkins, Defendant Swigart, and Defendant Kennedy – and each was aware that there was not probable cause that any crimes had been committed on UI or ISU campuses yet the use of Kibana to perform geolocation searches was being utilized in violation of the Fourth Amendment of the United States Constitution.

103.    Using this technology and the information uncovered through the illegal searches, on February 8, 2023, Defendant Sanger and DCI procured subpoenas from Dubuque County to FanDuel regarding 69 accounts and DraftKings regarding 73 accounts. The subpoenas requested:

Subpoena IFIF005188 and IFIF005186

1)  Account owner information – Name, DOB, SSN, Address, Account Status, Account Created Date, All Linked Email Addresses, Phone Numbers, Account Wallet Balances, All Linked Financial Accounts (Banks, Credit Cards, PayPal, Venmo, Wire Transfers, etc.)
2)  All Account Linked Devices
3)  Total Account Win & Loss Statement (Online & Retail)
4)  All Deposits and Withdrawals along with their respective Geolocation Data (Online & Retail)
5)  All Account Transactions and Wagering History (Online & Retail)
6)  Total Account Promos Awarded/Used
7)  Any Internal Account Notes including Account Notifications from GeoComply Solutions, Inc.
8)  Initial Account Setup IP Address and Geolocation Data

104.  The subpoenas set out that the reason for the Applications were "Prohibited Activities."

105.  This general and ambiguous reason was used because none of the Defendants had probable cause or even reasonable suspicion that a crime had been committed.

106.   In fact, on January 19, 2024, Defendant Sanger gave a deposition where he admitted that at the time the subpoenas were issued, he did not have reasonable suspicion that a crime had been committed.

107.   The Defendants knew that the subpoenas sought more than "subscriber/account info," and as the Story County Attorney advised in September 2022, obtaining users' Geolocation data from an online sports wagering company "would require a warrant."

108.   Upon information and belief, each of the Plaintiffs herein state that 18 USC § 2703 and their Fourth Amendment rights were violated when the aforementioned electronic data and information was obtained without securing a warrant, an administrative subpoena, the appropriate consent, or a court order without specific and articulable facts that the contents of the information sought was relevant and material to a criminal investigation.

109.   The Story County Attorney advised Defendant Swigart that such a generic and ambiguous application would not "establish grounds" for the necessary court order, and specifically referenced 18 U.S.C. § 2703.

110.   Then, on March 2, 2023, Defendant Swigart informed Defendant Nelson that "From what I just heard today on the GeoComply meeting, other states/jurisdiction researching account information on Kibana, requires a subsequent subpoena or search warrant to Geo Comply for the following: (1) locations geofenced, (2) accounts identified in the geofenced area." . . . :**It's going to be a controversial issue for us to be able to articulate what leads to an investigator to search specific locations for accounts based on the absence of a complaint or lead**." (emphasis added).

111.   Defendant Nelson replied on March 5, 2023, "Hmm, very interesting. Yeah I'll think through that. I'll talk further with you in Bettendorf. Thank you."

112.   On March 24, 2023, Defendant Jobes sent an email to Defenant Nelson stating that

"**Some agents are expressing concern related to the initial use of the geolocation data and the potential need to identify the source of the data in subsequent court proceedings**." (emphasis added).

113.   On March 27, 2023, Defendant Duenow requested a copy of GeoComply Terms and Conditions which specifically state:

We disclose information to You solely in accordance with our published privacy statement/policy, these Guidelines,  and/or applicable law:

- A jurisdictionally valid subpoena is required to compel the disclosure of basic user records, which may include name, length of service, credit card information (including billing address), email address(es), and an IP address, if available.
- A court order is required to compel the disclosure of certain records or other information related to a user account (not including contents of communications), which may include message headers and IP addresses, location information of devices over a period of time, in addition to the basic user records identified above.
- A search warrant properly issued under the procedures described in the U.S. Federal Rules of Criminal Procedure (or equivalent state/province/country warrant procedures), based on a showing of probable cause, is required to compel the disclosure of the stored contents and information associated with any account.

Appropriate use of these local processes is necessary for you to obtain information relating to specific devices or users ("User Identifying Information").  User Identifying Information includes:

- Information relating to presence (or lack thereof) of an IP address or set of IP addresses in a given geographic area;
- The identities and/or identifying information for associated with particular users/players/end-users (e.g., names, address, phone numbers, identification documents); and
- Locations of devices over a given period of time.

114.   The Defendants cannot claim that they were unaware a warrant should have been issued in this case.  On April 14, 2023, Defendant Duenow – acting as a member of the Unit – obtained a Geofence warrant so that Kibana could be used in the investigation of two men

unrelated to this case, Mr. Hobbs and Mr. Buckhanan. These two young men, age 19, were using Mr. Buckhanan's father's application to place underage bets.

115.    Accordingly, each of Defendants Duenow, Nelson, Sanger, Swigart, Kennedy, and Adkins were aware not only of when a search warrant was necessary but the procedure to apply for one when attempting to obtain a Geofence warrant so that Kibana could be utilized.

116.    On April 19, 2023, Special Agent Troy Nelson sent an email to Special Agent Brian Sanger about the continued efforts to outlaw proxy wagering in Iowa.

117.    On April 26, 2023, subpoenas were issued to ISU.

118.    The subpoena set out the reason for the Application was "Violations of 99F, Identity Theft, and Theft Cheating on a Sport Wagering Event."

119.    In April 2023, and in the few months thereafter, DCI Special Agent Defendants applied for and secured search warrants pertaining to the cell phones of Plaintiffs Paniro Johnson, Drew Woodley, Nathan Schon, Jeremiah Mathis, and Evan Schuster.   Thereafter, law enforcement seized the Plaintiffs' cell phones.

120.    The warrant application misrepresented the investigation by stating: "It was within the normal course of duties, investigators discovered numerous online sports wagering accounts which appeared to be suspicious and/or potentially fraudulent in nature."   This statement was a material misrepresentation to the Court.

121.    On January 19, 2024, Defendant Sanger gave a deposition wherein he stated the reason for his initial review of the geolocation points within college athletic facilities was:

> Well, based on my knowledge and experience, if individuals wanted to infiltrate a sports team that there's legal wagers placed on and try to take advantage of inside information of those sports teams, you're going to want to be close to those sports teams, and you're going to want to go to where they have training centers, because that's where they develop their strategy for the game they're going to play, that's where the coaches are, that's where the employees are. Those are people that have access to the players.

So if you're trying to do wrongdoing in the sports betting industry and trying to take advantage of inside knowledge or do anything that could manipulate or fix the outcome of the game or hinder it, you're going to want to be close to where those teams practice, play, develop their strategy to get any type of advantage you possibly can.

122.   Defendant Sanger testified on January 19, 2024, that he had never been involved in an investigation wherein he developed this information.

123.   Defendant Sanger described a hunch, a hunch that proved not to be true, and that were not within the normal course of his duties.

124.   In the first week of May 2023, the athletes were informed that they were under investigation.

125.   UI baseball players were informed on May 5, 2023, that they were suspended from the team.

126.   ISU football players were informed on or about May 6, 2023, that they were suspended.

127.   UI football players were informed on or about August 16, 2023, that they were suspended.

128.   ISU wrestlers were informed that they were suspended in or around August 2023.

129.   On May 8, 2023, the University of Iowa issued a press release that stated:

"The University has received information about 111 individuals.  This includes 26 current student-athletes from baseball, football, men's basketball, men's track and field, and men's wrestling, as well as one full time employee of the UI Department of Athletics…According the UI, leadership was first notified on May 2, of potential criminal conduct related to sports wagering and possible NCAA violations."

130.   On May 18, 2023, the DCI procured subpoenas in Dubuque County to GeoComply seeking:

Any Internal Account Notes, Alerts, Notifications, SARs Reports including any Account Notifications from GeoComply Solutions, Inc. to Any Sportsbooks regarding the below account.

131.    The Application stated the reason for the subpoenas were Violations of 99F, Tampering w/Records, Fraud, and Id. Theft.

132.    On June 6, 2023, a second subpoena identified as IFIF005439 was issued to ISU.

133.    On June 7, 2023, a follow-up subpoena was sent to FanDuel regarding 35 of the previously listed 69 accounts on February 8, 2023, and DraftKings regarding 25 of the previously listed 73 accounts also on February 8, 2023.  The subpoena requested the same data requested previously with the added language of: "All records must include a '**Business Records Certificate of Authenticity.**'"

134.    The Application stated the reason for the subpoenas were Tampering w/Records, Violations of 99F, Id. The Cheating at a Sports Wagering Event and Fraud.

135.    On June 20, 2023, subpoenas were issued in Dubuque County for the same data requested on May 18, 2023.

136.    The Application stated the reason for the subpoenas were Violations of 99F, Tampering w/Records, Fraud, and Id. Theft.

137.    During one of the criminal cases of the Plaintiffs, one of DCI's agents, SA Ludwick, also accused DCI of withholding information and misleading him during the investigation.

138.    Specifically, SA Ludwick was told the Defendants' investigation and use of GeoComply's software was to investigate the online sports wagering operators, not the Plaintiffs who would not be charged with a crime.  This was specifically relayed by SA Ludwick to one of the college athletes he interviewed, who was later charged.

139.    In fact, Defendant Nelson congratulated SA Ludwick for "obtaining a confession" from one of the college athletes.

140.    This was not an isolated incident. Multiple DCI agents were informed and later told college athletes interviewed that they were not the targets of the investigation but instead were only assisting in the investigation into various online sports wagering companies.

141.    Moreover, as a result of the DCI's warrantless search of Plaintiffs' geolocation and electronic data, many of the Plaintiffs' personal items, including their cell phones, were seized by various DCI officials and agents.

142.    SA Ludwick further testified on January 19, 2024, that:

    a.  Geopoint locators search without a warrant by SA Sanger is an illegal search.
    b.  SA Sanger did a very broad search under administrative rights of that geofence third party vendor they had access to.
    c.  There was no probable cause or reasonable suspicion to start an investigation into this matter.
    d.  The search of the geopoint locators was a constitutional violation of the athletes' rights.
    e.  Story County is called the State of Story by DCI SA's because they are heavy on probable cause.
    f.  99F is for regulatory infractions only.
    g.  It was a bit odd that the subpoenas and warrants were issued outside of Story and Johnson County.
    h.  He had a conversation with SA Sanger wherein he expressed his displeasure, and disbelief, and dismay towards the investigation.
    i.  SA Ludwick was asked if there was consensus or a group of DCI Agents that are very troubled by what the image of this particular investigation is and how it was conducted, his answer was, "Absolutely, to include so much that a special agent had a heart attack and died over this case."
    j.  He would not be surprised if non-athletes were let go.

143.    These seizures occurred following the issuance of various invalid and unconstitutional warrants which were only set forth after, and because of, Defendants' use of GeoComply's software and technology without a warrant and the issuance of non-administrative

subpoenas without reasonable suspicion or probable cause in violation of the Fourth Amendment to the United States Constitution.

144.    After obtaining the illegally seized information, many – but not all – of the Plaintiffs were subsequently indicted for various crimes.

145.    Criminal complaints were filed against 23 Iowa college athletes, one student equipment manager for the UI basketball team, and one student graduate assistant for the UI football team.

146.    Due to each of the Defendants' actions and/or failures to legally investigate the Plaintiffs, the Defendants severely upended the Plaintiffs' lives, collegiate careers, and future opportunities, as set forth below.

147.    After the State obtained the various records and information without a warrant with many of the Plaintiffs being indicted, GeoComply's stance on DCI's use of its software changed.

148.    Upon realizing Defendant Sanger and DCI's efforts in charging Plaintiffs without due process, GeoComply informed IRGC that GeoComply was going to end the partnership with DCI by January 26, 2024.

149.    As a result of GeoComply informing IRGC of its intentions, IRGC also accused DCI and its agents – the Defendants in this case – of withholding information from them in their use and implementation of the GeoComply software.

150.    In fact, IRGC was not made aware of DCI's investigation and their tactics therein, until the criminal complaints against many of the Plaintiffs were filed and made public in 2023.

151.    On January 19, 2024, Defendant Sanger gave a deposition where he admitted that UI and ISU student athletes are allowed to bet on certain sporting events through online sports wagering apps.

152.    On January 19, 2024, Defendant Sanger gave a deposition where he admitted that the geofenced information he had access to from the UI and ISU athletic facilities did not allow him to see whether a legal or illegal bet had been made. He also stated that he agreed that the wagering applications did not even indicate that a bet had been made, only that the wagering application had been opened.

153.    On January 19, 2024, Defendant Sanger gave a deposition where he admitted that of the hundreds of subpoenas sent out, only 18 people were charged.

154.    On January 19, 2024, Defendant Sanger gave a deposition where he admitted that he received the go ahead to conduct the investigation, even though they did not have reasonable cause, from his supervisors Defendant Nelson and Defendant Jobes.

155.    On January 19, 2024, Defendant Sanger gave a deposition where he testified that Defendants Duenow, Kennedy, Adkins, Swigart, Sanger, and Nelson would have group meetings discussing decisions to use Kibana to search the UI and ISU facilities.

156.    On January 19, 2024, Defendant Sanger gave a deposition where he testified that Defendants Duenow, Kennedy, Adkins, Swigart, Sanger, and Nelson were all present for the training in December of 2022 on GeoComply, and each were given their own log-ins to use the technology.

157.    On January 19, 2024, Defendant Sanger gave a deposition where he testified that the first time he had ever seen Kibana was at the training in December.

158.    On January 19, 2024, Defendant Sanger gave a deposition where he testified that Defendant Jobes was present at the training in December.

159.    On January 19, 2024, Defendant Sanger gave a deposition where he testified that no one truly used Kibana until the December training.

25

160.   On January 19, 2024, Defendant Sanger gave a deposition where he testified that when he was first getting familiar with the Kibana product, he did searches of college freshman and sophomore dorms without a warrant or probable cause that a crime had been committed. Defendant Sanger further testified that he informed Defendant Jobes and Defendant Nelson about these warrantless searches at that time.

161.   However, neither Defendant Jobes nor Defendant Nelson stopped, discouraged, or prevented Defendant Sanger or any other members of the Unit from continuing to conduct warrantless searches using Kibana.

162.   On January 19, 2024, Defendant Sanger gave a deposition where he testified that his discussions with Defendant Jobes and Defendant Nelson about his warrantless searches of the freshman and sophomore dorms occurred prior to the warrantless and illegal searches of Plaintiffs which occurred in this case.

163.   On January 19, 2024, Defendant Sanger gave a deposition where he testified that Defendant Jobes and Defendant Nelson "approved the operation and the subpoenas to move forward with the investigation."

164.   Defendant Jobes and Defendant Nelson were approving subpoenas based off of warrantless and illegal searches in violation of the Fouth Amendment of the United States Constitution.

165.   On January 19, 2024, Defendant Sanger gave a deposition where he testified that the general public did not have access to Kibana technology the way that Defendant Sanger could access the technology.

166.    Accordingly, Defendants Sanger, Swigart, Duenow, Kennedy, Adkins, and Nelson were utilizing technology not available to the general public to perform warrantless and illegal searches of Plaintiffs in violation of the Fouth Amendment of the United States Constitution.

167.    Each of the Plaintiffs in this case suffered deprivations of their liberty when their property, which they each had a reasonable expectation of privacy in, was illegally searched by each of the Defendants.

168.    Each of the Plaintiffs in this case suffered deprivations of their liberty when their property, which they each had a reasonable expectation of privacy in, was illegally seized by subpoenas based on fruits of the poisonous tree and upon fabrications to the court by each of the Defendants.

169.    At all times relevant to this lawsuit, each of the Defendants were acting under color of state law.

## B.    Allegations Specific to Plaintiffs

170.    All allegations specific to Plaintiffs replead each preceding paragraph and their context and allegations as if fully set forth herein.  All of the Plaintiffs' allegations are to be read in conformance with the allegations asserted against Defendants set forth above.

171.    The factual nature specific to each Plaintiff set forth within this section would not have occurred without the actions, inactions, conduct, and failures of Defendants above.

## I.    Paniro Johnson

172.    Plaintiff Paniro Johnson first competed for the ISU wrestling team during the 2022-2023 season where he won the Big 12 Championship, the first ISU wrestler to ever do so at his weight class.

173.   Johnson was also a 2023 NCAA Qualifier and a 2023 NWCA Scholar All-American.

174.   In December 2020 and December 2021, two of Johnson's family members each opened a DraftKings account in the State of Pennsylvania, with the express intention of allowing Johnson to use it.  The DraftKings app and two accounts were downloaded on Johnson's phone no later than 2021.

175.   Johnson had express consent from his two family members to download and use the accounts.

176.   After Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication, Defendant Kennedy applied and received authorization for a search warrant to Johnson's cell phone in Pottawattamie County on April 30, 2023.

177.   On May 2, 2023, DCI executed the search warrant and seized Johnson's cell phone.

178.   On August 1, 2023, Defendant Sanger filed a criminal complaint against Johnson for an indictable offense.

179.   On August 21, 2023, Trial Information was filed charging Johnson with Identity Theft, in violation of Iowa Code §715A.8, and Tampering with Records, in violation of Iowa Code §715A.5.

180.   Due to the pending criminal charges and the NCAA suspension, Johnson did not compete for the ISU wrestling team during the 2023-2024 season.

181.    On February 27, 2024, Johnson's legal counsel filed a Motion to Suppress, seeking suppression of all of the evidence obtained to support Johnson's charges due to Defendant Sanger and DCI's warrantless searches and seizures set forth herein

182.    On March 1, 2024, the Story County Attorney's Office filed a Motion to Dismiss the charges against Johnson in light of the allegations set forth above.

183.    On March 1, 2024, the Honorable Judge Stephen Owen of the Second Judicial District of Iowa, dismissed the charges against Johnson with prejudice and in their entirety.

184.    On May 28, 2024, the NCAA suspended Johnson for the first 10% of regularly scheduled dates of competition for the 2024-2025 wrestling season.

185.    At all times relevant to the events complained of herein, Johnson had the DraftKings application downloaded to his personal cell phone.

186.    At all times relevant to the events complained of herein, Johnson used his personal bank account in conjunction with the DraftKings account on his personal cell phone.

187.    During the relevant dates when GeoComply data was retrieved by Defendants when the account was used or opened outside of the State of Pennsylvania, Johnson accessed the DraftKings application on his personal cell phone.

188.    Johnson's criminal charges and suspension detrimentally affected Johnson's collegiate experiences and future opportunities.

## II.    Terry Roberts

189.    Plaintiff Terry Roberts is a former cornerback who played for the UI football team from 2019-2022.

190.    Roberts opened DraftKings and FanDuel accounts in his own name, with accurate DOB and SSN information, after he turned 21 years old in late 2021. Roberts downloaded the DraftKings and FanDuel apps and accounts on his cell phone when he opened the accounts.

191.    Roberts's personal bank account was connected to the DraftKings and FanDuel accounts.

192.    Roberts entered the NCAA transfer portal on December 6, 2022, where he eventually transferred to play football at Michigan State University ("MSU").

193.    The last time Roberts set foot in the UI athletic facility was on December 7, 2022.

194.    Roberts learned of the investigation after Defendant Sanger used GeoComply's technology to geofence UI's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication.

195.    Specifically, Roberts received a letter dated June 6, 2024, from the UI Athletic Department that he was under investigation for online sports wagering.

196.    Roberts was set to start at cornerback for the MSU football team during the 2023-2024 season.

197.    Although Roberts was not and has not been charged by the State for his involvement in online sports wagering, Roberts was forced to miss the entirety of his senior season which included potential professional football opportunities, and his final year of eligibility.

198.    At all times relevant to the events complained of herein, Roberts had the DraftKings and FanDuel applications downloaded on his personal cell phone.

199.    At all times relevant to the events complained of herein, Roberts used his personal bank account in conjunction with the DraftKings and FanDuel accounts on his personal cell phone.

200.    At all times relevant to the events complained of herein, Roberts's name was listed on the DraftKings and FanDuel accounts on his personal cell phone.

201.    During the relevant dates when GeoComply data was retrieved by Defendants, Roberts accessed the DraftKings and FanDuel applications on his personal cell phone.

202.    Roberts's suspension detrimentally affected Roberts's collegiate experiences and future opportunities.

### III.    Brennan Swafford

203.    Plaintiff Brennan Swafford is a two-time NAIA national champion who competed for the UI wrestling team during the 2022-2023 season.

204.    Swafford also started for the UI wrestling team during the very early portion of the 2023-2024 season until his suspension.

205.    Swafford opened a DraftKings account in his own name, with accurate DOB and SSN information, in or around April of 2023 when Swafford was 23 years old. Swafford downloaded the account and App to his phone at the same time.

206.    Swafford's personal bank account was connected to the DraftKings account.

207.    Swafford created the DraftKings account to place a $20.00 bet on the UI women's basketball team when they played in the National Championship in April 2023.

208.    The $20 wager on the UI women's basketball team to win the National Championship was the only bet Swafford made.

209.    Swafford was suspended by the NCAA for the 2023-2024 season after Defendant Sanger used GeoComply's technology to geofence UI's athletic facility to identify individual

online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication.

210.    Although Swafford was not and has not been charged by the State for his $20 bet on the UI women's basketball team, Swafford was forced to miss the remainder of his senior season, which included his final year of eligibility.

211.    At all times relevant to the events complained of herein, Swafford had the DraftKings application downloaded to his personal cell phone.

212.    At all times relevant to the events complained therein, Swafford used his personal bank account in conjunction with the DraftKings account on his personal cell phone.

213.    At all times relevant to the events complained therein, Swafford's name was listed on the DraftKings account.

214.    During the relevant dates when GeoComply data was retrieved by Defendants, Swafford accessed the DraftKings application on his personal cell phone.

215.    Swafford' suspension detrimentally affected Swafford' collegiate experiences and future opportunities.

**IV.    Corey Cabanban**

216.    Plaintiff Corey Cabanban competed for the ISU wrestling team from 2019-2023.

217.    After turning 21 years old, Cabanban opened a FanDuel account in his own name, with accurate DOB and SSN information. Cabanban downloaded the FanDuel account and app to his personal cell phone when he created the account.

218.    Cabanban's personal bank account was connected to the FanDuel account.

219.    Cababan was suspended by the NCAA for the 2023-2024 season after Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication.

220.    Although Cabanban was not and has not been charged by the State for his online sports wagering, Cabanban was forced to miss the entirety of his senior season, which included his final year of eligibility.

221.    At all times relevant to the events complained of herein, Cabanban had the FanDuel application downloaded to his personal cell phone.

222.    At all times relevant to the events complained therein, Cabanban used his personal bank account in conjunction with the DraftKings App and account on his personal cell phone.

223.    At all times relevant to the events complained therein, Cababan's name was listed on the FanDuel account described above.

224.    During the relevant dates when GeoComply data was retrieved by Defendants, Cabanban accessed the FanDuel application on his personal cell phone.

225.    Cabanban's suspension detrimentally affected Cabanban's collegiate experiences and future opportunities.

## V.    Cameron "Cam" Jones

226.    Plaintiff Cameron Jones is a NCAA All-American who has competed for the ISU track and field team from 2021-2024.

227.    In June 2022, after turning 21 years old, Jones opened a DraftKings account in his own name with accurate DOB and SSN information. Jones downloaded the DraftKings account and app to his personal cell phone when he created the account.

228.    Jones' personal bank account was connected to the DraftKings account.

229.    Jones learned of the investigation after Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication.

230.    Although Jones was not and has not been charged by the State for his online sports wagering, Jones was forced to miss five NCAA track and field competitions, and assessed a $500 civil penalty by the NCAA.

231.    At all times relevant to the events complained of herein, Jones had the DraftKings application downloaded to his personal cell phone.

232.    At all times relevant to the events complained therein, Jones used his personal bank account in conjunction with the DraftKings App and account on his personal cell phone.

233.    At all times relevant to the events complained therein, Jones' name was listed on the DraftKings account described above.

234.    During the relevant dates when GeoComply data was retrieved by Defendants, Jones accessed the DraftKings application on his personal cell phone.

235.    Jones' suspension detrimentally affected Jones' collegiate experiences and future opportunities.

## VI. Samuel Schuyler

236.    Plaintiff Samuel Schuyler competed for the ISU wrestling team from 2021-2023, where he was a two-time NCAA Qualifier, Big 12 Runner-up, and a NWCA Scholar All-American.

237.    Schuyler opened DraftKings and FanDuel accounts in his own name, with accurate DOB and SSN information, after he turned 21 years old. Schuyler downloaded the DraftKings and FanDuel accounts and apps to his personal cell phone when he created them.

238.    Schuyler's personal bank account was connected to the DraftKings and FanDuel accounts.

239.    During the 2023-2024 school year, Schuyler attended and was employed by ISU as a graduate assistant coach for the ISU wrestling team.

240.    Schuyler learned of DCI's investigation after Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication.

241.    Although Schuyler was not and has not been charged by the State for his online sports wagering, Schuyler was twice terminated by ISU as a graduate assistant for the ISU wrestling team as a result of the investigation and Defendants' aforementioned conduct.

242.    At all times relevant herein, Schuyler had the DraftKings and FanDuel applications downloaded to his personal cell phone.

243.   At all times relevant to the events complained herein, Schuyler used his personal bank account in conjunction with the DraftKings and FanDuel Apps and accounts on his personal cell phone.

244.   At all times relevant to the events complained herein, Schuyler's name was listed on the DraftKings and FanDuel accounts described above.

245.   During the relevant dates when GeoComply data was retrieved by Defendants, Schuyler accessed the DraftKings and FanDuel applications on his personal cell phone.

246.    Schuyler's terminations detrimentally affected Schuyler's collegiate experiences and future opportunities.

**VII.   Carter Schmidt**

247.   Plaintiff Carter Schmidt competed for the ISU wrestling team from 2021-2024.

248.   Schmidt opened DraftKings and FanDuel accounts in his own name, with accurate DOB and SSN information, after he turned 21 years old. Schmidt downloaded the DraftKings and FanDuel accounts and apps to his personal cell phone when he created them.

249.   Schmidt's personal bank account was connected to the DraftKings and FanDuel accounts.

250.   Schuyler learned of DCI's investigation after Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication.

251.   Although Schuyler was not and has not been charged by the State for his online sports wagering, Schuyler was initially informed that he would likely be suspended from competing for the ISU wrestling team during his senior and final year.

252.   At all times relevant herein, Schmidt had the DraftKings and FanDuel applications downloaded to his personal cell phone.

253.   At all times relevant to the events complained herein, Schmidt used his personal bank account in conjunction with the DraftKings and FanDuel Apps and accounts on his personal cell phone.

254.   At all times relevant to the events complained herein, Schmidt's name was listed on the DraftKings and FanDuel accounts described above.

255.   During the relevant dates when GeoComply data was retrieved by Defendants, Schmidt accessed the DraftKings and FanDuel applications on his personal cell phone.

256.   Defendants' actions detrimentally affected Schmidt's collegiate experiences.

**VIII.   Nathan Schon**

257.   Plaintiff Nathan Schon competed for the ISU wrestling team from 2022-2023.

258.   In late 2021, Schon's family member opened DraftKings and FanDuel accounts with the express intention of allowing Schon to use it.  The DraftKings and FanDuel app and accounts were downloaded on Schon's phone in late 2021.

259.   Schon had express consent from aforementioned family member to download and use the accounts.

260.   After Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and

geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication, DCI applied and received authorization for a search warrant to Schon's cell phone.

261.    DCI executed the search warrant and seized Johnson's cell phone.

262.    As a result of the investigation, Schon was suspended by the NCAA for the entire 2023-2024 wrestling season.

263.    On August 18, 2023, Defendant Sanger filed a criminal complaint against Schon for an indictable offense.

264.    On September 19, 2023, before the disclosure of the Defendants' conduct alleged herein, Schon entered into a plea agreement with the State wherein Schon pled guilty to a simple misdemeanor Underage Gambling in violation of Iowa Code §725.19(1).

265.    At all times relevant to the events complained of herein, Schon had the DraftKings and FanDuel applications downloaded to his personal cell phone.

266.    At all times relevant to the events complained of herein, Schon used his personal bank account in conjunction with the DraftKings and FanDuel accounts on his personal cell phone.

267.    During the relevant dates when GeoComply data was retrieved by Defendants, Schon accessed the DraftKings and FanDuel applications on his personal cell phone.

268.    Due to Defendants' actions and/or failures, Schon's collegiate experience and future opportunities have been detrimentally affected.

**IX.    Drew Woodley**

269.    Plaintiff Drew Woodley competed for the ISU wrestling team from 2020-2023.

270.   In late 2021, Woodley downloaded and used a DraftKings account in a family member's name, the app and account for which was downloaded onto Woodley's personal cell phone and linked directly to Woodley's financial account.

271.   After Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication, DCI applied and received authorization for a search warrant to Woodley's cell phone.

272.   DCI executed the search warrant and seized Johnson's cell phone.

273.   As a result of the investigation, Woodley was suspended by the NCAA for the 2023-2024 wrestling season.

274.   On August 24, 2023, Defendant Sanger filed a criminal complaint against Woodley for an indictable offense.

275.   On December 5, 2023, before the disclosure of the Defendants' conduct alleged herein, Woodley entered into a plea agreement with the State wherein Woodley pled guilty to a simple misdemeanor Underage Gambling in violation of Iowa Code §725.19(1).

276.   At all times relevant to the events complained of herein, Woodley had the DraftKings application downloaded to his personal cell phone.

277.   At all times relevant to the events complained of herein, Woodley used his personal bank account in conjunction with the DraftKings account on his personal cell phone.

278. During the relevant dates when GeoComply data was retrieved by Defendants, Woodley accessed the DraftKings application on his personal cell phone.

279. Due to Defendants' actions and/or failures, Woodley's collegiate experience and future opportunities have been detrimentally affected.

## X.   Jeremiah "Trey" Mathis

280. Plaintiff Jeremiah Mathis is a former student and member of the ISU football during the 2022-2023 season.

281. In 2021, Mathis's family member opened a DraftKings account with the express intention of allowing Mathis to use it. The DraftKings app and account were downloaded on Mathis's personal cell phone thereafter.

282. Mathis had express consent from his aforementioned family member to download and use the account.

283. After Defendant Sanger used GeoComply's technology to geofence ISU's athletic facility to identify individual online sports wagering accounts for apps that were either opened or active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication, DCI applied and received authorization for a search warrant to Mathis's cell phone.

284. DCI executed the search warrant and seized Mathis's cell phone.

285. As a result of the investigation, Mathis was informed by the ISU coaching staff that he would be suspended for the 2023-2024 football season.

286.    On August 18, 2023, Defendant Sanger filed a criminal complaint against Mathis for an indictable offense.

287.    On October 2, 2023, before the disclosure of the Defendants' conduct alleged herein, Mathis entered into a plea agreement with the State wherein Mathis pled guilty to a simple misdemeanor Underage Gambling in violation of Iowa Code §725.19(1).

288.    At all times relevant to the events complained of herein, Mathis had the DraftKings application downloaded to his personal cell phone.

289.    At all times relevant to the events complained of herein, Mathis used his personal bank account in conjunction with the DraftKings account on his personal cell phone.

290.    During the relevant dates when GeoComply data was retrieved by Defendants, Mathis accessed the DraftKings app on his personal cell phone.

291.    Due to Defendants' actions and/or failures, Mathis's collegiate experience and future opportunities have been detrimentally affected.

## XI.    Evan Schuster

292.    Plaintiff Evan Schuster was a student equipment manager for the UI basketball team during the 2022-2023 season.

293.    In 2021, Schuster's family member opened a FanDuel account with the express intention of allowing Schuster to use it.  The FanDuel app and account were downloaded on Schuster's personal cell phone thereafter.

294.    Schuster had express consent from his aforementioned family member to download and use the account.

295.    After Defendant Sanger used GeoComply's technology to geofence UI's athletic facility to identify individual online sports wagering accounts for apps that were either opened or

active, used Kibana analytic software to obtain drawback reports detailing the dates, times, and geolocations in which each of those individual accounts were either opened or used, and used non-administrative subpoenas to secure further geolocation data and contents of electronic communication, law enforcement applied and received authorization for a search warrant to Schuster's cell phone.

296. Law enforcement executed the search warrant and seized Schuster's cell phone.

297. As a result of the investigation, Schuster was indefinitely suspended as an equipment manager for UI basketball.

298. On August 21, 2023, Defendant Sanger filed a criminal complaint against Schuster for an indictable offense.

299. In early 2024, before the disclosure of all the Defendants' conduct alleged herein, Schuster entered into a plea agreement with the State wherein Schuster pled guilty to a simple misdemeanor Underage Gambling in violation of Iowa Code §725.19(1).

300. At all times relevant to the events complained of herein, Schuster had the FanDuel application downloaded to his personal cell phone.

301. At all times relevant to the events complained of herein, Schuster used his personal bank account in conjunction with the FanDuel account on his personal cell phone.

302. During the relevant dates when GeoComply data was retrieved by Defendants, Schuster accessed the FanDuel app on his personal cell phone.

303. Due to Defendants' actions and/or failures, Schuster's collegiate experience and future opportunities have been detrimentally affected.

## CAUSES OF ACTION

### Count One – Illegal Search

**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Brian Sanger, Chris Swigart, Chris Adkins, Phil Kennedy, Heather**
**Duenow, David Jobes, and Troy Nelson**

304.    Plaintiffs repeat and replead each allegation contained in the preceding paragraph as if fully set forth herein.

305.    The Fourth Amendment to the United States Constitution guarantees people the right to be free from unreasonable searches.

306.    A search under the Fourth Amendment occurs when a governmental employee or agent of the government violates an individual's reasonable expectation of privacy.

307.    At all times material hereto, each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson's actions and/or omissions were made under the color of authority and law as officers and employees of the State of Iowa, DPS, and DCI.

308.    On all dates relevant to the events complained of herein, each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson violated each of the Plaintiffs' constitutional rights by utilizing GeoComply software to illegally, and without a warrant or consent, track each of Plaintiffs' activity on their cell phones.

309.    Each of the Plaintiffs had privacy interests in the information and data on their cell phones that were searched as protected by *Carpenter v. U.S.*, 585 U.S. 296 (2018).

310.    Plaintiffs had a privacy interest in their locations that were accessed via each of the Defendants' illegal search utilizing GeoComply software, which is a right that has historically been protected by *U.S. v. Jones*, 565 U.S. 400 (2012) and *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021).

311.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson violated each of the Plaintiffs' clearly established Fourth Amendment rights under the United States Constitution to be free from unlawful search.

312.    On all dates relevant to the events complained of herein, the law was clearly established that a search made without a warrant into a person's personal cell phone violated the Fourth Amendment of the United States Constitution.

313.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson demonstrated deliberate indifference to and reckless disregard for each of the Plaintiffs' civil and constitutional rights by effectuating an unconstitutional search.

314.    The actions of each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson were willful, wanton, and in gross disregard for each of the Plaintiffs' civil rights, justifying an award of punitive damages.

315.    Each of the Plaintiffs request reasonable attorney fees and costs associated with the prosecution of this action under 42 U.S.C. §1988.

316.    As a direct and proximate result of each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson's illegal and unjustified conduct, each of the Plaintiffs have suffered deprivations of their liberty and mental and emotional anguish, for which they sue herein.

**Count Two- Illegal Seizure**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Brian Sanger, Chris Swigart, Chris Adkins, Phil Kennedy, Heather Duenow, David Jobes, and Troy Nelson**

317.    Plaintiffs repeat and replead each allegation contained in the preceding paragraph as if fully set forth herein.

318.    The Fourth Amendment to the United States Constitution guarantees people the right to be free from unreasonable searches.

44

319.    At all times material hereto each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson's actions and/or omissions were made under the color of authority and law as officers and employees of the State of Iowa, DPS, and DCI.

320.    On all dates relevant to the events complained of herein, each of Plaintiffs' constitutional rights were violated when their personal property, i.e. their personal data and cell phones, were unlawfully seized by agents of the State of Iowa, DPS, and DCI, at the direction of each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson.

321.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson knew that the warrants used as justification to obtain Plaintiffs' cell phones and personal data were invalid as issued based on fruits of the poisonous tree.

322.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson were in charge of the illegal investigation which utilized GeoComply software to search into Plaintiffs' personal activity on their cell phones, which subsequently was used as justification to obtain an unlawful warrant for many of the Plaintiffs' phones.

323.    In not having constitutional authority to do so, each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson had no lawful right to seize Plaintiffs' cell phones and personal data during the illegal investigation and search through each of Plaintiffs' personal property which each of the Plaintiffs had undisputed privacy interests in.

324.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson knowingly violated each of the Plaintiffs' clearly established Fourth Amendment rights under the United States Constitution to be free from unlawful seizure.

325.    On all dates relevant to the events complained of herein, the law clearly established a seizure made with an invalid warrant of a person's personal cell phone and personal data was

considered fruits of the poisonous tree and violated the Fourth Amendments of the United States Constitution.

326.   Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson demonstrated a deliberate indifference to and reckless disregard for Plaintiffs' civil and constitutional rights by effectuating an unconstitutional seizure.

327.   The actions of each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson were willful, wanton, and in gross disregard for each of the Plaintiffs' civil rights, justifying an award of punitive damages.

328.   Each of the Plaintiffs request reasonable attorney fees and costs associated with the prosecution of this action under 42 U.S.C. §1988.

329.   As a direct and proximate result of each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson's illegal and unjustified conduct, each of the Plaintiffs have suffered losses to their liberty and mental and emotional anguish.

**<u>Count Three - Failure to Intervene</u>**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Brian Sanger, Chris Swigart, Chris Adkins, Phil Kennedy, Heather Duenow, David Jobes, and Troy Nelson**

330.   Plaintiffs repeat and replead each allegation contained in the preceding paragraph as if fully set forth herein.

331.   The Fourth Amendment to the United States Constitution guarantees people the right to be free from unreasonable searches.

332.   At all times material hereto each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson's actions and/or omissions were made under the color of authority and law as officers and employees of the State of Iowa, DPS, and DCI.

333.    Even though an officer has no liability under the doctrines of respondeat superior or supervisor liability, see *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011), at the time of this illegal investigation, it was clearly established that an officer who fails to intervene to prevent a constitutional violation by another officer may be held liable for violating the Fourth Amendment. *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009).

334.    Supervisory officers who act with "deliberate indifference toward the violation," *Wagner*, 664 F.3d at 275 (quoting *Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir. 2003)), or, in other words, are aware that their subordinates' actions create a "substantial risk of serious harm," may be liable if they fail to intervene to mitigate the risk of harm, *id*. (quoting *Kahle v. Leonard*, 477 F.3d 544, 551–52 (8th Cir. 2007)) (internal quotation marks omitted).

335.    On all dates relevant to the events complained of herein, each of Plaintiffs' constitutional rights were violated when (1) GeoComply software was used to illegally, and without a warrant or consent, track each of Plaintiffs' activity on their cell phones, and when (2) their personal property, i.e. their personal data and/or their cell phones, were unlawfully seized by agents of the State of Iowa, DPS, and DCI.

336.    Both the illegal search (tracking of Plaintiffs' activity) and the illegal seizure (taking of personal data held by electronic communication service providers, phones and data) were done by and/or at the direction of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson.

337.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson knew that the searches and subsequent seizures were illegal and constituted violations of each of the Plaintiffs' constitutional rights under the Fourth Amendment to the United States Constitution.

338.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson had an opportunity to stop or prevent the other Defendants from continuing to utilize Kibana technology to illegally search the Plaintiffs.

339.    Defendant Sanger testified at his deposition that each of the Defendants were present for meetings where they discussed Kibana use in this case – and an email referenced one of these meetings – in which it is stated that they did not have probable cause a crime had been committed.

340.    On February 2, 2023, Defendant Chris Adkins emailed Defendant Nelson and Defendant Sanger – in an email titled "Thoughts from Yesterday" – wherein he admits, amongst other things, that "we don't necessarily have a crime on the books in Iowa, but I think it would be a good idea to report them to the University, the Big Ten, and the NCAAS. If they get suspended or get a scholarship taken away, so be it."

341.    In this email on February 2, 2023, Defendant Adkins made a reference to something "Heather said yesterday". This was a reference to Defendant Heather Duenow.

342.    Upon information and belief, the discussion on February 1, 2023 – the day before this email – included the team members of the Unit, including Defendant Nelson, Defendant Sanger, Defendant Duenow, Defendant Adkins, Defendant Swigart, and Defendant Kennedy – and each was aware that there was not probable cause that any crimes had been committed on UI or ISU campuses yet the use of Kibana to perform geolocation searches was being utilized in violation of the Fourth Amendment of the United States Constitution.

343.    Each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson had an opportunity to stop or prevent the other Defendants from requesting and issues

subpoenas based on these illegal searches which the Defendants knew would violate each of the Plaintiffs' rights to be free from illegal seizures.

344.    However, knowing that constitutional violations were happening and were about to happen, none of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, or Nelson took any action to prevent or stop any of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson from violating Plaintiffs' constitutional rights.

345.    The actions of each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson were willful, wanton, and in gross disregard for each of the Plaintiffs' civil rights, justifying an award of punitive damages.

346.    Each of the Plaintiffs request reasonable attorney fees and costs associated with the prosecution of this action under 42 U.S.C. §1988.

347.    As a direct and proximate result of each of Defendants Sanger, Swigart, Adkins, Kennedy, Duenow, Jobes, and Nelson's illegal and unjustified conduct, each of the Plaintiffs have suffered losses to their liberty and mental and emotional anguish.

## PUNITIVE DAMAGES

348.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

349.    When viewed objectively from the standpoint of each of the Defendants, at the time of the occurrence, each of the Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

350.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by each of the Defendants, which was recklessly or callously indifferent to each

of the Plaintiffs' constitutionally protected rights, each of the Plaintiffs are entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## DAMAGES

351.    As a direct and proximate result of the acts and omissions of each of the Defendants as described above, each of the Plaintiffs suffered and hereby seek recovery for economic injuries, damages, and losses, and other economic losses and damages.

352.    Plaintiffs are also entitled to all case costs and interest, pre- and post-judgment, as provided by Iowa and Federal law.

353.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiffs seek to recover, and hereby request the award of punitive damages, reasonable attorney's fees, and costs of court.

## ATTORNEY'S FEES

354.    If Plaintiffs prevail in this action, by settlement or otherwise, Plaintiffs are entitled to and hereby demand attorney's fees under 42 U.S.C. § 1988.

## JURY DEMAND

355.    Plaintiffs demand a jury trial on all issues so triable.

## PRAYER

WHEREFORE, Plaintiffs respectfully request this Court enter judgment in their favor and against Defendants, and award them all relief allowed by law and equity, including but not limited to:

a.    Actual economic damages as established at trial;

b.    Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, including but not limited to, lost wages, physical and mental pain, trauma, fear, anxiety, permanent disfigurement, loss of enjoyment of life, loss of liberty, loss of sense of security, and other nonpecuniary losses;

c.    Consequential damages;

d.      Punitive or exemplary damages for all claims as allowed by law in an amount to be determined at trial;

e.      Issuance of an Order mandating appropriate equitable relief,

f.      Pre-judgment and post-judgment interest at the highest lawful rate;

g.      Attorney's fees and costs;

h.      All other allowable damages against Defendants; and

i.      Such further relief as justice requires.

**PALMER PERLSTEIN**

BY: */s/ James P. Roberts*

James P. Roberts, #24105721
Grant Gerleman, #24083065
Scott H. Palmer, #00797196
(*Pro Hac Admissions Pending*)
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: (214) 987-4100
Facsimile: (214) 922-9900
Email:   james@palmerperlstein.com
         grant@palmerperlstein.com
         scott@palmerperlstein.com

**SANDY LAW FIRM, P.C.**

BY: */s/ Christopher D. Sandy*

Christopher D. Sandy, #AT0001037
Michael L. Sandy, #AT0012779
304 18th St. PO Box 445
Spirit Lake, IA 51360
Telephone: (712) 336-5588
Facsimile: (712) 336-5589
Email: christopher@sandylawpractice.com
         michael@sandylawpractice.com

**ATTORNEYS FOR PLAINTIFFS**