IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PANIRO JOHNSON, TERRY ROBERTS, BRENNAN SWAFFORD, COREY CABANBAN, CAMERON "CAM" JONES, SAMUEL SCHUYLER, CARTER SCHMIDT, NATHAN SCHON, DREW WOODLEY, JEREMIAH "TREY" MATHIS III, AND EVAN SCHUSTER<br><br>        Plaintiffs,<br><br>v.<br><br>BRIAN SANGER, CHRISTOPHER SWIGART, CHRISTOPHER ADKINS, PHILLIP KENNEDY, HEATHER DUENOW, DAVID JOBES, AND TROY NELSON,<br><br>        Defendants. | Case No. 4:24-cv-00146-RGE-SBJ<br><br><br><br>**BRIEF SUPPORTING DEFENDANTS' PRE-ANSWER MOTION TO DISMISS INTERVENORS' COMPLAINT** |

TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………2

FACTS……………………………………………………………………………………7

ARGUMENT……………………………………………………………………………11

I.    INTERVENORS FAILED TO PLEAD PLAUSIBLE CLAIMS FOR ILLEGAL
SEARCH (COUNT I) AND ILLEGAL SEIZURE (COUNT II) ………..…..………12

A. Intervenors Johnson, Schon, Woodley, Mathis and Schuster Lack Standing
To Allege a Constitutional Violation……………………………………………...12

B. Intervenors Failed To Plead a Constitutional Violation…....………………..……15
   1.  Intervenors Had No Reasonable or Actual Expectation of Privacy
       In Their Location Data……………………………………………………………16
   2.  Narrow Technological Surveillance of Voluntarily Disclosed
       Location And Movement Data Is Not a Fourth Amendment Search…………..18

3.    The Third-Party Doctrine Defeats Intervenors' Claims. .............................20
4.    Defendants Here Did Not Conduct A CSLI Search Like the Officers
In *Carpenter V. United States*; The Third-Party Doctrine Applies.................23
5.    Defendants Did Not Conduct A Typical Geofence Search.............................29
6.    No Defendant Conducted A Warrantless Search Of A Cellphone
Or Accessed Private Personal  Information................................................31
7.    Regardless Of Whether A "Search" Occurred, Once Provided To
Third-Party Companies, Intervenors' Location Data Was in An
Unprotected Digital Space. ...............................................................32
8.    Even If A "Search" Occurred, Intervenors Consented to It..........................33
9.    No Warrant was required for a search and seizure of location data
due to "special needs".....................................................................35
C. No unconstitutional seizure occurred.....................................................44

II.    INTERVENORS FAILED TO STATE A PLAUSIBLE CLAIM FOR RELIEF
FOR COUNT III:  FAILURE TO INTERVENE.......................................47

III.    EVEN IF A CONSTITUTIONAL VIOLATION OCCURRED, THE ALLEGED
RIGHT WAS NOT CLEARLY ESTABLISHED; DEFENDANTS ARE
ENTITLED TO QUALIFIED IMMUNITY...............................................48

IV.    INTERVENORS ARE NOT ENTITLED TO DAMAGES, AND THEIR
CLAIMS ARE NEITHER COGNIZABLE NOR CAUSALLY LINKED TO A
CONSTITUTIONAL VIOLATION. ......................................................54
A. Intervenors Cannot Show Defendants Caused Their Damages...............55
B. Intervenors Do Not Have Cognizable Claims. ....................................57
C. Intervenors Cannot Recover For Their Own Illegal Activity. .................59

CONCLUSION...........................................................................60

## INTRODUCTION

In 2019, Iowa legalized online sports wagering. And the computer or smartphone became—in essence—the front door to the casino. But territory restrictions apply to online gamblers—they must be in Iowa to place bets. So Iowa law required online Sportsbooks to monitor geolocation activity. This enables them to reject bets attempted outside permitted boundaries. But gambling regulations also require monitoring to detect fraud and other suspicious wagering, which Sportsbooks must report to the Iowa Racing and Gaming Commission ("IGRC").

To comply with these requirements, online Sportsbooks use the services of a company called GeoComply. GeoComply is a licensed vendor in Iowa, and its technology enables Sportsbooks to geolocate a device at certain intervals when a Sportsbook application is open. The company also supplies a software tool called Kibana, which can render geolocation data viewable on a pindrop map. This viewable data is anonymized. The Sportsbooks notify their users that location data is monitored and may be shared for various reasons with third parties, the government, or law enforcement. The Sportsbooks give this notice through their user agreements, terms and conditions, or privacy policies.

This case was originally filed on April 26, 2024 by Eyioma Uzazurike, *et al.*, against a set of defendants that included, among others, the State of Iowa, Iowa Department of Public Safety ("DPS"), Iowa Division of Criminal Investigation ("DCI"), and several DCI agents with the DCI's Sports Wagering Unit. The original plaints then filed to amend their complaint to assert new claims against different defendants. This time, the plaintiffs name the members of the DCI's Sports Wagering Unit, in their individual capacities only. They allege the defendants violated their rights in obtaining the plaintiffs' location data while using the online Sportsbooks, as discussed in greater detail in the Brief in Support of Defendants' Pre-Answer Motion to Dismiss Plaintiffs' Amended Complaint, filed contemporaneously with this brief.

On September 3, 2024, Paniro Johnson, Terry Roberts, Brennan Swafford, Corey Cabanban, Cameron "Cam" Jones, Samuel Schuyler, Carter Schmidt, Nathan Schon, Drew Woodley, Jeremiah "Trey" Mathis III, and Evan Schuster (collectively

"Intervenors") filed a motion to intervene in the case asserting substantially the same claims against the same defendants arising out of the same general set of circumstances as the plaintiffs' amended complaint. These Intervenors are additional current or former NCAA athletes and one equipment manager who, like the original plaintiffs, engaged in sports wagering in violation of NCAA rules or Iowa law. They likewise voluntarily shared their location data through the online Sportsbooks so they could gamble online. Some of the Intervenors also fraudulently used other peoples' Sportsbook accounts to evade detection. They likewise assert the Defendants here have violated their rights—and, as discussed in detail below, their claims also fail.

The set of Defendants named by the Intervenors here are DCI Special Agents Brian Sanger, Christopher Swigart, Christopher Adkins, Phillip Kennedy, and Heather Duenow, and Special Agent in charge Troy Nelson and Assistant Director of DCI David Jobes. The Defendants comprise the DCI's Sports Wagering Unit. DCI is "the primary criminal investigative and enforcement agency for the purpose of enforcement of" Iowa Code chapter 99F, which governs Iowa's sports wagering regulations. Iowa Code § 80.25A.

In about September 2023, the IRGC authorized DCI to monitor Sportsbooks' geolocation data. The authorization was limited in scope to the purposes of Iowa Code section 99F.12(2)(*b*), which requires Sportsbooks to report *inter alia* "any abnormal wagering activity or patterns that may indicate a concern about the integrity of an authorized sporting event" or "any other conduct with the potential to corrupt a wagering outcome of an authorized sporting event . . . for purposes of financial gain."

The section identifies concerns about "match fixing, and suspicious or illegal wagering activities, including the use of funds derived from illegal activity, wagers to conceal or launder funds derived from illegal activity, use of agents to place wagers, or use of false identification." *Id.*

In reviewing location data, DCI Special Agent Sanger observed wagering activity in college athletic facilities where members of the public are barred from entry. But law forbids coaches, athletic trainers, officials, players, and certain others from sports wagering. So out of concern for match fixing and cheating, DCI subpoenaed the Sportsbooks for identifying information associated with these bets, and it discovered Plaintiffs and Intervenors' involvement. DCI subpoenaed schools for player contact information and ultimately obtained search warrants for certain Plaintiffs' and Intervenors' phones.

Upon learning of Intervenors' illicit gambling activities, Intervenors' colleges and universities suspended them from athletic participation. Some Intervenors were also charged with violations of Iowa gambling laws. Several Intervenors pleaded guilty to criminal charges and admitted they inappropriately used other peoples' gambling accounts.

Here, under 42 U.S.C. section 1983, Intervenors allege that Defendants violated their Fourth Amendment rights, premised on alleged illegal search and seizure and an alleged failure to intervene by other members of the Sports Wagering Unit. But the claims fail.

First, no illegal search or seizure occurred. The initial "geofence search" was not a search under the Fourth Amendment. Even if it did constitute a search, Intervenors had no reasonable expectation of privacy in the location data they voluntarily shared with third-party Sportsbooks. Several Intervenors lack standing because the allegedly-searched accounts weren't even theirs. Yet, even if a search occurred Intervenors consented to the disclosure of their location data to the government or law enforcement.

This is not a case where police retrieved involuntarily- and mass-collected Cell Site Location Information ("CSLI") to reconstruct a complete picture of a suspect's historic location and movements. Instead, Intervenors knowingly and voluntarily shared their locations through their betting applications so they could gamble online. The narrow holding of *Carpenter v. U.S.*, 585 U.S. 296 (2018), does not apply here.

DCI subpoenaed the Sportsbooks for identifying information associated with the bets and the schools for player contact information. DCI then used that information to obtain search warrants for some of the Intervenors' cell phones. The search warrants were supported by probable cause of criminal activity, i.e. identity theft, tampering with records, and underage gambling.

Second, Intervenors cannot show that a right to be free from a warrantless review of location data voluntarily shared with third-party betting companies to comply with territorial gambling regulations and gamble online was clearly established. Qualified immunity shields Defendants from suit.

Third, Defendants did not cause Intervenors' damages. The colleges and universities suspended Intervenors; Defendants did not. To the extent they allege damages in or because of their criminal convictions, those claims fail under the *Heck* doctrine, because they have not shown any of those convictions were overturned.

Finally, Intervenors demand a civil recovery for their own criminal activity— and that's just wrong as a matter of public policy. Even if Intervenors' rights were infringed, and even if they could link their damages to Defendants acts, they have unclean hands. "No court will lend its aid to a party who founds his claims for redress upon an illegal act." *The Fla.*, 101 U.S. 37, 43, 25 L. Ed. 898 (1879).

Intervenors want to make bad law that rewards criminal behavior. Their Complaint should be dismissed.

## FACTS

Although Defendants recite some pleaded facts from the complaint, they do so under the standards applying to motions to dismiss; they do not concede the veracity of the alleged facts. *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (noting that when reviewing Rule 12(b)(6) motions, courts "accept the factual allegations of the complaint as true."). Defendants refer the Court to the facts set forth in Defendants' Motion to Dismiss Plaintiffs' Complaint for a more detailed discussion.

Much like Plaintiffs in the original cause of action, Intervenors attempt to divert attention from their criminal activity, which raises standing problems – addressed later – and which doom these Intervenors' claims from the start. But the goal of qualified immunity is to protect Defendants not only from judgment but also from suit. *T.S.H. v. Green*, 996 F.3d 915, 918 (8th Cir. 2021). So where facts are

publicly available or appear in documents contemplated by the complaint, the Court should consider them when ruling on Defendants' motion to dismiss.[1]

The Intervenors' Complaint does not explain when, where, and how—indeed, even *whether*—each of the Intervenors placed sports wagers. And while Intervenors claim they may have had permission to place bets on other peoples' accounts, they omit that such wagering is in violation of the sportsbooks' terms and conditions. Because Iowa law, User Agreements, and NCAA rules forbid these athletes from gambling, their covert wagering was an obvious attempt avoid detection. Other Intervenors were underage or otherwise gambling illegally. Several Intervenors admitted these violations in their criminal cases:

- **Intervenor Nathan Schon**: "I used Kristine Schon's identity and account to place approximately 865 sports wagers on Draft Kings[.] The sum total of my wagers totaled more than $11,700[.] I was under the age of 21 for at least one of the wagers placed on Kristine Schon's DraftKings account[.] Twenty-one wagers were made on Iowa State University sporting events at which time I was an Iowa State wrestler." [App. 208].
- **Intervenor Drew Woodley**: "I used Kelli Helgeson's identity and account in excess of 100 wagers on DraftKings[.] The sum total of my wagers totaled over $2,251.00[.] I was under the age of 1 at the time he placed at least one sports wager[.] I placed wagers on Iowa State University basketball and football events while a wrestler at Iowa State University." [App. 214].

---

[1] When deciding a motion to dismiss, the Court may consider materials outside the pleadings that "are part of the public record or do not contradict the complaint." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)); *Illig*, 652 F.3d at 976. The court also considers those documents that are "integral to the claim[s]" or "contemplated by or expressly mentioned in the complaint" when their authenticity is unquestioned. *Dittmer Props., L.P. v. F.D.I.C.*, 708 F.3d 1011, 1021 (8th Cir. 2013); *Porous Media Corp.*, 186 F.3d at 1079 (Courts "may consider 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint'" (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1357, at 299 (1990))).

- **Intervenor Jeremiah Mathis III**: "I state that being under the legal age to gamble in Iowa, I used my mother's account on DraftKings to place in excess of 125 wagers and said wagers totaled more than $556.00." [App. 222].
- **Intervenor Evan Schuster**: "On August 4, 2020, in Johnson County, Iowa, the Defendant placed a sports bet while under the age of 21 on a fantasy contest involving monetary stakes." [App. 226].

Much like the Plaintiffs, Agent Sanger uncovered many of the Intervenors' illicit gambling through the Sportsbooks during his investigation. The investigation is explained in detail in Defendants' Motion to Dismiss Plaintiffs' Complaint.

And again, much like the Plaintiffs' Complaint, the Intervenors allege Agent Sanger used the GeoComply technology without a warrant to review sports betting location data at Iowa State University, University of Iowa, and other colleges. [Doc. 33 ¶¶82, 84-86]. This review found randomized unique identifiers, which did not identify the account holders. [Doc. 33 ¶85].[2] With these identifiers in hand, Agent Sanger and DCI then subpoenaed the Sportsbooks to identify the account holders. [Doc. 33 ¶103]. DCI officials and agents then applied to the court for search warrants, and once authorized, they seized Plaintiffs' phones. [Doc. 33 ¶176]. And after obtaining this information, prosecutors throughout the state arrested certain Intervenors for "an indictable offense." [Doc. 33 ¶¶178, 263, 274, 286, 298].

Intervenors claim they experienced various damages, mainly from suspensions. But they neglect to explain how they were suspended, who made those decisions, or how such decisions could have been controlled by Defendants.

---

[2] The DraftKings Privacy Policy or Terms and Conditions often has similar language. For space and convenience, Defendants primarily discuss the FanDuel policy and provide parallel citations as appropriate.

Defendants' investigations led to criminal charges, but Intervenors' suspensions do not stem from those. Some of the criminally-charged Intervenors' suspensions predate their criminal charges. And some of the suspended Intervenors were not criminally charged at all. But in many instances, Intervenors fail to reveal in their complaint precisely when their suspensions began, sometimes claiming in conclusory manner it was because of the investigation and/or charges, but they reveal little else. The following chart[3] organizes some relevant facts about these Intervenors:

| Intervenor | Consequence | Account |
|---|---|---|
| Paniro Johnson | NCAA suspension | Family members |
| Terry Roberts | NCAA suspension | Own account |
| Brennan Swafford | NCAA suspension | Own DraftKings account |
| Corey Cabanban | NCAA suspension | Own FanDuel account |
| Cameron Jones | NCAA suspension | Own DraftKings account |
| Samuel Schuyler | Termination of employment | Own DraftKings and FanDuel accounts |
| Carter Schmidt | None alleged | Own FanDuel and DraftKings accounts |
| Nathan Schon | NCAA suspension Conviction for underage gambling on 9/19/23 | Family member |
| Drew Woodley | NCAA suspension Conviction for underage gambling on 12/5/23 | Family member |
| Jeremiah Mathis | NCAA suspension Conviction for underage gambling on 10/2/23 | Family member |
| Evan Schuster | NCAA suspension Conviction for underage gambling | Family member |

---

[3] Facts here come from the division of Intervenors' Complaint discussing allegations specific to each Plaintiff, and Plaintiffs' criminal documents and guilty pleas included in Defendants Appendix supporting their Motion to Dismiss at pages 207-229.

## ARGUMENT

In Counts I and II, Intervenors do not plead any plausible claims for unreasonable search or seizure under the Fourth Amendment. No constitutional violation occurred. In Count III, Intervenors allege Defendants failed to intervene in Agent Sanger's investigation and, as a result, claim some unstated constitutional violation. But the law does not recognize a claim for failure to intervene outside of excessive use of force context.

Even if the Intervenors stated a recognizable constitutional violation, which they have not, any alleged constitutional violations were not clearly established and they are entitled to qualified immunity.

Finally, Intervenors' claims suffer causation problems. Some Intervenors have no cognizable claims under the *Heck* doctrine. And Intervenors cannot win a civil recovery for their illegal activity.

***Motion to dismiss standard.*** Intervenors fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also id.* r. 8(a)(2) (Intervenors did not state a "claim showing that [they] are entitled to relief"). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting "*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But this demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do." *Id.* "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* And the tenant that courts accept factual allegations as true "is inapplicable to legal conclusions." *Id.*

## I. Intervenors failed to plead plausible claims for illegal search (Count I) and illegal seizure (Count II).

### A. Intervenors Johnson, Schon, Woodley, Mathis and Schuster lack standing to allege a constitutional violation.

To evade detection, some Intervenors admit they used other peoples' gambling accounts to place sports bets online. [Doc. 33, ¶¶174, 258, 270, 281, 293; App. 208, 214, 222, 226]. They had no reasonable or actual expectation of privacy in gambling accounts they didn't own. So inspection of these third-party accounts did not invade their personal privacy rights, and they lack standing to challenge the alleged acts.

Standing generally "involves two inquiries: first, whether the proponent of a particular legal right has alleged 'injury in fact,' and, second, whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties." *Rakas v. Ill.*, 439 U.S. 128, 139 (1978).

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *Rakas,* 439 U.S. at 133; *Presley v. United States*, 895 F.3d 1284, 1289 (11th Cir. 2018)) ("Privacy is personal," so "Plaintiffs must demonstrate that their own privacy rights are at stake"); *Crosby v. Paulk*, 187 F.3d 1339, 1345 n.10 (11th Cir. 1999)) (Plaintiffs may not "assert[] Fourth Amendment rights of third parties who were subject to searches."); *see also U.S. v. Barragan*, 379 F.3d 524, 529 (8th Cir.

2004) ("An individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1988))). And people have no "reasonable expectation of privacy in another's belongings." *Lenz v. Winburn*, 51 F.3d 1540, 1549 (11th Cir. 1995).

A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. So "[i]f a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Barragan*, 379 F.3d at 529–530 (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

Aware they were violating NCAA rules, some Intervenors used others' gambling accounts to place bets and avoid detection. [Doc. 33, ¶¶174, 258, 270, 281, 293; App. 208, 214, 222, 226]. Even with their own accounts at stake, Intervenors had no reasonable expectation of privacy in location data they voluntarily shared with third parties, especially because they consented to disclosure of that information to the government or law enforcement. [App. 36; *see also* DraftKings, App. 9, 11–13]. No Fourth Amendment search occurred. But Intervenors lack standing to challenge geolocation monitoring of other people's accounts at the outset—even if that monitoring were a "search."

These standing principles apply to digital accounts. Parties have no privacy interests in digital accounts they don't own, so courts dismiss these challenges for lack of standing. *United States v. Davis*, No. 21-cr-0101, 2022 WL 3009240, at *7–8 (M.D. Ala. July 1, 2022) (where Google gave to police "identifying account information for a Gmail account that did not belong to" the defendant, but belonged to another person's device in the defendant's getaway car, the defendant lacked standing to challenge the search, because he didn't show his "own privacy rights [were] at stake."). And this avoids the "quagmire" of Fourth Amendment questions plaguing this evolving area of law. *Id.*

Intervenors fail to plead "a sufficiently close connection" to the accounts Defendants monitored to prove standing. *Barragan*, 379 F.3d at 529–530 (quoting *Gomez*, 16 F.3d at 256). Intervenors cannot assert privacy interests vicariously. *Rakas*, 439 U.S. at 133.

Also, when someone disassociates himself from property, they lose standing to challenge a search of that property. *U.S. v. Boruf*, 909 F.2d 111, 116 (5th Cir. 1990). Many Intervenors here "did everything [they] could do disassociate [themselves] from the" accounts to mask their illicit conduct. [App. 208, 214, 222, 226]. This voluntary denial of ownership "forfeit[ed] any reasonable expectation of privacy in [the accounts]." *U.S. v. Magnum*, 100 F.3d 164, 170 (D.C. Cir. 1996) (Defendant "disclaimed ownership of [a] bag" and so "abandoned" his property and waived any legitimate privacy interest in it"); *see also U.S. v. Green*, 275 F.3d 694, 699 (8th Cir.

2001) (Defendant could not "show any possessory or privacy interest in" another person's car, and, "[i]n fact, he ha[d] denied such an interest").

And expectations of privacy are even lower when a person is not "'legitimately on [the] premises'" of another's property. *See U.S. v. Douglas*, 774 F.3d 1065, 1070 (8th Cir. 2014) (quoting *Rakas*, 439 U.S. at 148)); *Cross v. Mokwa*, 547 F.3d 890, 894 n.4 (8th Cir. 2008) ("A person who is 'wrongfully on the premises' may not object to the legality of a search." (citation omitted)). But even where there is "common authority" and "mutual use of [] property," owners are "held to have a lower expectation of privacy in the area searched." *U.S. v. Risse*, 83 F.3d 212, 216 n.3 (8th Cir. 1996). Yet here, Intervenors weren't even the owners of the accounts. [Doc. 33, ¶¶174, 258, 270, 281, 293; App. 208, 214, 222, 226]. And they fail to show they enjoyed a "right to exclude" or had lawful possession, control, ownership, or other legitimate privacy interests in in these third-party accounts. *See Byrd v. U.S.*, 584 U.S. 395, 406 (2018).

Without "a sufficiently close connection to the" accounts, Intervenors lack "standing to claim [the accounts and location data] were searched or seized illegally." *Douglas*, 744 F.3d at 1071 (quoting *Barragan*, 379 F.3d at 529–530). Intervenors cannot maintain this action against Defendants without standing to allege a Fourth Amendment violation. *See Mokwa*, 547 F.3d at 894 n.4.

**B. Intervenors failed to plead a constitutional violation.**

Even where Intervenors used their own gambling accounts, they had no reasonable expectation of privacy in the location data they voluntarily shared to

gamble online. [App. 6, 9, 11–13, 37, 49, 122, 125, 130].[4] Monitoring of that data was not a Fourth Amendment "search." For many reasons, Intervenors cannot establish a constitutional violation:

- Intervenors had no reasonable or actual expectation of privacy in their location data.
- Narrow technological surveillance of voluntarily-shared location and movement data is not a Fourth Amendment "search."
- Under the Third-Party Doctrine, Intervenors have no reasonable expectation of privacy in location data they voluntarily gave to third-parties.
- The data review here was not like the search of mass-collected, Cell-Site Location Information ("CSLI") in *Carpenter v. U.S.*; this case is distinguishable, and the third-party doctrine applies.
- An inspection of voluntarily-provided location data is not a typical Geofence search.
- No Defendant conducted a warrantless search of a cellphone.
- The review of location data here was analogous to a search of an open field; no warrant was required.
- Even if a search occurred, "special needs" justified a departure from the warrant requirement.
- Defendants did not seize Intervenors' location data, and they later seized the cell phones in good-faith reliance on valid warrants.
- Intervenors waived a Fourth Amendment challenge, because they consented to the review and disclosure of their location data.

For these reasons, Counts I and II must be dismissed.

### 1. **Intervenors had no reasonable or actual expectation of privacy in their location data.**

No Fourth-Amendment "search" occurred here, so Defendants did not violate Intervenors' constitutional rights. Only when a person has an "expectation of privacy" that "society is prepared to recognize as reasonable" do government intrusions into that sphere "qualify as a search," requiring a warrant supported by probable cause.

---

[4] *See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

*Smith v. Md.*, 442 U.S. 735, 740, 746 (1979). This is an objective inquiry. *Id.* at 740. But the party must subjectively "seek[] to preserve [something] as private" as well. *Id.* Intervenors had no expectation objectively or subjectively.

Historically, the Fourth Amendment protects "the privacies of life" against "arbitrary power" in order "to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305. It braced against "arbitrary invasions by government officials" into "the privacy and security of individuals," especially from "the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.'" *Id.* at 303 (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)).

But the location data review here was nothing like that. Intervenors knowingly and voluntarily shared their location data with third parties to gamble online. [App. 6, 9, 11–13, 37, 49, 122, 125].[5] They also authorized disclosure of that data to the government or law enforcement, either explicitly or implicitly. [App. 130; *see also* DraftKings, App. 7–9, 11–13, 15]. And the third-party doctrine defeats Intervenors' claims.

Although the Supreme Court declined to extend the third-party doctrine to mass-collected, Cell Site Location Information ("CSLI") automatically generated by cell phones in *Carpenter v. U.S.*, 585 U.S. 296 (2018), this case is distinguishable. It

---

[5] *See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

lies at the intersection of two streams of authority—location/movement tracking authorities and third-party doctrine authorities—but it falls outside the *Carpenter* exception.

The following will analyze these authorities first and then show the *Carpenter* exception does not reach user generated location information—like the data here; so the third-party doctrine applies. Intervenors had neither an objective nor a subjective expectation of privacy in their location data.

Finally, aside from certain conclusory references to Defendants' use of GeoComply "illegally" [*E.g.*, Doc. 33 ¶308], Intervenors' complaint focuses on the actions of Defendant Sanger. [Doc. 33 ¶¶84-95]. Specific unconstitutional acts alleged against remaining Defendants are less clear, especially where many Defendants are listed solely because they were members of the task force, and no personal involvement is specified. But no Defendant violated Intervenors' constitutional rights.

## 2. Narrow technological surveillance of voluntarily disclosed location and movement data is not a Fourth Amendment Search.

Intervenors had no reasonable expectation of privacy in their location data here. When "voluntarily conveyed to anyone who want[s] to look," people generally lack a privacy interest in their physical location and movements. *See United States v. Knotts*, 460 U.S. 276 at 287. This is especially so when location and movements occur in public spaces. *Id.* at 281–82.

But Intervenors have revealed neither their locations nor their privacy interest in them at the time they access the online Sportsbooks. And that matters. But their

voluntarily disclosures of their locations to online Sportsbooks only diminished their expectations of privacy further.

Even where police surreptitiously track someone's movements, they do not intrude on a Fourth Amendment privacy interest. In *United States v. Knotts*, 460 U.S. 276, 277–280 (1983), police tracked a defendant's interstate movements by monitoring the signal of a discretely planted beeper in a container placed in his vehicle. Police there "relied not only on visual surveillance, but on the use of the beeper to signal the" defendant's presence. *Id.* at 282. But the Court held "[n]othing in the Fourth Amendment prohibited the police from augmenting the[ir] sensory faculties" with the "enhancement as science and technology afforded them." *Id.*

So *Knotts* involved (1) a surreptitiously planted beeper, (2) without the defendant's knowledge or (3) consent, which (4) continuously tracked the Defendant's location (5) over a long course of travel. That was constitutional. But it was more invasive than the alleged "search" here.

In this case, Intervenors (1) voluntarily (2) shared their location data to (3) comply with territorial gambling regulations, while (4) knowingly (5) consenting to monitoring by third parties and disclosure to the government, plus (6) the location data was not continually collected but (7) only recorded at certain intervals while the betting application was open. [App. 6, 9, 11–13, 37, 49, 122, 125].[6] The "enhancement"

---

[6] *See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

that "science and technology afforded" Defendants here was far less suspect than the secret tracking in *Knotts*.

Unlike *Knotts* and this case, continual, long-term tracking can raise privacy concerns. *United States v. Jones*, 565 U.S. 400, (2012). In *United States v. Jones*, the FBI remotely tracked the movements of the defendant's vehicle with a GPS tracking device for 28 days. *Id.* Although the majority focused on physical trespass, 565 U.S., at 404–405, five concurring Justices questioned continual tracking of a device like a cell phone, because it captures "every movement" someone makes, and "longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.* at 415 (Sotomayor, J., concurring), *id.* at 430 (Alito, J. concurring).

But this case involves no continual monitoring. GeoComply registers a person's location only at certain intervals while the betting application is open. [App. 122, 125].[7] That is when their location matters legally—they must be in the State to gamble online. It does not record people's "every movement." The data collected is narrow—its sweep is not unnecessarily broad to "impinge on expectations of privacy;" it only snapshots user locations while their betting applications are open. [*Id.*]. And this case involves no heightened Fourth Amendment concern raised by physical trespass. *See Jones*, 565 U.S., at 404–405. Intervenors do not sufficiently plead any expectation of privacy in their locations at the time they were gambling.

### 3. The third-party doctrine defeats Intervenors' claims.

---

[7] *See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN] (location verification occurs "when [GeoComply's] geolocation products and services are used," which "are not designed to track the general movements" of users).

Intervenors also have "no legitimate expectation of privacy in information [they] voluntarily turn[ed] over to third parties." *Smith*, 442 U.S. at 743–744. That is so "even if the information is revealed on the assumption that it will be used only for a limited purpose." *United States v. Miller*, 425 U.S. 435, 433 (1976). Intervenors have not shown they had a subjective expectation of privacy in their location data when gambling online; but even if they did, it was not "one that society is prepared to recognize as 'reasonable.'" *Id.* (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)).

Sharing information with third parties defeats an objectively reasonable expectation of privacy in that data. In *United States v. Miller*, the Supreme Court rejected a Fourth Amendment challenge where the government subpoenaed the defendant's bank for copies of his checks and bank records to investigate fraud and tax evasion. 425 U.S. at 436–437. These records were not "private papers" the defendant placed into "a constitutionally protected area." *Id.* at 440 (quoting *Hoffa v. United States*, 385 U.S. 293, 301–302 (1966)). The defendant could "assert neither ownership nor possession" over the documents; they were instead "business records of the bank." *Id.* The records were "not confidential communications but negotiable instruments to be used in commercial transactions." *Id.* at 442.

Further, the documents all "containe[d] only information voluntarily conveyed to the banks," which were "exposed to their employees in the ordinary course of business." *Id.* So the defendant had "tak[en] the risk, in revealing his affairs

to another, that the information [would] be conveyed by that person to the government." *Id.* at 443.

That assumption of risk was far more obvious here where Intervenors consented in writing to their location data and communications being monitored by third-party Sportsbooks and others and disclosed to the government or law enforcement. [App. 49; see also *DraftKings*, App. 9, 11–13]. Especially where sharing location data is a legal prerequisite for online gambling, the gambler assumes the risk that their data will be shared with law enforcement, even without explicit, contractual agreements. Yet the User Agreement here even warn users of the risk. [*Id.*] *Miller* also shows Intervenors have diminished expectations of privacy in business records and commercial transactions, which are analogous to the data inspected in this case.

Likewise, in *Smith*, 442 U.S. at 736, the Supreme Court held the warrantless installation of a pen register—a device that surreptitiously recorded the number dialed on a telephone—was not a Fourth Amendment "search." Because telephone users know they must "'convey' [the] phone numbers" they dial to third parties— telephone companies—they entertain no "actual expectation of privacy in the numbers they dial." *Id.* at 742. Phone users are subjectively aware this data is used for several purposes by the third-party company, including billing, detecting fraud, preventing violations of law, and keeping records of toll calls, among others. *Id.*

And objectively, people have "no legitimate expectation of privacy in information [they] voluntarily turn[] over to third parties." *Id.* at 743–44. Following

*Miller*, the court held the defendant "voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business," and thereby "assumed the risk that the company would reveal to police the numbers he dialed." *Id.* at 744.

Like numbers voluntarily conveyed to a phone company, Intervenors' location data enabled the services of a third-party, and Intervenors knew these third-party companies used this data for several purposes, including legal compliance. [App. 9, 11–13, 49]. And even if they hadn't consented to that data being monitored by—or disclosed to—the government, they "assumed the risk that the [online sportsbooks] would reveal to police the" location data they shared. *Id.* at 744; *cf United States v. Shipton*, 5 F.4th 933, 936 (8th Cir. 2021). They had no objective or subjective expectation of privacy.

### 4. Defendants here did not conduct a CSLI search like the officers in *Carpenter v. United States*; the third-party doctrine applies.

The data review here was not a search of involuntarily collected Cell-Site Location Information ("CSLI"), which can invade certain expectations of privacy under *Carpenter v. United States*, 585 U.S. 296 (2018), because of the expansive and involuntary nature of its collection. This case rather involves voluntarily shared location data. That is more like User Generated Location Information ("UGLI"), which does not trigger the privacy concerns assessed in *Carpenter*. *See United States v. Bledsoe*, 630 F.Supp.3d 1, 8–17 (D.D.C. 2022). This case does not come within *Carpenter's* narrow holding; the third-party doctrine applies and defeats Intervenors' claims.

*a. Carpenter's holding was narrow and concerned only sweeping police reviews of CSLI, which is generated automatically, shared involuntarily, and collected on a mass scale.* *Carpenter* held states do not have "unrestricted access to a wireless carrier's database of physical location information." 585 U.S. at 320. A State's access to these historical records—when they "provide a comprehensive chronicle of the user's past movements"—amounts to a "search" under the Fourth Amendment. *Id.* at 300.

But this case doesn't involve that. Intervenors voluntarily shared their location data with third-party Sportsbooks to comply with territorial gambling regulations. [App. 6, 9, 11–13, 37, 49, 122, 125]. For many reasons, this is unlike the search in *Carpenter*.

Voluntarily shared location data does not implicate the privacy concerns of the CSLI in *Carpenter*. Under the above, there is little expectation of privacy in a person's location and movements made available to "anyone who wanted to look." *Knotts*, 460 U.S. at 281. But further, neither the GeoComply technology nor the Sportsbook applications amount to "almost a 'feature of human anatomy.'" *Id.* at 311 (quoting *Riley*, 573 U.S. at 385). They do not "track[] nearly exactly the movements of its owner," *id.* at 311, but only very specific location snapshots, and only at specific intervals while the betting application is open on a device. [App. 6, 9, 11–13, 37, 49, 122, 125].[8]

---

[8] *See also* GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

Defendants did not access a wireless company's "deep repository of historical location information at practically no expense" to "achieve[] near perfect surveillance," like attaching "an ankle monitor to the phone's user." *Id.* at 311–312. Voluntary location disclosures through online Sportsbooks are nothing like "being tailed every moment of every day for five years," where the police may "call upon the results of that surveillance" at any time. *Id.* at 312. Defendants did not reconstruct a complete "record of [Intervenors'] physical movements as captured through CSLI." *Carpenter*, 585 U.S. at 309–10.

These are not "location records [that] 'hold for many Americans the "privacies of life.""" *Id.* (quoting *Riley*, 573 U.S. at 403). No "time-stamped data provides an intimate window into [Intervenors'] li[ves], revealing not only [their] particular movements, but through them [their] 'familial, political, professional, religious, and sexual associations.'" *Id.* (quoting *Jones*, 565 U.S. at 415). The data here is not a "chronicle [people's] past movements through [a] record of [their] cell phone signals" captured on a society-wide scale, *id.* at 305, 309, but location snapshots at specific intervals only when a gambling application is open on a device. [App. 6, 9, 11–13, 37, 49, 122, 125].[9]

---

[9]    GeoComply    FAQ,    https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN]. ("Location data that GeoComply collects is depersonalized and used to verify for security and fraud risk prevention. . . . Our products and services are not designed to track the general movements or record the website habits of people on the internet. . . . When our geolocation products and services are used, we obtain and verify the physical location of where users are for customers.")

The location data is not "continually logged for all of the 400 million devices in the United States," amounting to a "tracking capacity [that] runs against everyone." *Carpenter*, 585 U.S. at 312; [App. 6, 9, 11–13, 37, 49, 122, 125]. Cellphones are a ubiquitous feature of modern life; online Sportsbooks are not. The location data here is voluntarily shared by the subset of the population who chooses to gamble online in the state of Iowa and only at certain intervals when their betting applications are open. [App. 6, 9, 11–13, 37, 49, 122, 125].

The CSLI in *Carpenter* was generated automatically, inescapably, and therefore involuntarily. *Id.* at 315. But Intervenors' voluntary disclosure of their location information is limited, controlled by the user, and voluntary. The nature and limits of the data collection here are more like *Smith* (pen registers) and *Miller* (banking records) than *Carpenter*. "There is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers today." *Carpenter*, 585 U.S. at 314.

*Carpenter* itself recognized the distinction this case presents: *Carpenter* held it was not a case "about 'using a phone' or a person's movement at a particular time"— that's *this* case. 585 U.S. at 315. Instead, *Carpenter* was "about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id.* Indeed, "[s]uch a chronicle implicates privacy concerns far beyond those considered in *Smith* and *Miller*." *Carpenter*, 585 U.S. at 315. "[T]he deeply revealing

nature of CSLI, its depth, breath, and comprehensive reach, and the inescapable and automatic nature of its collection" distinguish it from the voluntary disclosures here.

**b. Courts do not apply** *Carpenter's* ***holding to voluntarily shared location information.*** In *United States v. Bledsoe*, the District Court for the District of Columbia assessed the scope of Fourth Amendment interests "in non-content information derived from user-generated content of a highly public event that reveals . . . user-generated location information ("UGLI")." 630 F.Supp.3d at 9. Without a warrant, police there acquired identification information on Facebook accounts belonging to people who live-streamed or posted content on Facebook while storming the U.S. Capitol building during the January sixth riots. *Id.* at 3. The narrow holding of *Carpenter* did not apply; no Fourth-Amendment search occurred. *Id.* at 8–17.

*Bledsoe* distinguished *Carpenter* at length and emphasized the limited scope of its holding. *Bledsoe* observed *Carpenter* assessed not only "the act of sharing" under the third-party doctrine, but also the "nature of the particular document sought" in determining whether a legitimate expectation of privacy attached to its contents. *Id.* at 11. And unlike the limited disclosures of personal information in UGLI, the CSLI in *Carpenter* gave "a detailed chronicle of a person's physical presence complied every day, every moment, over several years." *Id.* But UGLI, like the data disclosures here, lack the "comprehensive and intimate nature" of CSLI, which enables "a much deeper intrusion into an individual's privacy than previous third-party doctrine cases." *Id.*

And the act of "sharing" in prior third-party cases involved "voluntary exposure," which *Carpenter* "found to be absent in the context of CSLI records." *Id.*

"[T]he nature of the activity" that generates CSLI is involuntary, because cell-phones generate the "cell-site records 'without any affirmative action on the part of the user beyond powering up.'" *Id.* (quoting *Carpenter*, 585 U.S. at 315). So "[u]sers cannot voluntarily assume the risk of exposure of the location information when its generation is essential, automatic, and inescapable." *Id.* at 11–12. That is unlike the voluntary disclosures here and with other UGLI. *Carpenter's* holding was "a narrow one" and it was "context-specific," "even in cases involving CSLI." *Id.* at 12.

*Bledsoe* highlighted the key distinction between this case and *Carpenter*: "the information at issue here is affirmatively and voluntarily generated by the user, not automatically and unavoidably created simply by powering up a cell phone." *Id.*; [App. 6, 9, 11–13, 37, 49, 122, 125, 235–236, 237].[10] Specifically, "[t]he volitional aspect of the UGLI data at issue in this case 'places the conduct into the heartland of the third-party doctrine.'" *Bledsoe*, 630 F.Supp.3d at 9. Intervenors here voluntarily shared their locations by opening their online Sportsbooks.

"Facebook's Data Policy" further diminished reasonable expectations of privacy, and it warned users that Facebook will "access, preserve and share information when [it] has a good faith belief it is necessary to: detect, prevent and address fraud and other illegal activity; to protect [Facebook], [the user] and others, including as part of investigations; or to prevent death or imminent bodily harm." *Id.* at 16. "By agreeing to Facebook's Data Policy, defendant voluntarily 'assumed the

---

[10] GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

risk' that the company's records 'would be divulged to police' should Facebook have a good faith belief that such disclosure is necessary to address illegal activity." *Id.* Under materially similar language in the Sportsbooks' User Agreements here, Intervenors assumed the same risk that their location information would be disclosed to law enforcement. [App. 9, 11–13, 49].

"The third-party doctrine partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another." *Carpenter*, 585 U.S. at 314. Intervenors knowingly and voluntarily shared their location data with third-parties and consented to its disclosure to the government or law enforcement. [App. 6, 9, 11–13, 37, 49, 122, 125]. This case is distinguishable from *Carpenter*; the third-party doctrine applies.

### 5. Defendants did not conduct a typical geofence search.

This case also does not involve a typical geofence search of CSLI. Those are searches under "geofence warrants," which "authorize[] the seizure of location data collected from smartphones of individuals within a particular area over a specified range of time." *United States v. Rhine*, 652 F.Supp.3d 38, 66 (D.D.C. 2023). It is a search of CSLI or other location data (like "Google Location History") mass collected from smart phones, *id.* at 67, which gives law enforcement access to all recorded location data within the specified temporal and geographic boundary. *Id.* at 77–78. And it is a "sweeping search[]" of that mass-collected data. *United States v. Kirkendoll*, 2024 WL 1016049, at *1 (D.N.M. Mar. 8, 2024) ("Geofencing is a process whereby law enforcement 'specifies a location and period of time, and, after judicial

approval, companies conduct sweeping searching of their location databases and provide a list of cell phones and affiliated users found at or near a specific area during a given timeframe[.]'" (quoting Note, *Geofence Warrants and the Fourth Amendment*, 134 HARV. L. REV. 2508, 2509 (2021))).

The above *Carpenter* analysis applies and needn't be repeated. No Defendant accessed sweeping, mass-collected data to reconstruct a complete picture of anyone's movements. This case is distinguishable.

This case also does not involve the geofence warrant concerns. The "technological advances" in "expanded law enforcement surveillance capabilities" combined with "corporate data collection practices" raise special Fourth Amendment issues. *Rhine*, 652 F.Supp.3d at 66. But voluntarily provided location disclosures from individual users are unlike sweeping police reviews of historic, mass-collected location data. [App. 6, 9, 11–13, 37, 49, 122, 125].

Geofence warrants can be overbroad and lack particularity by, among others, authorizing a search of location data for persons other than the target subject with unnecessarily large time and location parameters. *Rhine*, 652 F.Supp.3d at 73–77. The "geofence boundary" can "potentially include the data for cell phone users having nothing to do with the alleged criminal activity." *Id.* at 79 (quoting *In re Search of Info. That is Stored at the Premises Controlled by Google ("Kansas")*, 542 F.Supp.3d 1153, 1158 (D. Kan. 2021)).

That's not this case. Online Sportsbook users purposely disclose their location data when they gamble; the data is not passively and inescapably shed from their

phone, mass-collected by tech and wireless companies, and then retrieved and searched by law enforcement. [App. 6, 9, 11–13, 37, 49, 122, 125].[11] The location data here is individual to the user who gambles; GeoComply does not collect location data on all cell phones. [*Id.*]. And the location data here is captured only at the relevant time when gamblers have betting applications open; GeoComply does not continuously capture location data like tracking an ankle monitor. [*Id.*].

### 6. No Defendant conducted a warrantless search of a cellphone or accessed private personal information.

This case is also unlike the cell phone search in *Riley v. California*, 573 U.S. 373 (2014). This case concerns voluntarily shared location data, disclosed to third-party Sportsbooks to enable online gambling; *Riley* involved unconsented, wholesale rummaging through a phone's contents incident to an arrest. *Id.* at 378–380.

*Riley* held "officers must generally secure a warrant before" searching a cell phone incident to an arrest. *Id.* But that was based on privacy concerns not implicated here. *Riley* observed that cell phones differ quantitatively and qualitatively from inspecting the physical "contents of an arrestee's pockets." *Id.* at 395. They have "immense storage capacity" that "collects in one place many distinct types of information," and "[t]he sum an individual's private life can be reconstructed through a thousand photographs" and other data stored on the phone. *Id.* at 393, 394. Because cell phones "hold for many Americans 'the privacies of life,'" the Court's "answer to the question of what police must do before searching a cell phone seized incident to

---

[11] GeoComply FAQ, https://www.geocomply.com/trust-center/faq/ [https://perma.cc/BK93-HFNN].

an arrest [was] simple—get a warrant." *Id.* at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 625 (1886)).

But that is quantitatively and qualitatively different from the voluntary location disclosures here. [App. 6, 9, 11–13, 37, 49, 122, 125]. No Defendant rummaged through a vast store of information reflecting Intervenors' "privacies of life" without a warrant. *Riley*, 573 U.S. at 403. *Riley's* rationale does not extend to this case.

> **7. Regardless of whether a "search" occurred, once provided to third-party companies, Intervenors' location data was in an unprotected digital space.**

The review of Intervenors' location data here was analogous to a search of an "open field." "The Fourth Amendment protects the curtilage of an individual's residence, but not surrounding open fields." *U.S. v. Mathias*, 721 F.3d 952, 955 (8th Cir. 2013) (quoting *United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006)). "Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (quoting *Boyster*, 436 F.3d at 991).

Although Intervenors did not plead facts about their locations when they gambled, Intervenors nevertheless placed their location data outside of any protected "curtilage." To gamble, they put their location in the open. That is a digital space that no reasonable individual could expect "should be treated as the home itself." *Id.* at 956 (quoting *United States v. Dunn*, 480 U.S. 294, 304 (1987)). Any inspection of the digital space created by GeoComply resembled a search of an open field where Fourth Amendment protections do not extend.

### 8.  Even if a "search" occurred, Intervenors consented to it.

Through the Sportsbooks user agreements or privacy policies, Intervenors explicitly consented to geolocation monitoring by the IRGC and authorized data disclosures to law enforcement or the government; even if a "search" occurred, Intervenors waived their right to challenge it. [App. 6–9, 11–13, 15, 37, 49, 122, 130].

A "search" that is "conducted pursuant to a valid consent is constitutionally permissible" and "wholly valid." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Under the FanDuel agreement, Intervenors explicitly "consent[ed] to the monitoring and recording by the IRGC of any wagering communications and geographic location information," and they further "acknowledge[d] that BIU reserves the right to report unusual or suspicious activity to the proper authorities." [App. 37]. The DraftKings policies and contracts contain other disclosure language, including acknowledgement that DraftKings may "disclose personal information" in good faith "to comply with relevant laws" like gaming regulations, "to respond to discovery requests, subpoenas, or warrants served on DraftKings," "in connection with any legal investigation," to protect or defend the rights or property of [DraftKings] or [its users]," "to investigate or assist in preventing any violation or potential violation of law, this notice, or our Terms of Use," or for an emergency justifying disclosure. [App. 13].

A valid consent must be voluntary, "not the product of police coercion." *Bustamonte*, 412 U.S. at 229. But no law enforcement officer coerced Intervenors' consent or their voluntary decision to gamble. No Intervenor even alleges as much. Intervenors instead voluntarily consented to inspection of their location data by third

parties and the government so they could place online sports wagers. And Intervenors who gambled fraudulently on other people's accounts functionally consented to monitoring and disclosure, adding waiver to the standing problem this created.

Consent may even be implied in some cases when people engage in regulated activities. *Missouri v. McNeely*, 569 U.S. 141, 161 (2013) (plurality opinion) (discussing states' "implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk driving offense."); *South Dakota v. Neville*, 459 U.S. 553, 559, 563–564 (1983) (discussing a similar implied-consent law and a defendant's choice to submit to BAC testing); *see also Mitchell v. Wis.*, 588 U.S. 840, 843–844 (2019) (upholding an implied consent law that allowed a warrantless blood draw from an unconscious motorist suspected of drunk driving).

And in analogous contexts, courts hold that implied consent may also be "inferred 'from surrounding circumstances indicating that the [party] knowingly agreed to the surveillance.'" *Griggs-Ryan v. Smith*, 904 F.2d 112, 116–117 (1st Cir. 1990). Although it "will vary from case to case," implied consent "may be deduced from 'the circumstances prevailing' in a given situation," and the inference is especially strong when "language or act . . . tend to prove" the person "knows of, or assents to, encroachments on the routine expectation" of privacy. *Id.* at 117; *see also United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987) (in the context of prison monitoring, finding implied consent where defendant "knowingly agreed to the surveillance"); *United States v. Bonanno*, 487 F.2d 654, 658 (2d Cir. 1973)

("[A]lthough a person having a telephone conversation with another in regard to criminal activities generally does not expect that the latter will reveal this to the police, he has no "justifiable" expectation . . . that the latter may not do so or may not have consented to a government agent's listening in or making a recording" (citation omitted)).

So even without explicit consent, Intervenors implicitly consented to geolocation monitoring. Gambling is a highly regulated activity. When done online, geolocation monitoring is necessary to ensure territorial compliance, among other concerns. Intervenors voluntarily shared their locations under this regulatory scheme to place online sports wagers. And user agreements reflect Intervenors acknowledgment of geolocation monitoring. Intervenors had no "justifiable expectation" the Sportsbooks would not reveal the data to the police in this context. *Bonanno*, 487 F.2d at 658. They impliedly consented to geolocation inspection.

### 9. No warrant was required for a search and seizure of location data due to "special needs".

Regardless of whether Defendants acts amounted to a "search," "special needs" would justify a departure from the warrant requirement here. The Supreme Court allows exceptions to the warrant requirement when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 350 (1985) (Blackmun, J. concurring).

A State's "supervision of a regulated industry" is such a "special need" that allows "in certain circumstances government investigators [to] conduct[] searches

pursuant to a regulatory scheme," without "warrant or probable-cause requirements so long as their searches meet 'reasonable legislative or administrative standards.'" *Griffin v. Wis.*, 483 U.S. 868, 873 (1987) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967)); *see also New York v. Burger*, 482 U.S. 691, 702–703 (1987); *Donovan v. Dewey*, 452 U.S. 594, 602 (1981); *United States v. Biswell*, 406 U.S. 311, 316 (1972). "[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989). "When faced with special needs, [the Supreme Court] has not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." *Id.* at 619–620.

Because "[s]earches of this sort can affect an infinite number of people and places," *Rivera-Corraliza v. Morales*, 794 F.3d 208, 216 (1st Cir. 2015), Courts look for certain criteria to ensure the warrantless inspection is reasonable under the Fourth Amendment. *Burger*, 482 U.S. at 702.

But here, as reflected in the user agreements and privacy policies, Sportsbooks either explicitly or implicitly allowed the IRGC or the government to monitor geolocation data. [App. 6–9, 11–13, 15, 37, 49, 122]. Iowa law requires the IRGC to disclose to DCI "abnormal wagering activit[ies] or patterns that may indicate a concern about the integrity of an authorized sporting event." Iowa Code § 99F.12(2)(b). And the IRGC authorized DCI to review data under Iowa Code section 99F.12(2)(*b*). [Doc. 33 ¶¶60-62].

Consent dispenses with the warrant requirement. *See, e.g., U.S. v. Mendoza-Gonzalez*, 363 F.3d 788, 795 (8th Cir. 2004) (warrants are unnecessary when persons voluntary consent to a search). But the *Burger* test factors that courts assess under the special-needs doctrine arrive at the same result.

**a.** "First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* In our context here, "[t]he regulation of gambling enterprises lie at the heart of the state's police power." *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999). "Formulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens." *Id.* "The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens." *Id.* "State gaming policies reflect a delicate trade-off between the economic boon of increased tax revenue and enhanced employment on the one hand and the risk of moral rot, human exploitation, and political corruption on the other." *Id.*

So the Commission's policy is "to require that all industry participants conduct sports wagering in a manner suitable to protect the health, safety, morals, good order, and general welfare of the state." 491 Iowa Admin. Code r. 13.2(1) "Responsibility for selecting, implementing, and maintaining suitable methods of operation rests with the facility, vendor, and advance deposit sports wagering operator." *Id.* "Willful or persistent use or toleration of methods of operation deemed unsuitable in the sole discretion of the commission will constitute grounds for disciplinary action, up to and including revocation." *Id.*

Reporting requirements aim to ensure "the integrity of an authorized sporting event or events," keeping the wagering enterprise free of corruption, and promoting "proper standards of custom, decorum, and decency" to avoid "any type of conduct that reflects negatively on the state or commission or acts as a detriment to the sports wagering industry." *Id.* r. 13.2(2)(*d*); *id.* r. 13.2(7)(*d*).

The unique enterprise of sports wagering presents "special needs" that go "beyond normal law enforcement." *Cf. Skinner*, 489 U.S. at 620. Substantial government interests inform Iowa Code chapter 99F and Iowa Administrative Code chapter 491–13; *Morales*, 794 F.3d at 220 (1st Cir. 2015) (finding gambling regulations serve an important state interest).

**b.** "Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme.'" *Burger*, 482 U.S. at 702. As to this factor, courts recognize the warrant requirement can frustrate the goals of a regulatory scheme "to detect and thus to deter safety and health violations." *Id.* at 702–703. That frustration of purpose can negate the warrant and probable cause requirements. *See id.* Indeed, to "serve as a credible deterrent," inspections may need to be "unannounced, even frequent." *Id.* at 710 (quoting *Dewey*, 452 U.S. at 600).

Here, rules include many reporting requirements and forbid licensees from denying lawful demands for review of certain information. *See, E.g.,* 491 Iowa Admin. Code r. 13.2(2)(*f*); *id.* r. 13.2(2)(7)(*d*). For example, the Commission requires licensees to implement "internal controls" that report "suspicious or illegal wagering activities"

and include "integrity-monitoring procedures" that require the "sharing of information" with "governing authorities." 491 Iowa Admin. Code. r. 13.2(7).

Administrative rule 13.5—which governs advance deposit sports wagering—incorporates this reporting requirement for licensees and requires geolocation monitoring to "detect potential fraudulent and suspicious activity." *Id.* r. 13.5(3)(b). Iowa law then requires the Commission to share this information "with the division of criminal investigation." Iowa Code § 99F.12(2)(b). In apparent compliance with these sections, Sportsbooks' user agreements either explicitly authorize or acknowledge geolocation monitoring by the IRGC or otherwise warn users their data may be disclosed to government or law enforcement. [App. 6–9, 11–13, 15, 37, 49, 122].

These requirements help to protect not only the wagering enterprise from corruption but also "the integrity of an authorized sporting event or events." 491 Iowa Admin. Code. r. 13.2(7)(*d*). They also promote "proper standards of custom, decorum, and decency" to avoid "any type of conduct that reflects negatively on the state or commission or acts as a detriment to the sports wagering industry." *Id.* r. 13.2(2)(*d*); *id.* r. 13.2(7)(*d*). Well-regulated and well-monitored online gambling can deter the "moral rot, human exploitation, and political corruption" that can assail the "quality of life" of Iowa citizens because of gambling. *Johnson*, 199 F.3d at 720.

But a warrant requirement would interfere with these goals. Due to the elusive and disbursed nature of online gambling, authorities would rarely have sufficient reasonable suspicion or probable cause for a warrant to look for "abnormal wagering

activity or patterns" to address the "concern about the integrity of an authorized sporting event." Iowa Code § 99F.12(2)(b). And Licensees could disregard internal controls and integrity-monitoring regulations undetected while the wagering enterprise suffers corruption.

**c.** The final *Burger*-test factor requires "the statute's inspection program, in terms of the certainty and regularity of its application, [to] provid[e] a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702. This means "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id. at 703.*

To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* at 703 (quoting *Dewey,* 452 U.S., at 600). As to this pervasiveness factor, in *United States v. Burger*, the Supreme Court held a junkyard was closely regulated and found the following persuasive: "The regulatory scheme required junkyard owners to get licenses and registration numbers from the state; display the registration numbers prominently at the businesses; keep books recording purchases and sales of autos and auto parts; and make the books and autos available for inspection." *Morales*, 794 F.3d at 218 (citing *Burger*, 482 U.S. at 704). Plus "[j]unkyard owners could also get hit with criminal penalties, license revocation, and civil fines if they failed to comply."

*Burger*, 482 U.S. at 704; *see also Morales*, 794 F.3d at 217–218 (finding gambling regulations were pervasive enough to qualify the gambling industry as closely regulated).

Here, regulation of gambling in Iowa is more pervasive than that. Iowa Code section 99F and 491 Iowa Administrative Code chapter 13 lay out a comprehensive scheme regulation. This cannot be fully reproduced here. But law and regulations not only require "specific authorization from the commission to conduct advance deposit sports wagering," but also prohibit many activities in "the conduct of all sports wagering," *id.* 13.2(3); they require Sportsbooks to submit "internal controls" of their operations, and many rules govern the "operation of an account" by advance-deposit-sports-wagering licensees', *id.* r. 13.2(7), 13.5(3), they require geolocation monitoring according to "industry best practices" and detection and reporting of "suspicious or illegal wagering activities" including fraud, which the IRGC must report to DCI. *id.* r. 13.2(7)(*d*), 13.5(3)(*b*).

Along with these reporting requirements and other audits, rules also forbid licensees from denying lawful commission demands for "information, documents, [and] access to inspect any portion of the sports wagering operation." *Id.* r. 13.2(2)(*f*). Licensees must give "[w]ritten notification" of "any incident where there is a violation involving criminal activity, Iowa Code chapter 99F, a commission rule or order, or an internal control within 72 hours of detection." *Id.* They must "provide all information requested by the commission" pertaining to their books and records, and "[a]ll records

pertaining to the accounts of persons who registered or have account activity in Iowa shall be available to allow for audits and investigations." *Id.* r. 13.2(13).

The rules also warn that violations of law or commission rules "may constitute an unsuitable method of operation, subjecting the licensee to" fines or adverse actions against their licenses. *Id.* r. 13.7(8). "The commission has the discretion to suspend mobile gaming operations of its licensees by written order if necessary." *Id.*

This incomplete summary shows Iowa's gambling regulations are "sufficiently comprehensive" and licensees know they are subject to government inspection. *Burger*, 482 U.S. at 703. For example, FanDuel's user agreement states users "consent to the monitoring and recording by the IRGC of any wagering communications and geographic location information." [App. 37].

As to the second warrant function, the statute must be "carefully limited in time, place, and scope" to limit the discretion of inspectors. *Biswell*, 406 U.S., at 315. But context matters. "Time restrictions," for example, may not be "feasible" for some operations. *See, e.g., United States v. Ponce–Aldona*, 579 F.3d 1218, 1225–26 (11th Cir. 2009). These factors cannot "render the entire inspection scheme unworkable and meaningless." *See U.S. v. Dominguez-Prieto*, 923 F.2d 464, 469–470 (6th Cir. 1991).

Geolocation inspections are unique, because they do not involve a physical intrusion upon the licensee's premise, but a computerized review of historic location data generated by betting application users. [App. 237]. Time and place concerns are less probative in this context, although some mandatory disclosure rules include reasonable timeframes to report certain violations. *E.g.,* 491 Iowa Admin. Code r.

13.2(7)(*e*) (requiring notification to the commission "within 72 hours of detection.") Yet regulations here are properly limited in scope, and the scheme satisfies the *Burger* test.

Iowa law and regulations require licensees to report geolocation data. And regulatory concerns include activity that is abnormal, illegal, suspicious, unauthorized, or fraudulent, with special concern for "the integrity of an authorized sporting event." *Id.* r. 13.2(7)(*d*); *id.* r. 13.5(3)(*b*); Iowa Code § 99F.12(2)(b). These kinds of disclosures enable the State to verify licensees' compliance with the regulatory scheme, which promotes public health and safety by deterring corrupt gambling.

Sportsbooks either explicitly or implicitly authorize or acknowledge government monitoring, [App. 6–9, 11–13, 15, 37, 49, 122, 130], which tracks with their regulatory obligations to report suspicious or "abnormal wagering activity" to the commission. Iowa Code § 99F.(12)(2)(b); Iowa Admin. Code r. 13.2(7)(*d*), 13.5(3)(*b*). Iowa law requires the commission to report this information to DCI. Iowa Code § 99F.12(2)(b). And the Commission authorized DCI to review geolocation data within the scope of Iowa Code 99F.12(2)(*b*). [Doc. 33 ¶¶60-62]. That statute expressly identifies the concern that "abnormal wagering activity or patterns" can "indicate a concern about the integrity of an authorized sporting event." *Id.* The review of geolocation data with GeoComply's software either followed a lawful request from DCI or the IRGC's authorization under Iowa law, administrative rules, and Sportsbooks user agreements. [App. 6–9, 11–13, 15, 37, 49, 122, 130; Doc. 33 ¶64–66].

The full statutory, regulatory, contractual, and factual context clarifies the limited scope of geolocation inspections here.

Gambling is a highly regulated industry, and only recently, Iowa allowed people to gamble online. The smartphone became—in essence—the front door to the casino. Geolocation monitoring helps ensure regulatory compliance under Iowa's gambling laws and protect the integrity of authorized sporting events. It is reasonable for Iowa's agencies to supervise this, especially since the State opened casinos to everyone in the state with an internet connection.

## C. **No unconstitutional seizure occurred.**

No unlawful seizure occurred either. Defendants did not "seize" Intervenors' location data. And Intervenors' cell phones were seized under a valid warrant. Intervenors rely on only one theory to challenge the warrant—fruit of the poisonous tree because of an "illegal subpoena" (as discussed in detail below). But no "search" occurred; that theory fails. And Intervenors identify no false statements in the warrant affidavit. Their claim fails under the *Franks* doctrine, and regardless, Defendants relied on the warrant in good faith.

Nobody unlawfully seized location data. Aware of government monitoring, Intervenors voluntarily shared their location data with third-parties and implicitly or explicitly authorized disclosure to the government or law enforcement. [App. 6–9, 11–13, 15, 37, 49, 122, 130]. And some Intervenors didn't own the accounts from which the data was allegedly "seized," so they lack standing at the outset. There was

no impermissible search and seizure; the "seizure" claim cannot stand vis-à-vis location data.

Further, location data monitoring did not deprive Intervenors of dominion over their property. Intervenors do not even allege as much, perhaps because they shared that data with third parties, and the claim wouldn't make sense. *PPS, Inc. v. Faulkner County, Ark.*, 630 F.3d 1098, 1102 (8th Cir. 2011) ("The Fourth Amendment protects against two distinct governmental actions—unreasonable searches and unreasonable seizures. 'A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her . . . property.'" (quoting *Horton v. Cal.*, 496 U.S. 128, 133 n.5 (1990))).

But beyond that, it is unclear how Intervenors owned or possessed the location data to begin with. *Cf. Thompson v. Cockrell*, 2024 WL 1908522, at *2–3, 9–10 (E.D. Mo., May 1, 2024) ("Simply check[ing] the VIN numbers on [a] motorcycle" and mistakenly allowing third parties to take it from Plaintiff's residence was not an unlawful seizure by officer-defendants— "taking" the VIN number data was not a "seizure").

And the data wasn't taken from Intervenors like contraband at a crime scene. *See id.* Unlike *Riley*, when the data was monitored, Intervenors weren't physically deprived of the data. Even when the phones were eventually seized, that was under a valid warrant.

Intervenors' consent to geolocation monitoring was like leaving their data in "plain view," so even if a "seizure" occurred, it was reasonable. *PPS, Inc.*, 630 F.3d

at 1103 ("[T]he Fourth Amendment does not prohibit all unwarranted seizures, only *unreasonable* ones"). Through users' consent to geolocation monitoring, the Sportsbook enabled—indeed, required—GeoComply to record Intervenors' locations. And that same consent permitted Sportsbooks to share location data with third-parties, including the government or law enforcement. [App. 6–9, 11–13, 15, 37, 49, 122, 130]. The legal and contractual context of online betting gave officers "a prior justification" for being in the digital space where Intervenors shared their data, where they are "lawfully in a position from which [to] view the [data]." *Id.* (quoting *United States v. Muhammad*, 604 F.3d 1022, 1027 (8th Cir. 2010)).

Next, Defendant acted in good faith reliance on a warrant when they seized the phones; there was no unreasonable seizure of those either.  Defendants seized the phones under valid warrants. A seizure of property is authorized when executed under a valid warrant supported by probable cause. U.S. Const. amend. 4. The Fourth Amendment requires a warrant (1) to "be issued by neutral, disinterested magistrate," *Dalia v. U.S.*, 441 U.S. 238, 256 (1979); (2) to be supported by "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense," *id.*, (quoting *Warden v. Hayden*, 387 U.S. 294, 307 (1967)); and (3) "particularly describe the '"things to be seized,"' as well as the place to be searched," *id.* (quoting *Stanford v. Tex.*, 379 U.S. 476, 481 (1965)).

But Intervenors do not challenge the validity of the warrant except to claim it was "issued based on fruits of the poisonous tree." [Doc. 33, ¶ 321]. But the above shows that is false. There was no illegal search.

Defendants also reasonably relied on the warrant. Count II fails under the *Franks* doctrine and the good-faith exception. Intervenors did not identify any false statements in the warrant affidavit, much less any made knowingly, intentionally, or with reckless disregard for the truth. *Franks v. Del.*, 438 U.S. 154, 155–156 (1978).

Although the exclusionary rule will bar "evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate,"[19] the good-faith exception holds evidence should not be suppressed when "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.* at 909 (quoting *Illinois v. Gates*, 462 U.S. 213, 255 (1983)). "The exclusionary rule does not apply 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope'." *United States v. Saddler*, 19 F.4th 1035, 1040 (8th Cir. 2021) (quoting *U.S. v. Leon*, 468 U.S. 897, 920 (1984)). But Intervenors do not assail the information supplied by affiants, the magistrate's role in approving the warrants, sufficiency of probable cause, or the facial validity of the warrants. *See Saddler*, 19 F.4th at 1040 (quoting *Leon*, 468 U.S. at 923). And they do not show that any warrant was subsequently invalidated. *Leon*, 468 U.S. at 908–909 (quoting *Franks*, 438 U.S. at 171).

No illegal search occurred; nothing was illegally seized. Intervenors cannot maintain this civil action where no evidence would have been suppressed.

## II. Intervenors failed to state a plausible claim for relief for Count III: Failure to Intervene.

A claim for failure to intervene requires proof that a defendant failed to prevent excessive force by another officer. *Hollingsworth v. City of Ann*, 800 F. 3d 985, 991

(8th Cir. 2015). Intervenors allege Defendants violated Intervenors' constitutional rights, not for failing to intervene in the excessive use of force by another officer, but for failing to take any action to prevent or stop any other Defendant from violating Intervenors' constitutional rights against unlawful search or seizure. [Doc. 33, ¶4]. Intervenors cite to *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009), in support of their claim. However, *Nance* is an excessive use of force case and there is no claim for failure to intervene without an allegation of excessive force. *see Perkins v. City of Des Moines*, 712 F.Supp.3d 1159, 1181 (S.D. Iowa 2024) citing *Zubrod v. Hoch*, 907 F.3d 568, 580 (8th Cir. 2018); see also *Bloodworth v. Kansas City Bd. Of Police Comm'rs*, 89 F.4th 614, 628 n.5 (8th Cir. 2018). ("[T]here is no clearly established law regarding a duty to intervene outside of the excessive force context."); *Hess v. Ables*, 714 F. 3d 1048, 1052 (8th Cir. 2013) ("outside of the excessive force contest, there is no clearly established law regarding a duty to intervene to prevent constitutional violations").

Here, Intervenors attempt to *expand* the law on failure to intervene to cases that do not involve excessive use of force claims and yet in the same argument ask this Court to find that the law on this issue was clearly established at the time of the search or seizure. As a matter of law, Intervenors' claim for failure to intervene fails. And even if the Intervenors did plead a plausible claim for relief for failure to intervene, Defendants are entitled to qualified immunity as discussed next.

### III. Even if a constitutional violation occurred, the alleged right was not clearly established; Defendants are entitled to qualified immunity.

No unreasonable search or seizure occurred. But Intervenors cannot show any "unlawfulness of [Defendants'] conduct was 'clearly established at the time'" anyway.

*T.S.H.*, 996 F.3d at 918. It is not well-established that the Fourth Amendment protected Intervenors' location data in the Sportsbook accounts here. Defendants are immune from suit.

A right is not "clearly established" unless "'every reasonable official' would have known the conduct was unlawful at the time of the alleged violations." *Id.* Although courts do not "define clearly established law at a 'high level of generality,'" the "specificity of the rule is especially important in the Fourth Amendment Context." *Green*, 996 F.3d at 918. (quoting *Wesby*, 583 U.S. at 63). The "crucial question" is only "whether the official acted reasonably in the particular circumstances." *Id.* (quoting *Wesby*, 583 U.S. at 63–64).

"A plaintiff must identify either 'controlling authority' or 'a robust "consensus of cases of persuasive authority"' that 'placed the statutory or constitutional question beyond debate' at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–742 (2011)). "As the Supreme Court has reiterated, 'qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."'" *Ryno*, 58 F.4th at 1004–1005 (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)); *see also Wesby*, 583 U.S. 63–64.

This case involves a warrantless review of location information knowingly and voluntarily supplied to gambling companies through online betting applications to ensure territorial compliance with Iowa law where users control the disclosure of their location data through their use of the betting application, and where they

authorize the Sportsbook's disclosure of this information to third parties, the government, or law enforcement through user agreements. [App. 6–9, 11–13, 15, 37, 49, 122, 130].

To the extent this question is not decisively resolved in Defendants' favor by existing Fourth Amendment principles—particularly the third-party doctrine—this would be an issue of first impression before the U.S. Supreme Court. It is *per se* not clearly established—especially at the time of the events. Defendants "cannot be expected to predict the future course of constitutional law;" Intervenors' claims fail. *Procunier v. Navarette*, 434 U.S. 555, 562 (1968); *see also Harlow v. Fitzgerald*, 547 U.S. 800, 818 (1982). Intervenors attempt to show the law on this issue was clearly established by citing to the opinion of one prosecuting attorney and an agent within the DCI. A law isn't clearly established merely by listing a number of personal opinions. It requires *settled* law. *Ashcroft v. al-Kidd,* 563 U.S. 731, 741-42 (2011) ("Settled law" means "it is dictated by controlling authority or a robust consensus of cases of persuasive authority.") (internal quotations omitted).  Defendants "cannot be expected to predict the future course of constitutional law;" Intervenors' claims fail. *Procunier v. Navarette*, 434 U.S. 555, 562 (1968); *see also Harlow v. Fitzgerald*, 547 U.S. 800, 818 (1982).

Intervenors argue the data review here was a typical geofence search, but that is inaccurate. The above analysis doesn't need to be repeated. Yet even if this kind of data sharing amounted to standard geofence searching, that law is not clearly established. Courts evaluating the issue have pointed this out.

For example, the U.S. District Court for the District of Columbia observed that "technological advances coupled with corporate data collection" have presented "new

and consequential Fourth Amendment questions, the answers to which are not neatly directed by existing precedent." *Rhine*, 652 F.Supp.3d at 66. As recently as January 2023, the district court there observed the "state of the law" on this "important topic" was "evolving," and ultimately held "based on the unique facts at issue" there that "suppression [was not warranted] in [that] particular case." *Id.*

Another court held a defendant lacked a privacy expectation in location data associated with an account he did not own—the same standing problem plaguing this case, too—so the court therefore avoided a "journey into the quagmire of geofence search warrants." *Davis*, 2022 WL 3009240, at *8–9. That judge lamented that *Carpenter* left important questions open, leaving courts to decide "just how long is a piece of string." *Id.* at *7 (quoting *United States v. Howard*, 426 F.Supp.3d 1247, 1254 (M.D. Ala. 2019)). This shaky territory is a "new area of law," *Rhine*, 652 F.Supp.3d at 75, and its contours are not clearly defined. *Id.* at 66. And this court should not "journey into [that] quagmire" either. *Id.* at 74–75. Courts are "in 'uncharted territory'" when they evaluate geofence issues. *Davis*, 2022 WL 3009240, at *7.

Another court observed, "[w]hether geofencing falls within the strictures of the Fourth Amendment has been the subject of some debate," and "Courts have reached varying conclusions" while "some prominent legal scholars have questioned whether the access of geofence information constitutes a search under the Constitution." *Kirkendoll*, 2024 WL 1016049, at *1 n.1. It added that courts "have assumed without deciding that a warrant is required for the government to obtain geofence location information," yet "the question of whether geofence warrants impede on an

individual's reasonable expectation of privacy remains 'an open question.'" *Id.* at *2 (quoting *Geofence Warrants and the Fourth Amendment*, 134 HARV. L. REV. 2508, 2510 (2021)).

Even when a right is "clearly established," it may be "difficult for [the defendant] to determine how the relevant legal doctrine . . . will apply to the factual situation the [defendant] confronts." *Saucier*, 533 U.S. at 205. So if a "mistake as to what the law requires is reasonable . . . the [defendant] is entitled to the immunity defense." *Id.* "The reasonableness inquiry is objective, evaluating 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Huff v. City of Burbank*, 632 F.3d 539, 549 (9th Cir. 2011) (quoting *Grahm v. Connor*, 490 U.S. 386, 397 (1989)); *see also Howard v. Kansas City Police Dept.*, 570 F.3d 984, 989 (8th Cir. 2009) ("[T]he question is whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances, without regard to their underlying intent or motivation." (quoting *Graham*, 490 U.S. at 396–97)).

So even if Intervenors could show a warrantless review of geolocation data under the contractual and regulatory scheme here overstepped Fourth Amendment bounds—they can't—a mistake in this counterfactual would not be unreasonable. Defendants acted reasonably under the unique facts here—where betting app users not only knowingly and voluntarily share their locations to gamble online but also authorize certain disclosure of that data to government or law enforcement under a regulatory scheme that requires online Sportsbooks to disclose suspicious or

abnormal wagering patterns to the Iowa Racing and Gaming Commission, who then must report them to DCI. Iowa Admin. Code r. 13.5(3)(*b*); Iowa Code §99F.12(2)(b); [App. 6–9, 11–13, 15, 37, 49, 122, 130].

The inquiry must be "undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201. And here, the "contours of the right" to be free from government inspection of voluntarily shared geolocation data were not "sufficiently clear" so that every "reasonable official would understand that what [they are] doing violates that right." *Anderson*, 483 U.S. at 640. Officers may inspect data where they have knowing and voluntary consent, and clearly established law says Intervenors have no expectation of privacy in data they share with third parties. "[I]n the light of pre-existing law[,] the unlawfulness [was not] apparent." *Id.*

Also, the "existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable officer would find that conduct constitutional." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994); *see also Meehan v. Thompson*, 763 F.3d 936, 945 (8th Cir. 2014). Regulations require online Sportsbooks to monitor geolocation data—enabled by GeoComply—to detect fraudulent or other suspicious wagering activity; they require Sportsbooks to report this to the IRGC; they require the IRGC to share this information with DCI; and the IRGC authorized DCI's review under Iowa Code section 99F.12(2)(*b*). Iowa Admin. Code r. 13.5(3)(*b*); Iowa Code §99F.12(2)(*b*); [Doc. 33 ¶¶60–62]. And that's on top of the contractual context where certain disclosures to government are authorized by agreement. [App. 6–9, 11–13, 15, 37, 49, 122, 130].

The full legal, contractual, and factual context allowed geolocation monitoring. That defeats legitimate expectations of privacy. It also justified DCI's reasonable understanding that they could review geolocation data.

Under "[t]he 'clearly established' standard," "[t]he rule must be settled law," the contours of which are "so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted," and thus "with a high degree of specificity," "clearly prohibits the officer's conduct in the particular circumstances before him." *Wesby*, 583 U.S. at 63–64.

Considering the "relevant legal authority" and the low likelihood the Supreme Court would rule for Intervenors, *see Elder v. Holloway*, 510 U.S. 510, 512, 516 (1994), no Defendant violated a clearly established right. They are immune from suit and this matter must be dismissed.

## IV.    Intervenors are not entitled to damages, and their claims are neither cognizable nor causally linked to a constitutional violation.

To prevail, Intervenors must sufficiently allege (1) an unlawful search and seizure (2) was causally linked[12] to "an 'actual, compensable injury.'" *Waters v. Madson*, 921 F.3d 725, 740 (8th Cir. 2019) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 n.7 (1994)). They accomplish none of this. Certain causation problems have already been discussed. And the above shows Defendants violated no part of the Fourth Amendment. But regardless, Intervenors do not allege an actual, compensable injury causally linked to Defendants' allegedly unconstitutional conduct. To the

---

[12] *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 309 (1986).

extent Intervenors connect their alleged damages to wrongful convictions, they have

no compensable injury under the *Heck* doctrine.

**a. Intervenors cannot show Defendants caused their damages.**

Intervenors' claims for damages fail on causation. Intervenors may recover

compensatory damages only when they prove "actual injury caused by the denial of

[their] constitutional rights." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299,

309 (1986). "[*N*]o compensatory damages [may] be awarded for violation of

[constitutional] right[s] absent proof of actual injury." *Id.*; *see also Carey v. Piphus*,

435 U.S. 247, 264 (1978) (also holding damages are unavailable for mere

deprivations). "[T]he abstract value of a constitutional right may not form the basis

for § 1983 damages." *Id.*

Even if a Defendant ran afoul the Fourth Amendment, that deprivation did not

cause Intervenors' injuries. First, Intervenors caused their own injuries by violating

the law and NCAA rules. But second, the *colleges and universities*—not Defendants—

sanctioned Intervenors.

Although Intervenors presumably believe their injuries would not have

occurred but for Defendants' geolocation monitoring, Defendants did not control

university officials after they subpoenaed Intervenors' information. The universities'

independent discretion to discipline Intervenors is a supervening cause. *See Payne v.

City of LaSalle*, 610 F.Supp. 606, 608 n.4 (N.D. Ill. 1985) (explaining "*Monell* did not

set any new and different standards of proximate cause," including the defenses of

intervening or supervening causes). Intervenors cannot overcome that break in the

causal chain; this defect dooms their complaint. *See Imbler v. Pachtman,* 424 U.S. 409, 418 (1976) (courts must read section 1983 "in harmony with general principles of tort immunities and defenses rather than in derogation of them"); *see also Martinez v. State of Cal.,* 444 U.S. 277, 285 (1980) (liability is barred when the link between the defendant's conduct and the plaintiff's deprivation are "too remote").

Although some Intervenors were criminally charged, in several instances, the school suspensions predated those charges. So the criminal charges did not proximately cause the suspensions; the universities' discipline did. *See Payne*, 610 F.Supp. at 608 n.4. Even if Defendants violated the Fourth Amendment, Intervenors have no injuries casually linked to it. *Id.* Constitutional rights "do not exist in a vacuum," and "[w]here no injuries [caused by Defendants] [are] present, no 'compensatory' damages [can] be awarded." *Memphis Community Sch. Dist.*, 477 U.S. at 308.

Next, punitive damages are not available against the State or its officials acting in their official capacity. *Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1985). And punitive damages are available against officials only in their personal capacities. *Id.* Yet the above shows Intervenors claims do not lie against any Defendant individually. Despite the nominal gloss in their pleading, Intervenors brought official capacity suits in essence.

Even if Intervenors could establish nominal damages, they would not be guaranteed attorney fees. "In some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." *Farrar v. Hobby*, 506

U.S. 103, 115 (1992). "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." *Id.* (citation omitted). Even if "technical[ly]" a "prevailing party," "'the degree of the plaintiff's overall success [must] go[] to the reasonableness' of a fee award." *Id.* at 114 (quoting *Hensley v. Eckerhart*, 461 U.S. 424 (1983)).

Here, Intervenors' own rules violations caused their suspensions and related injuries. Intervenors should not gain from their own illicit activity, and "fee awards under § 1988 were never intended to 'produce windfalls to attorneys.'" *Id.* (quoting *Riverside v. Rivera*, 477 U.S. 561, 580 (1986)).

b. **Intervenors do not have cognizable claims.**

Although unclear, some Intervenors at times appear to link their injuries to convictions or "charges levied" against them. But if so, their claims are barred by the *Heck* doctrine. Yet even if not, the above shows a supervening cause stands between Defendants and Intervenors' alleged injuries. Intervenors' complaint cannot survive either horn of the dilemma.

Under *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), a Section-1983 claim is not cognizable when it implies the invalidity of a criminal conviction that has not been overturned. *Crawford v. Van Buren Cnty., Ark.*, 678 F.3d 666, 670 (8th Cir. 2012). Although search-and-seizure infractions may not necessarily imply the invalidity of a conviction—"due to doctrines such as independent source, inevitable discovery, and harmless error"—search and seizure claims are not categorically beyond the *Heck*

rule. *See Smith v. Ham*, 2021 WL 3674093, at *3, 3 n.4 (W.D. Ark. July 21, 2021). *Heck* explained, "In order to recover compensatory damages, . . . the §1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, which, we hold today, does not encompass the 'injury' of being convicted and imprisoned (until his conviction has been overturned)." *Heck*, 512 U.S. at 487 n.7.

For example, in *Smith v. Ham*, a Section 1983 Plaintiff's plea of "guilty to computer child pornography based upon images on his cell phone that were recovered in [a] search" doomed his claim, because "[a] determination that the search was invalid would undermine the validity of his conviction, in direct contravention of *Heck*." 2021 WL 3674093, at *4. Likewise here, several Intervenors pleaded guilty to underage gambling charges. But if geolocation monitoring is per se invalid as Intervenors claim, then this "would undermine the validity of [their] convictions [too], in direct contravention of *Heck*." *Id*. No potential applications of doctrines like independent source, inevitable discovery, or harmless error rescue their claims in the context of this case. *See id*.

To the extent these Intervenors allege injury in—or because of—their criminal convictions, their claims are not cognizable under *Heck*. No Intervenor showed their conviction was overturned in a subsequent proceeding, and this is especially obvious for those who pleaded guilty to illegal gambling charges.

But even if *Heck* does not apply, Intervenors cannot show Defendants proximately caused their injuries. University officials suspended or disciplined

Intervenors, but these actions superseded Defendants authority, control, or discretion. Intervenors cannot establish causation and damages against Defendants.

### c. Intervenors cannot recover for their own illegal activity.

Intervenors want the State of Iowa to pay them because they gambled illegally and got caught. But that's bad public policy and bad law.

Longstanding legal doctrines preclude parties from obtaining civil remedies for their own illegal acts. For example, "[t]here is authority holding that a party cannot obtain redress under § 1983 for damages caused by its own illegal acts 'in pari delicto' with another." *L.L. Nelson Enterprises, Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 806 (8th Cir. 2012) (quoting *Dudley v. Stoneman*, 653 F.2d 125, 126 (4th Cir. 1981)). Relying on *Pinter v. Dahl*, 486 U.S. 622, 633–35 (1988), the 8th Circuit acknowledges the applicability of this defense in section 1983 actions. *L.L. Nelson Enterprises, Inc.*, 673 F.3d at 806. *Pinter v. Dahl* held that this "equitable defense . . . is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." 486 U.S. at 632. The 4th Circuit likewise holds *in pari delicto* is a defense to claims section 1983. *Stoneman*, 653 F.2d at 126 (applying *in pari delicto* and holding a "plaintiff may not recover under [§] 1983.")

Even if Intervenors' rights were infringed, and even if they could link their damages to Defendants' acts, they have unclean hands. *Cf. id.* (analogizing *in pari delicto* to the unclean-hands doctrine); 27A Am. Jur. 2d Equity § 23 ("Under the clean hands doctrine, one cannot maintain an action if, to establish the cause of action, the

person must rely, in whole or in part, on any illegal or immoral act or transaction to which the person is a part.")

Similar doctrines like the wrongful conduct rule forbid such recovery because it is "wrong as a matter of public policy." *Tate v. Derifield*, 510 N.W.2d 885, 888 (Iowa 1994); *Julie Hansen Scheley v. Sioux County, et al.*, No. 22-2096, 2024 WL 3291798, at *6 (Iowa Ct. App. July 3, 2024) (holding "a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party, or to maintain a claim for damages based on his own wrong or caused by his own neglect, . . . or where he must base his cause of action, in whole or in part, on a violation by himself of the criminal or penal laws." (quoting *Tug v. Mingo: Let the Plaintiffs Sue–Opiod Addiction, The Wrongful Conduct Rule, and the Culpability Exception*, 34 W. Mich. U. T.M. Cooley L. Rev. 33, 52 (2017))).

"No court will lend its aid to a party who founds his claims for redress upon an illegal act." *The Fla.*, 101 U.S. 37, 43, 25 L. Ed. 898 (1879) "[T]he maxim, '*ex turpi causa non oritur actio*,' applies with full force." *Id.* Intervenors want to make bad law that rewards criminal behavior. Their Complaint should be dismissed.

## CONCLUSION

Defendants did not violate Intervenors' constitutional rights. Intervenors had no expectation of privacy in location data they voluntarily shared with third-party Sportsbooks to gamble online. They fail to state any plausible claim against any Defendant under the Fourth Amendment. Even if an expectation of privacy existed, the law was not clearly established. Defendants are entitled to qualified immunity.

All their claims fail. Defendants respectfully ask this Court to dismiss Intervenors'

Complaint in its entirety.

Respectfully submitted,

**BRENNA BIRD**
Attorney General of Iowa

/s/ *Shannon Archer*
Shannon Archer
Assistant Attorney General

/s/ *Ryan Pell*
Ryan Pell
Assistant Attorney General

Iowa Department of Justice
Hoover State Office Building
Des Moines, Iowa 50319
(515) 281-8080
(515) 281-4209 (fax)
shannon.archer@ag.iowa.gov
ryan.pell@ag.iowa.gov

ATTORNEYS FOR DEFENDANTS