IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| EYIOMA UWAZURIKE, NOAH SHANNON, NELSON BRANDS, TONY CASSIOPPI, JIREHL BROCK, HUNTER DEKKERS, ISIAH LEE, ARLAND BRUCE, IV, DODGE SAUSER, DESHAWN HANIKA, AHRON ULIS, AARON BLOM, JACK JOHNSON, JAKE REMSBURG, JEREMIAH WILLIAMS, HARRY BRACY, HOWARD BROWN, KEATON ANTHONY, JACOB HENDERSON, GEHRIG CHRISTENSEN, BENJAMIN TALLMAN, ABE ASSAD, COBE SIEBRECHT, CULLAN SHRIEVER, PATRICK KENNEDY, and JAKE ENGLISH,<br><br>        Plaintiffs,<br><br>PANIRO JOHNSON, TERRY ROBERTS, BRENNAN SWAFFORD, COREY CABANBAN, CAMERON JONES, SAMUEL SCHUYLER, CARTER SCHMIDT, NATHAN SCHON, DREW WOODLEY, JEREMIAH MATHIS, III, and EVAN SCHUSTER,<br><br>        Plaintiff-Intervenors,<br><br>v.<br><br>DAVID JOBES, TROY NELSON, BRIAN SANGER, CHRISTOPHER ADKINS, HEATHER DUENOW, PHILLIP KENNEDY, and CHRISTOPHER SWIGART,<br><br>        Defendants. | No. 4:24-cv-00146-RGE-SBJ<br><br><br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS** |

## I.    INTRODUCTION

Plaintiffs and Intervenors—all former student athletes at Iowa institutions—sue Defendants—all Iowa law enforcement officers—for alleged violations of their Fourth and Fourteenth Amendment rights under the United States Constitution for unreasonable search and seizure, as well as failure to intervene. Plaintiffs' and Intervenors' claims arise from Defendants' actions surrounding an investigation for possible match fixing at collegiate sporting events. Defendants used software to review historical location information indicating when and where sports wagering applications were open or used in or near collegiate athletic facilities. The investigation ultimately culminated in collegiate student athletes being suspended from their respective sports, and a subset of those individuals being charged criminally for underage sports wagering or tampering with records.

Defendants move to dismiss Plaintiffs' and Intervenors' complaints. Defendants argue they did not violate any of Plaintiffs' or Intervenors' constitutional rights, and even if they did, Plaintiffs' and Intervenors' rights were not clearly established at the time the events occurred, and Defendants are thus entitled to qualified immunity. Plaintiffs and Intervenors resist.

The Court applies traditional Fourth Amendment principles and finds Plaintiffs have sufficiently alleged that Defendants conducted an unconstitutional search. However, because the right was not clearly established at the time of Defendants' actions, Defendants are entitled to qualified immunity and the Court grants Defendants' motion to dismiss.

## II.    BACKGROUND

### A.    Iowa Sports Wagering Law

Iowa has a complex regulatory system in place to manage sports wagering within its borders. *See generally* Iowa Code Chapter 99F. The Court provides a brief overview of the regulatory scheme as relevant to the issues here.

The Iowa Racing and Gaming Commission (the Commission) is the entity charged with overseeing and enacting sports wagering regulations. *See id.* § 99F.4. The Iowa Department of Criminal Investigations (DCI) has a subdivision serving as the "primary criminal investigative and enforcement agency for the purpose of enforcement of chapters 99D, 99E, and 99F." *Id.* § 80.25A. The Commission issues licenses to applicants if the Commission is satisfied that the applicant will comply, or has complied, with Chapter 99F and its adopted rules. *Id.* § 99F.7(1). Licensees may enter into an additional agreement with the Commission to allow individuals in Iowa to place wagers remotely via their cell phones or other electronic means. *Id.* § 99F.9(4).

Under Chapter 99F, licensees are subject to various rules and regulations outlining their responsibilities. Of particular note for this case, licensees are required to:

> employ reasonable steps to prohibit coaches, athletic trainers, officials, players, or other individuals who participate in an authorized sporting event or sports-related event that is the subject of sports wagering from sports wagering under this chapter. In addition, a licensee shall employ reasonable steps to prohibit persons who are employed in a position with direct involvement with coaches, players, athletic trainers, officials, players, or participants in an authorized sporting event or sports-related event that is the subject of sports wagering from sports wagering under this chapter.

*Id.* § 99F.7A(4); *see also* Iowa Admin. Code r. 491-13.2(7)(a).[1] An "authorized sporting event" is defined as "a professional sporting event, collegiate sporting event, international sporting event, or professional motor race event." Iowa Code § 99F.1(3). As such, Iowa law prohibits collegiate athletes from participating in sports wagering—regardless of whether the collegiate athlete's sports team is actively competing.

A licensee is further required to "promptly report" to the Commission

---

[1] Section 99F.7A(4) was amended effective July 1, 2022. 2022 Iowa Legis. Serv. Ch. 1143 (H.F. 2497). The amendments added references to "sports-related events" in addition to "sporting events." These amendments went into effect as the events giving rise to this case occurred. Because the change to this code section has no impact on this case, the Court does not discuss the changes.

> any abnormal wagering activity or patterns that may indicate a concern about the
> integrity of an authorized sporting event or sports-related event, and any other
> conduct with the potential to corrupt a wagering outcome of an authorized sporting
> event or sports-related event for purposes of financial gain, including but not
> limited to match fixing, and suspicious or illegal wagering activities, including the
> use of funds derived from illegal activity, wagers to conceal or launder funds
> derived from illegal activity, use of agents to place wagers, or use of false
> identification.

*Id.* § 99F.12(2)(b); *see also* Iowa Admin. Code r. 491-13.2(7)(d). The Commission is required to

share information it receives pursuant to this subsection with the DCI, any other law enforcement

entity upon request, and any regulatory agency the Commission deems appropriate. Iowa Code

§ 99F.12(2)(b).

Iowa Code § 99F.15 sets forth prohibited activities relating specifically to sports wagering

and their associated criminal penalties. Relevant here, subsection (4)(d) makes it a class "D" felony

to cheat at sports wagering. *Id.* § 99F.15(4)(d). More generally, it is also illegal for anyone under

the age of twenty-one to gamble. *Id.* § 725.19. It is also a crime when someone "falsifies, destroys,

removes, or conceals a writing or record, with the intent to deceive or injure anyone or to conceal

any wrongdoing." *Id.* § 715A.5.

## B.    Factual Background

The following facts are taken from Plaintiffs' amended complaint, Intervenors' complaint,

and information embraced by the complaints, such as depositions of certain Defendants, the terms

and agreements for the sports wagering applications at issue, and the criminal proceedings of

various Plaintiffs and Intervenors.[2] Plaintiffs' amended complaint and Intervenors' complaint

---

[2] On a motion to dismiss, "[Courts] ignore materials outside the pleadings but may consider
materials that are part of the public record or do not contradict the complaint, and materials that
are 'necessarily embraced by the pleadings.'" *Nelson Auto Ctr., Inc. v. Multimedia Holdings
Corp.*, 951 F.3d 952, 955 (8th Cir. 2020) (citation omitted).

    While courts primarily consider the allegations in the complaint in determining
    whether to grant a Rule 12(b)(6) motion, courts additionally consider "matters
    incorporated by reference or integral to the claim, items subject to judicial notice,

contain substantially similar allegations and claims. *Compare* Pls.' Am. Compl., ECF No. 32 *with* Intvs.' Compl., ECF No. 33. The Court cites Plaintiffs' amended complaint to expound the following factual background, unless there are meaningful differences with Intervenors' complaint, in which case the Court cites both complaints.

The Court must accept as true all factual allegations in the complaint but not its legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544. 555–56 (2007)). "In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012).

At the time the events at issue took place, all Plaintiffs and Intervenors resided in Iowa and were student athletes at the University of Iowa, Iowa State University, or Ellsworth Community College. ECF No. 32 ¶¶ 1–27; ECF No. 33 ¶¶ 1–12; *see also* ECF No. 32 ¶¶ 194–494 (detailing allegations specific to individual Plaintiffs); ECF No. 33 ¶¶ 170–303 (same for Intervenors). Defendant David Jobes worked as the Assistant Director of the DCI. ECF No. 32 ¶ 28. Defendant Troy Nelson worked as the DCI Special Agent in Charge of the Sports Wagering Unit. *Id.* ¶ 29. Defendants Brian Sanger, Christopher Swigart, Christopher Adkins, Phillip Kennedy, and Heather Duenow worked as DCI Special Agents in the Sports Wagering Unit. *Id.* ¶¶ 30–34. In May 2019, Iowa legalized online sports wagering for individuals twenty-one years old or older. *Id.* ¶ 44.

FanDuel and DraftKings are online sports wagering companies that offer mobile applications to use their services. *See* ECF No. 32 ¶¶ 48–53. Plaintiffs and Intervenors downloaded

---

matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."
*Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B Wright & Miller, *Federal Practice & Procedure* § 1357 (3d ed. 2004)).

one or both of these applications onto their personal cell phones between February 2020 and December 2022. *See* ECF No. 32 ¶¶ 194–494; ECF No. 33 ¶¶ 170–303. Plaintiffs and Intervenors either created their own online sports wagering accounts or "were authorized to use someone else's account by the person who created the account" on FanDuel, DraftKings, or both. ECF No. 32 ¶ 45; ECF No. 33 ¶ 32; *see* ECF No. 32 ¶¶ 194–494; ECF No. 33 ¶¶ 170–303. Plaintiffs and Intervenors used passwords and/or facial recognition technology to restrict access to these accounts. ECF No. 32 ¶ 50; ECF No. 33 ¶ 35.

GeoComply Solutions, Inc. is a Canadian corporation licensed in Iowa which contracts and provides geolocation services to several sports wagering companies—including FanDuel and DraftKings—so those companies can verify that online sports wagering is lawful in the location where the application users are located. ECF No. 32 ¶¶ 39–41. For GeoComply to provide this service, users must "consent to share their location data with a respective online sports betting company," who then "share[s] users' location data with GeoComply, who in turn provides verification back to the companies. Part of the information users agree to share is location data that tracks users' locations every time they open the online sports betting application . . . ." *Id.* ¶ 41; *see also* Defs.' App. Supp. Mot. Dismiss Pls.' Am. Compl. 005–020 (DraftKings's Privacy Policy), 021–033 (DraftKings's Terms and Conditions), 034–139 (FanDuel's Terms and Conditions), ECF No. 42.

GeoComply has begun working with various law enforcement agencies throughout the country, including in Iowa. ECF No. 32 ¶ 43. Before Defendants could use GeoComply's software outside of training, GeoComply "insisted the [Commission] had to sign off on the use of GeoComply's technology," which the Commission eventually did. *Id.* ¶¶ 73–75. After receiving approval from the Commission, GeoComply provided Defendants with login credentials, allowing Defendants to utilize GeoComply's software and tools. *Id.* ¶ 81. Using these login credentials,

Defendants were able to access DraftKings and FanDuel users' geolocation data without a warrant. *Id.* ¶ 82. Defendants viewed dots on a virtual map indicating the location of a device accessing a sports wagering application when using GeoComply software. *See id.* ¶¶ 86, 88, 98–100. A location indicator dot was generated when the sports wagering application was opened, and at various increments while using the app to ensure the user remained within a jurisdiction where sports betting is legal. *See id.* ¶ 41; ECF No. 42 at 007 ¶ b; ECF No. 42 at 049 ¶ 21.2; Sanger Dep. 39:19–41:16, ECF No. 42 at 257. By drawing a boundary on the virtual map, Kibana (a software tool used in conjunction with GeoComply) removed information outside the boundary and simultaneously provided an account number for the users within the drawn boundary. *See* ECF No. 32 ¶¶ 98–100; Sanger Dep. 8:10–14, ECF No. 42 at 249. Kibana enabled agents to produce "reports detailing the exact dates, times, and precise locations – including the users' homes and specific areas within other States that allowed online sports betting – in which . . . individually identified accounts or [applications] were opened or used during the past several years." ECF No. 32 ¶ 103. Kibana enabled Defendants to access and compile years of historical geolocation information for each account selected. *Id.*

Plaintiffs and Intervenors allege Sanger viewed historical location data provided by GeoComply with neither probable cause of criminal activity nor a search warrant. *Id.* ¶¶ 97, 105, 110; *see also* Sanger Dep. 17:9–20, ECF No. 42 at 251. Sanger then drew a boundary around the University of Iowa's and Iowa State University's athletic facilities "purportedly out of concern for match-fixing and sports wagering cheating" after noticing activities within those facilities. ECF No. 32 ¶¶ 98–100. This provided Sanger with account numbers for users within the geofenced area. *See id.* ¶ 108. Sanger developed a report compiling historical geolocation data for these accounts. *Id.* ¶ 103. Plaintiffs allege Sanger was able to compile personal identifying information through GeoComply and Kibana including home addresses associated with the users identified by

the geofence-created report. *Id.* ¶¶ 103–04. All of these actions were conducted without a warrant. *Id.* ¶ 105.

Sanger and the DCI requested, received, and then "issued subpoenas from Dubuque County to FanDuel regarding 69 accounts and DraftKings regarding 73 accounts." *Id.* ¶ 118. The information requested from the accounts included:

> 1) Account owner information – Name, DOB, SSN, Address, Account Status, Account Created Date, All Linked Email Addresses, Phone Numbers, Account Wallet Balances, All Linked Financial Accounts (Banks, Credit Cards, PayPal, Venmo, Wire Transfers, etc.)
> 2) All Account Linked Devices
> 3) Total Account Win & Loss Statement (Online & Retail)
> 4) All Deposits and Withdrawals along with their respective Geolocation Data (Online & Retail)
> 5) All Account Transactions and Wagering History (Online & Retail)
> 6) Total Account Promos Awarded/Used
> 7) Any Internal Account Notes including Account Notifications from GeoComply Solutions, Inc.
> 8) Initial Account Setup IP Address and Geolocation Data

*Id.* A few months later, "subpoenas were issued to [Iowa State University]." *Id.* ¶ 132. It is unclear from the complaints what information this subpoena sought. Based on the information obtained from the subpoenas, search warrants for the cell phones of various Plaintiffs and Intervenors were authorized, and the phones were seized by law enforcement. *See id.* ¶ 134; ECF No. 33 ¶ 119.

The DCI then sought and obtained another subpoena to GeoComply seeking "Any Internal Account Notes, Alerts, Notifications, SARs Reports including any Account Notifications from GeoComply Solutions, Inc. to Any Sportsbooks regarding the below account." ECF No. 32 ¶ 149. The complaints do not indicate what account the subpoena referenced. Later, "a second subpoena . . . was issued to Iowa State." *Id.* ¶ 151. The complaints, again, do not specify what information this subpoena sought. Next, a subpoena requested the same information as the first subpoena for thirty-five of the previously listed sixty-nine accounts from FanDuel and twenty-five of the previously listed seventy-three accounts from DraftKings with the added language: "All records

must include a '**Business Records Certificate of Authenticity.**'" *Id.* ¶ 153 (emphasis in original). Another subpoena obtained financial records from FanDuel, identifying Plaintiff Eyioma Uwazurike's credit/debit card as being used to place deposits on an account identified as belonging to nonparty Rachel Francis. *Id.* ¶ 152.

At various points between May 2023 and February 2024, Plaintiffs and Intervenors were suspended from their respective collegiate sports. *See id.* ¶¶ 139–45; ECF No. 33 ¶¶ 125–28.[3] Many Plaintiffs and Intervenors, though not all, were criminally charged as a result of their use of FanDuel and/or DraftKings. *See* ECF No. 32 ¶¶ 194–494; ECF No. 33 ¶¶ 170–303. Some of these charges resulted in guilty pleas, and some were dismissed after defense counsel filed a motion to suppress evidence obtained in an alleged unconstitutional search. *See* ECF No. 32 ¶¶ 194–494; ECF No. 33 ¶¶ 170–303; *see, e.g., State v. Lee*, No. 02851 AGCR062914 (Iowa Dist. Ct., Story Cnty.).

After GeoComply learned of Sanger's and the DCI's actions in charging Plaintiffs and Intervenors, GeoComply informed the Commission it was ending the partnership with the DCI. ECF No. 32 ¶ 168. The Commission then "accused [the] DCI and its agent of withholding information from them in their use and implementation of the GeoComply software." *Id.* ¶ 169.

C.    **Procedural History**

Plaintiffs' amended complaint alleges claims against Defendants under the Fourth and Fourteenth Amendments of the United States Constitution for: unreasonable searches based on Defendants' use of data from GeoComply (Count I); unreasonable seizures based on Defendants' use of data from GeoComply (Count II); unreasonable searches based on illegally supported

---

[3] Uwazurike was suspended by the NFL. ECF No. 32 ¶ 142. It is unclear from the complaints whether Plaintiff Jake English was suspended from the Ellsworth Community College baseball team. *See id.* ¶ 26; *see generally id.*

subpoenas (Count III); unreasonable seizures based on illegally supported subpoenas (Count IV); and failure to intervene (Count V). ECF No. 32 ¶¶ 495–601. Plaintiffs seek punitive damages on all counts and attorneys' fees. *Id.*

Plaintiff-Intervenors moved to intervene, and the Court granted the unresisted motion. Mot. Intervene, ECF No. 23; Order Grant. Mot. Intervene, ECF No. 30. Intervenors' complaint alleges similar claims against Defendants under the Fourth Amendment of the United States Constitution: unreasonable searches based on Defendants' use of data from GeoComply (Count I); unreasonable seizures based on Defendants' use of data from GeoComply and illegally supported subpoenas (Count II); and failure to intervene (Count III). ECF No. 33 ¶¶ 304–47. Intervenors seek punitive damages on all counts and attorneys' fees. *Id.* ¶¶ 348–54.

Defendants move to dismiss Plaintiffs' amended complaint and Intervenors' complaint. Defs.' Mot. Dismiss Pls.' Am. Compl., ECF No. 41; Defs.' Mot. Dismiss Intvs.' Compl., ECF No. 43. Plaintiffs and Intervenors resist. Intvs.' Resist. Defs.' Mot. Dismiss Intvs.' Compl., ECF No. 50; Pls.' Resist. Defs.' Mot. Dismiss. Pls.' Am. Compl., ECF No. 53. Defendants respond to Plaintiffs' and Intervenors' resistances in a consolidated reply. Defs.' Consol. Reply Supp. Mots. Dismiss, ECF No. 64.

The Court finds the parties' briefing adequately presents the issues without need for oral argument. *See* LR 7(c); Fed. R. Civ. P. 78(b). The Court decides the parties' motions as set forth below.

## III.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim if a party fails "to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *accord Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). "The essential function of a complaint" and therefore the aim of the plausibility standard "is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian*, 760 F.3d at 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)).

Plaintiffs must "nudge[] their claims across the line from conceivable to plausible, [else] their complaint must be dismissed." *Twombly*, 550 U.S. at 570. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the defendant is liable." *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted).

## IV.    DISCUSSION

Plaintiffs and Intervenors allege, pursuant to 42 U.S.C. § 1983, Defendants conducted unreasonable searches and seizures in violation of the Fourth and Fourteenth Amendments of the United States Constitution. ECF No. 32 ¶¶ 495–575; ECF No. 33 ¶¶ 304–29. Plaintiffs and Intervenors also allege Defendants failed to intervene to prevent the alleged unconstitutional searches and seizures, also in violation of the Fourth and Fourteenth Amendments. ECF No. 32 ¶¶ 576–601; ECF No. 33 ¶¶ 330–47. Defendants first argue certain Plaintiffs and Intervenors lack Fourth Amendment standing to assert constitutional violations. Defs.' Br. Supp. Mot. Dismiss Pls.' Am. Compl. at 25–29, ECF No. 41-1; Defs.' Br. Supp. Mot. Dismiss Intvs.' Compl. at 12–15, ECF

No. 43-1. Defendants move to dismiss all counts, arguing no constitutional violations occurred. *See* ECF Nos. 41, 43. Defendants also argue that even if they violated the Fourth Amendment, they are entitled to qualified immunity because the rights at issue were not clearly established when the violations occurred. ECF No. 41-1 at 67–73; ECF No. 43-1 at 48–54.

The Court first addresses Fourth Amendment standing. The Court next turns to the issue of qualified immunity. The Court follows the traditional *Saucier* two-step analysis. *Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223 (2009). The first step asks whether Plaintiffs have sufficiently alleged a violation of a constitutional right. *Saucier*, 533 U.S. at 200–01. The second step determines whether that right was clearly established at the time of the violation. *Id.* Answering this second question requires the Court to define "the right allegedly violated . . . at the appropriate level of specificity" and "not as a broad general proposition." *Id.* at 201. Thus, the Court first evaluates whether the claims concerning unconstitutional searches under the Fourth Amendment constitute a violation of a constitutional right.[4] The Court then turns to whether the right to be free of such searches was clearly established at the time the searches occurred. After finding Defendants are entitled to qualified immunity, the Court then considers the remaining unresolved claims relating to the issuance of subpoenas and warrants, and the alleged unconstitutional seizure of Plaintiffs' cell phones and data. Finally, the Court discusses the claims based on a duty to intervene to prevent constitutional violations.

A.    **Standing**

Defendants argue various Plaintiffs and Intervenors lack Fourth Amendment standing to

---

[4] "[T]he Fourth Amendment is enforceable against the States through the Fourteenth Amendment." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967). Plaintiffs and Intervenors make no argument or allegation under the Fourteenth Amendment independent of the Fourth Amendment. *See* ECF Nos. 32–33, 50, 53. As such, the Court analyzes Plaintiffs' and Intervenors' claims under Fourth Amendment doctrine.

sue because the sports wagering accounts they used were owned by non-party individuals, and the ability to assert any privacy-rights violations belongs to those non-party individuals. ECF No. 41-1 at 25–30; ECF No. 43-1 at 12–16.

"Fourth Amendment rights are personal and may not be asserted vicariously." *United States v. Green*, 275 F.3d 694, 698 (8th Cir. 2001). As such, "Fourth Amendment standing is 'useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search,' but it does not implicate Article III jurisdiction." *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020) (quoting *Byrd v. United States*, 584 U.S. 395, 410 (2018)). "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Byrd*, 584 U.S. at 411.

Defendants argue some Plaintiffs lack standing because they used accounts owned by others in order to avoid detection by the NCAA or because they were under the age of twenty-one and so could not legally gamble. ECF No. 41-1 at 27–28. Defendants claim these Plaintiffs lack a privacy expectation in accounts they do not own. *Id.* at 27. The question of standing is answered with a straightforward application of traditional Fourth Amendment jurisprudence. All Plaintiffs here have standing because each is asserting their own reasonable expectation of privacy in their geolocation data and catalog of physical movements compiled by Defendants without a warrant. *See* ECF No. 32; ECF No. 33. The means of technological collection was in some cases Plaintiffs' own account, and in some cases the account of another, but in all instances, it was Plaintiffs' location history and movements being logged by the app, recorded by GeoComply and Kibana, and searched by Defendants without a warrant—not the location of the account holder, when that person differed. When an individual asserts their privacy rights were invaded, they have Fourth

Amendment standing. *See Bettis*, 946 F.3d at 1029. In *Bettis*, the Eighth Circuit found even "an unauthorized and unlicensed driver may challenge a search of a rental car operated with the renter's permission." *Id.* Using an application account of another with the account owner's permission is analogous to using the rental car of another. The Court therefore finds all Plaintiffs have standing.

### B.    Qualified Immunity as to the Alleged Unconstitutional Search

Qualified immunity shields a government official from liability for violating an individual's constitutional rights unless that right can be shown to be clearly established at the time the alleged violation occurred. *Pearson*, 555 U.S. at 231. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation marks and citation omitted). In determining whether Defendants here are entitled to qualified immunity, the Court first assesses whether Plaintiffs and Intervenors plausibly allege Defendants' warrantless compilation and use of historical geolocation information disclosed by GeoComply violates the Fourth Amendment. The Court then turns to whether the right to be free from such searches was clearly established at the time they occurred.

Plaintiffs and Intervenors allege Defendants violated their Fourth Amendment rights against unreasonable searches by using GeoComply and Kibana to observe and preserve their historical geolocation data without a warrant. ECF No. 32 ¶¶ 495–575; ECF No. 33 ¶¶ 304–29. Plaintiffs further allege Defendants' allegedly illegal use of their geolocation data to obtain subpoenas also constitutes an unreasonable search. ECF No. 32 ¶¶ 535–554. Defendants contend no illegal search occurred, and even if one did, the right to be free from such a search was not clearly established at the time the search occurred. ECF No. 64 at 17–19.

### 1.    Whether the GeoComply Search was a Constitutional Violation

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A]pplication of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citations omitted). An individual must demonstrate their conduct exhibits "an actual (subjective) expectation of privacy . . . that society is prepared to recognize as reasonable." *Id.* (internal quotation marks and citations omitted). If the individual meets this burden, then "official intrusion into that private sphere [created by a reasonable expectation of privacy] generally qualifies as a search" under the Fourth Amendment and, as such, "requires a warrant supported by probable cause." *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (citation omitted).

The Court begins with a discussion of the origins of the Fourth Amendment and the evolution of Fourth Amendment jurisprudence in a time of rapid technological change. At the time of the Founding, the Fourth Amendment responded to "the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Carpenter*, 585 U.S. at 303 (citation omitted). While much of earlier Fourth Amendment jurisprudence "was 'tied to common-law trespass'" and focused on physical government intrusion, the Supreme Court came to recognize this approach as insufficient because "the Fourth Amendment protects people, not places." *Id.* at 304 (citation omitted). While "no single rubric definitively resolves which expectations of privacy are entitled to protection, the analysis is informed by historical understandings" of what was intolerable at the time of the Founding. *Id.* at 304–05 (citing *Carroll v. United States*, 267 U.S. 132, 149 (1925)).

Through legal and technological change, the Supreme Court has recognized two critical guideposts. "First, that the Amendment seeks to secure 'the privacies of life' against 'arbitrary

power.'" *Id.* (quoting *Boyd v. United States,* 116 U.S. 616, 630 (1886)). "Second, and relatedly, that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Id.* (quoting *United States v. Di Re,* 332 U.S. 581, 595 (1948)). These core principles of the Fourth Amendment "assure[] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo v. United States,* 533 U.S. 27, 34 (2001). In *Kyllo*, the Supreme Court rejected a "mechanical interpretation of the Fourth Amendment" which would have left Americans "at the mercy of advancing technology." *Id.* at 35. The Fourth Amendment retains its critical importance even as "innovations in surveillance tools . . . ha[ve] enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter*, 585 U.S. at 305.

As in *Carpenter*, the present case lies "at the intersection of two lines of cases, both of which inform our understanding of the privacy interests at stake." *Carpenter*, 585 U.S. at 306. The first "addresses a person's expectation of privacy in his physical location and movements." *Id.* The second is the third-party doctrine. The third-party doctrine is supported by two main rationales. The first rationale is that "an individual has a reduced expectation of privacy in information knowingly shared with another." *Id.* at 314 (discussing *United States v. Miller*, 425 U.S. 435, 443 (1976)). The second rationale focuses on voluntary exposure of information, finding that "a person has no legitimate expectation of privacy in information [they] voluntarily turn[] over to third parties." *Smith*, 442 U.S. at 743–44.

Defendants argue their scanning and compilation of historical geolocation data using GeoComply and Kibana implicates no protectable Fourth Amendment interest because the information falls within the third-party doctrine. *See* ECF No. 41-1 at 30–42; ECF No. 43-1 at 16–29. Defendants also argue various search warrant exceptions apply, and even if a search occurred, Plaintiffs and Intervenors consented to it. ECF No. 41-1 at 45–57; ECF No. 43-1 at

32–44. Plaintiffs and Intervenors argue that *Carpenter* establishes that the third-party doctrine does not permit Defendants' warrantless collection and inspection of their historical location information via GeoComply and Kibana. ECF No. 50 at 19–26; ECF No. 53 at 31–35. Plaintiffs and Intervenors further argue no search warrant exceptions apply and they did not consent to a search. ECF No. 50 at 26–30; ECF No. 53 at 35–41.

Defendants encourage this Court to apply a narrow interpretation of the Fourth Amendment. They assert a warrantless scan for criminal activity using a novel technological innovation does not offend the Fourth Amendment because Plaintiffs were required to provide location data as a prerequisite for using a mobile phone app. Applying well-established Fourth Amendment principles, the Court concludes a government official using advanced surveillance tools to isolate identifiable users within a particular geographic area to catalog and scan their historical geolocation data generated by a phone application without obtaining a warrant does not comport with the Fourth Amendment. To hold otherwise would be inconsistent with the founders' antipathy towards unrestrained surveillance and would authorize pervasive intrusions on privacy expectations.

a.    Knowing and Voluntary Disclosure

The core rationale of the third-party doctrine is based on the notion that when a person knowingly and voluntarily shares information, they no longer have a reasonable expectation of privacy in that information. *See Smith*, 442 U.S. at 743–44. Modern digital life poses difficult challenges for courts applying the third-party doctrine. "[I]n our modern world, we must now expose to a third party information that we would have previously kept private, in order to continue to participate fully in society." *United States v. Davis*, 785 F.3d 498, 527 (11th Cir. 2015) (Rosenbaum, J., concurring). Yet if courts allow participation in modern life to abrogate Fourth

Amendment rights "we will face the Hobson's choice of leaving our historically recognized Fourth Amendment rights at the door of the modern world or finding ourselves locked out from it." *Id.*

This danger is heightened where the information sought is historical location data. *Carpenter*, 585 U.S. at 314 (noting "[t]he Court has in fact already shown special solicitude for location information in the third-party context"). In *Knotts*, the Court found no reasonable expectation of privacy in the public movements of a car because travelling over public streets "voluntarily conveyed [the information] to anyone who wanted to look." *United States v. Knotts*, 460 U.S. 276. 281 (1983). Yet when presented with longer term GPS monitoring of a vehicle travelling on public roads, the Supreme Court found such pervasive tracking constituted a search. *See United States v. Jones*, 565 U.S. 400 (2012). Special care must therefore be given as to a warrantless probe of historical location information.

The "third-party doctrine largely traces its roots to *Miller.*" *Carpenter*, 585 U.S. at 308. In *Miller*, the government sought cancelled checks, deposit slips, and monthly statements from Miller's bank during the course of an investigation into tax fraud. *Miller*, 425 U.S. at 440. The Supreme Court described the documents sought as "the business records of the banks" for which "[Miller] can assert neither ownership nor possession." *Id.* In *Smith*, the Supreme Court considered the use of a pen register which recorded the outgoing phone numbers dialed from a landline telephone. 442 U.S. at 742. The Supreme Court was skeptical "that people in general entertain any actual expectation of privacy in the numbers they dial." *Id.*

*Smith* and *Miller* did not rely "solely on the act of sharing" and instead focused on "the nature of the particular documents sought" to determine whether an individual relinquished their expectation of privacy in the information. *Carpenter*, 585 U.S. at 315 (internal quotation marks and citation omitted). In *Smith*, the court noted the "limited capabilities" of a pen register and the lack of any reasonable expectation of privacy in the numbers a person dials. *Smith*, 442 U.S. at

742. The court in *Riley* later distinguished the limited identifying information conveyed in the pen register analyzed in *Smith*, with the more expansive identifying information contained in a call log. *Riley v. California*, 573 U.S. 373, 400 (2014) (distinguishing *Smith* by noting "call logs typically contain more than just phone numbers; they include any identifying information that an individual might add, such as the label 'my house'"). In *Miller*, the court analyzed the nature of the documents sought to determine whether there was an expectation of privacy, describing the document sought as "not confidential communications but negotiable instruments to be used in commercial transactions." *Miller*, 425 U.S. at 442.

The information sought here was years of retrospective historical geolocation data. ECF No. 32 ¶ 103. This information is more akin to the location data sought in *Carpenter* than the limited information sought in *Smith* and *Miller*. In addition, the knowing and voluntary action here was Plaintiffs agreeing to the terms of using a gambling app, which in turn automatically generated and recorded the precise geolocation data Defendants ultimately sought. Applying the third-party doctrine to Plaintiffs here would go far beyond what the Supreme Court found constituted knowing and voluntary relinquishments of a privacy interest. Finding Plaintiffs here relinquished their privacy interests in their historical geolocation data would be a substantial expansion of the third-party doctrine as articulated in *Smith* and *Miller*, and one that is unsupportable in light of *Carpenter*.

To find no protectable expectation of privacy, the Court would need to assume a person intends to share the history of their movements with third parties when they open an app on their phone which requires precise location data as a prerequisite for use. Such an assumption is misplaced. In the context of the Federal Wiretap Act, courts have concluded users do not knowingly and intentionally share their location data when apps automatically generate geolocation data. *See Gonzales v. Uber Technologies, Inc.*, 305 F.Supp.3d 1078, 1085 (N.D. Cal

2018) (noting "the automatic generation of geolocation data" by an app as soon as it is opened is distinct from a text message stating 'I am at 6th and Broadway'"); *In re iPhone Application Litig.*, 844 F.Supp.2d 1040, 1061 (N.D. Cal. 2012) (recognizing geolocation data when an app is opened on a phone "is generated automatically, rather than through the intent of the user"). A background process automatically generating geolocation data is fundamentally different from a user voluntarily sharing information. Just as a user does not intentionally share automatically generated geolocation data for purposes of the Federal Wiretap Act, a user does not intentionally share geolocation data in a way that defeats their reasonable expectation of privacy in their physical movements by using a gambling app.

Here, as in *Carpenter*, "[t]here is a world of difference between the limited types of personal information addressed in *Smith* and *Miller* and the exhaustive chronicle of location information casually collected" by GeoComply. 585 U.S. at 314. Just as in *Carpenter*, "[t]he Government's position fails to contend with the seismic shifts in digital technology." *Id.* at 313. As such, the Court concludes no voluntary relinquishment of a user's privacy interest occurs when a user opens an app and precise location data is generated automatically in the background. *See Jones*, 565 U.S. at 417 (Sotomayor, J., concurring) (observing the *Smith* and *Miller* "approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks").

b.      Nature of the Technology and Information Sought

*Carpenter* addressed the constitutionality of accessing cell-site location information (CSLI). CSLI is a time-stamped record of the narrow geographic area a cell phone is in, generated whenever the phone connects to a cell tower. *Carpenter*, 585 U.S. at 300–01. In the near-decade since *Carpenter*, technology has advanced so precipitously that the cell tower location data at issue in *Carpenter* has been partially subsumed by the ubiquity of app-generated geolocation data. *See*

*Corus Realty Holdings, Inc. v. Zillow Group, Inc.*, 860 F.App'x 728, 733–34 (Fed. Cir. 2021) (discussing the ability of the Zillow app to collect "'fused' or 'crowd-sourced' location data" "where some cellular data is combined with GPS, WiFi, and/or other forms of location data" as opposed to "'cellular-based location data'" only); *In Re Google Location History Litig.*, 514 F.Supp.3d 1147, 1151–57 (N.D. Cal. 2021) (discussing the ability for Google apps to collect and track user location data and finding the "collection and storage of location data creates a detailed and comprehensive record of a users' individual movements over time" akin to that in *Carpenter*); *United States v. Smith*, 110 F.4th 817, 833 (5th Cir. 2024) (observing "the parallels between CSLI and Location History data" and warning "the potential intrusiveness of even a snapshot of precise location data should not be understated"). The Supreme Court noted its opinion in *Carpenter* "tread[ed] carefully" so as to not "embarrass the future." *Carpenter*, 585 U.S. at 316 (quoting *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (1944)). While the pace of technological progress and the ability to precisely track individuals has far outstripped the pace of third-party doctrine jurisprudence, the core principles which allowed the Supreme Court to recognize an unconstitutional search in *Carpenter* are equally applicable here.

The technology at issue here, GeoComply and Kibana, allows government agents to create detailed logs of a user's location through the location data produced when an app is opened on an individual's phone. Every time a user opens the sports betting app, the app registers the user's location and sends it to GeoComply, which authenticates whether the user is in a jurisdiction where sports gambling is legal. ECF No. 32 ¶ 41. The historical geolocation data is logged and searchable by a software tool called Kibana. *Id.* Using these tools, agents of the DCI were able to compile reports detailing the location history of users. DCI agents used the "Pindrop map" tool in GeoComply to look at "hot zones" where multiple users were submitting individual bets at the same location. *Id.* ¶ 86. These agents were also able to zoom into various other areas and highlight

where multiple users were all in one location. *Id.* ¶ 88.

After GeoComply trained DCI agents on how to use these tools, Sanger used GeoComply to draw a geofence—a boundary area on the geolocation map—around the athletic facilities of Iowa State University and the University of Iowa. *Id.* ¶ 98. The Kibana tool allowed Sanger to filter out all other data points except for those in the geofenced athletic facilities. *Id.* ¶ 99. Sanger then used Kibana's historical data tool to compile a list of devices and accounts which had a geolocation data point registered in the geofenced area in the preceding several months. *Id.* ¶ 102. Sanger then compiled a detailed report on each of these users. *Id.* ¶ 103. These reports used the historical geolocation data Kibana logged to detail exact times, dates, and locations where users' geolocation data was captured. *Id.* This extensive historical geolocation data provided Sanger with personally identifying information for each of the users of the accounts he tracked, including home locations. *Id.* ¶¶ 103–04. Sanger conducted this collection and historical geolocation tracking without a warrant. *Id.* ¶ 105.

While the method of historical geolocation collection is different from the CSLI at issue in *Carpenter*, the Fourth Amendment concerns are similar. *Carpenter* confronted "a new phenomenon: the ability to chronicle a person's past movements through the record of his cell phone signals." *Carpenter*, 585 U.S. at 309. This case confronts another new phenomenon: the ability to chronicle a person's past movements through the record of their cell phone apps' geolocation authentication data. The *Carpenter* Court noted "time-stamped data provides an intimate window into a person's life." *Id.* at 311. Here, Sanger generated a report detailing time-stamped user geolocations. The *Carpenter* Court was disturbed that "[w]ith just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense." *Id.* Here, Sanger was able to easily use the Kibana tool to access a repository of historical location data going back years. Among the locations Sanger complied in

his reports were users' home locations. This closely tracks the *Carpenter* Court's observation that "[a] cell phone faithfully follows its owner beyond public thoroughfares and into private residences." *Id.*

The context of the location data here is also similar to that of the CSLI in *Carpenter*. Plaintiffs here were required to share their precise location data as a prerequisite for accessing the gambling app functionality. ECF No. 32 ¶ 41. Unlike an application in which location data is necessary to enable key utilities—such as a ride-sharing app—the precise location data for a gambling app is only needed to ensure users are within a jurisdiction where gambling is legal. *Id.* While it is conceivable that the third-party doctrine may apply differently in the context of apps which prominently display and use a user's location for core features, because the user would be more conscious of that ongoing tracking, the Court is not faced with that issue here. This case is narrowly about the historical geolocation data an app automatically registers to ensure compliance. In *Carpenter*, the CSLI was recorded in the background in order to enable cell phone functionality. This is analogous to how the gambling apps at issue here generated historical geolocation data in the background in order to enable the app's functionality.

Most critically, this case shows the *Carpenter* Court's concerns were prescient. The Court warned "this newfound tracking capacity runs against everyone" because "[u]nlike with the GPS device in *Jones,* police need not even know in advance whether they want to follow a particular individual, or when." *Carpenter*, 585 U.S. at 312. The Court imagined "[w]hoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment." *Id.*

Here, Sanger began his geofence scan without any probable cause or any information regarding illegal sports betting on campus. ECF No. 32 ¶¶ 97, 120. Indeed, Adkins stated in an

email "we don't necessarily have a crime on the books" and "if we pursue this and it hits the media, which it would, and people start asking why nothing criminal was done — we can use that platform to hopefully push legislatures for code changes moving forward." *Id.* ¶¶ 111, 113. DCI agents used a geofence tool to draw a surveillance boundary around Iowa State University and the University of Iowa athletic facilitates based on the suspicion they could find users illegally gambling. Then having picked out their potential suspects, they used the historical location repository in Kibana to reconstruct the users' location history going back years. As more cell phone apps require geolocation authentication before use, the *Carpenter* Court's warning that "[o]nly the few without cell phones could escape this tireless and absolute surveillance" rings as true for app geolocation data as it did for CSLI data. 585 U.S. at 312.

Individuals have a reasonable expectation of privacy in the record of their physical location and movements. Plaintiffs here maintain their reasonable expectation of privacy in the chronicle of their historical location data stored by GeoComply even though they were required to share the location data in order to use the app. GeoComply, used in conjunction with Kibana, allowed the government to recreate a record of Plaintiffs' location each time the betting app was opened and revealed personal identifying information including their home locations. Location data is traditionally afforded strong Fourth Amendment protections and Plaintiffs did not knowingly and voluntarily relinquish their reasonable expectation of privacy in their historical geolocation data through their use of the gambling apps at issue. Plaintiffs maintained a reasonable expectation of privacy in this data. Obtaining and searching through the record of an individual's historical location and movements is an invasion of that individual's reasonable expectation of privacy. The Fourth Amendment requires that a warrant be obtained before such a search may be conducted. Because Defendants failed to obtain a warrant before using this surveillance technology to compile and search Plaintiffs' geolocation history, Plaintiffs have alleged a violation of the Fourth

Amendment right to be free from an unreasonable search.

## 2.    Whether the Right was Clearly Established

Having established Plaintiffs have alleged a violation of a constitutional right, the Court next turns to whether that right was clearly established at the time Defendants conducted the illegal search. Defendants contend they are immune from suit because the right to be free from a warrantless search of app-generated historical geolocation data was not clearly established at the time of the search. ECF No. 41-1 at 67–73; ECF No. 43-1 at 48–54. "Qualified immunity shields a government official from suit under § 1983 if [their] 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992)). "A plaintiff must identify either 'controlling authority' or 'a robust consensus of cases of persuasive authority' that 'placed the statutory or constitutional question beyond debate' at the time of the alleged violation. *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011) (internal quotation marks and citation omitted)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"The Supreme Court has warned that [courts] must not 'define clearly established law at a high level of generality,' and a right's contours must be 'sufficiently clear.'" *Rokusek v. Jansen*, 899 F.3d 544, 547–48 (8th Cir. 2018) (quoting *al-Kidd*, 563 U.S. 731 at 741–42). In "Fourth Amendment cases, . . .  the 'specificity of the rule is especially important' because 'officers will often find it difficult to know how' the Constitution applies in 'the precise situation encountered.'" *Dean v. Searcey*, 893 F.3d 504, 519 (8th Cir. 2018) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). Plaintiffs therefore bear the burden of showing more than that their historical

geolocation data was searched in general contravention of the Fourth Amendment. Plaintiffs must show specifically that their right to be free from Defendants' use of software to catalog and search the historical geolocation data automatically generated by a phone application without a warrant was clearly established at the time Defendants conducted their search.

In the amended complaint Plaintiffs reference several emails and communications among Defendants which they assert demonstrate Defendants were aware a warrant was required to access geolocation data yet chose to conduct their search without a warrant. ECF No. 32 ¶¶ 57–130. On September 15, 2022, Assistant Story County Attorney Tyler Grimm sent an email to Chris Swigart explaining that a search warrant would be required for geolocation data. ECF No. 32 ¶ 79. Swigart stated "Tyler conveyed to me, it's his understanding that anytime I request geolocation data from a sportsbook, I'll need a search warrant to secure these specific records." *Id.* ¶ 80. Swigart and Duenow "went back and forth on what would require a search warrant – indicating they understood search warrants were required." *Id.* ¶ 83. On March 2, 2023, Swigart emailed Nelson that he heard other states and jurisdictions required warrants to access geofenced location data. *Id.* ¶ 125. Nelson responded "[h]mm, very interesting. Yeah I'll think through that. I'll talk further with you in Bettendorf." *Id.* ¶ 126. On March 24, 2023, Jobes emailed Nelson: "[s]ome agents are expressing concern related to the initial use of the geolocation data and the potential need to identify the source of the data in subsequent court proceedings." *Id.* ¶ 127. Plaintiffs also allege Duenow obtained a warrant for a geofence search using Kibana in a separate gambling case, indicating Defendants did know a warrant was necessary. *Id.* ¶¶ 129–30.

These allegations, taken in the light most favorable to Plaintiffs, do not meet the standard necessary to overcome qualified immunity. Plaintiffs do not cite to any controlling authority or a robust set of persuasive authority clearly establishing this right, nor could they. The ability to surveil a person's historical geolocation data using an app's verification system is novel and courts

have yet to reach a consensus on the constitutionality of such searches. *Cf. United States v. Pricop*, 775 F.Supp.3d 1036, 1038–39 (D. Ariz. 2025) (discussing divergence by courts in applying *Carpenter*). The Court's opinion today follows the path the Supreme Court articulated in *Carpenter* for addressing the constitutionality of novel geolocation surveillance techniques, but *Carpenter* did not clearly establish law in this novel context. *Cf. Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Indeed, since *Carpenter*, courts have disagreed about the constitutionality of geolocation searches. *Compare Smith*, 110 F.4th at 830–36 (5th Cir. 2024), *with United States v. Chatrie*, 107 F.4th 319, 331 (4th Cir. 2024). While the advice to obtain a warrant Story County Attorney Tyler Grimm provided to Plaintiffs has proven correct, this advice is not the kind of controlling authority that defeats qualified immunity. Because the unconstitutionality of the historical geolocation searches Defendants conducted was not clearly established, Defendants are entitled to qualified immunity.

Accordingly, the Court grants Defendants' motion to dismiss as to Plaintiffs' Count I and Interveners' Count I.

### C.    Defendants' Use of Subpoenas

In Count III of Plaintiffs' amended complaint, Plaintiffs allege Defendants violated the Fourth Amendment "by supporting a subpoena for Plaintiffs' activity on their cell phones with illegally seized information obtained from the geofence search." ECF No. 32 ¶ 545. Plaintiffs assert that because illegally obtained evidence was used to support the investigatory subpoenas, the subpoenas are fruits of the poisonous tree in violation of Plaintiffs' Fourth Amendment rights. ECF No. 53 at 44–45. Plaintiffs also allege the subpoenas were not issued "for a lawfully authorized purpose." ECF No. 32 ¶ 548.

The Court first considers Plaintiffs' claim that the subpoenas violated the Fourth Amendment as fruit of the poisonous tree. Two subpoenas, IFIF005188 and IFIF005186, were requested on February 8, 2023, requesting information for sixty-nine accounts from FanDuel and

seventy-three accounts from DraftKings. ECF No. 32 ¶ 118. Sanger discovered these accounts through his use of GeoComply and Kibara to search geolocation data at the Iowa State University and the University of Iowa athletic facilities. *Id.* ¶ 103. As discussed above, the unconstitutionality of Defendants' search which supported the subpoena was not clearly established at the time of the search. Defendants are therefore entitled to qualified immunity on this count as well.

The Court next addresses Plaintiffs' claim that the subpoenas were not for a lawful purpose. In Iowa, "[t]he clerk of court, on written application of the prosecuting attorney and approval of the court, shall issue subpoenas, including subpoenas duces tecum, for such witnesses as the prosecuting attorney may require in investigating an offense." Iowa R. Crim. P. 2.5(6)(a). To satisfy the Fourth Amendment, investigatory subpoenas must meet three requirements:

> (1) the investigation must be for a lawfully authorized purpose although no specific crime need be charged; (2) the documents sought must be relevant to the inquiry; and (3) the items to be produced must be described in a manner permitting the object of the subpoena to properly respond with reasonable effort.

*Pattison Bros. Mississippi River Terminal v. Iowa Dist. Ct. For Clayton Cnty.*, 630 N.W.2d 782, 787 (Iowa 2001) (citation omitted). "Courts rarely, if ever, quash a subpoena on the grounds that it was issued for an unlawful purpose. This is because the lawful purpose criterion is satisfied when the county attorney is engaged in a bona fide criminal investigation." *Id.* (citation omitted).

Plaintiffs only challenge the sufficiency of the first element, "no reasonable suspicion of a crime existed as student-athletes can legally use [FanDuel and DraftKings], and the only information produced by the geofence related to location and account numbers." ECF No. 53 at 45. But cheating at sports wagering is a class "D" felony under Iowa Code § 99F.15(4)(d). As such, match fixing by collegiate athletes is a punishable offense, and the subpoenas issued to support an investigation into possible match fixing were issued for a lawful purpose. Probable cause is not a required element of an investigatory subpoena, and the subpoenas did have a lawful purpose. *See*

Case 4:24-cv-00146-RGE-SBJ   Document 89   Filed 11/05/25   Page 29 of 34

*In re Subpoena Duces Tecum*, 228 F.3d 341, 348–49 (4th Cir. 2000); *Becker v. Knoll*, 494 F.3d 904, 917 (10th Cir. 2007).

Accordingly, the Court grants Defendants motion to dismiss as to Plaintiffs' Count III.

### D.      Unreasonable Seizure Under the Fourth Amendment

Plaintiffs and Intervenors allege Defendants unreasonably seized their cell phones and personal data in violation of the Fourth Amendment. ECF No. 32 ¶¶ 515–34, 555–75; ECF No. 33 ¶¶ 317–29. Based upon the geolocation searches and subpoenas discussed above, Defendants sought and obtained warrants for some of Plaintiffs' cell phones and personal data. *Id.* These Plaintiffs assert that because the warrants were supported by an illegal search, seizure of their cell phones and data violates the Fourth Amendment protection against unreasonable seizures. *Id.*

The Court first addresses Defendants' seizure of some of Plaintiffs' and Intervenors' cell phones. Plaintiffs and Intervenors argue the search warrants issued for Defendants to seize the phones were obtained unlawfully due to a lack of articulable suspicion. ECF No. 50 at 31–32; ECF No. 53 at 42–43. Plaintiffs and Interveners also argue the warrants are fruit of the poisonous tree because the search underlying the warrants was unlawful. ECF No. 32 ¶ 526; ECF No. 33 ¶ 321. Defendants assert they are entitled to qualified immunity because the underlying constitutional violation was not clearly established at the time Defendants obtained the warrants based on the geolocation search. ECF No. 64 at 16–18.

Plaintiffs first resist qualified immunity on the grounds that the warrants were based on an illegal search of their geolocation data and so are also fruits of the poisonous tree. *Id.* ¶ 566. However, just as in the subpoenas discussed above, while the warrants were supported by the unconstitutionally obtained geolocation information, the unconstitutionality of the geolocation search was not clearly established at the time of the warrant application. "The protection of qualified immunity applies regardless of whether the government official's [reasonable] error

29

is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted). Defendants' reasonable mistake of law that collection of Plaintiffs' geolocation data did not require a warrant and so could legally support obtaining a subsequent warrant is entitled to qualified immunity. Plaintiffs therefore cannot overcome qualified immunity on these grounds.

Plaintiffs separately resist Defendants' assertion of qualified immunity by alleging that Defendants' investigation was not for a lawful purpose and, therefore, statements made on the warrant application describing the investigation were materially misleading. ECF No 32 ¶¶ 135–38. These statements include: "[i]t was within the normal course of duties, investigators discovered numerous online sports wagering accounts which appeared to be suspicious and/or potentially fraudulent in nature." ECF No. 32 ¶ 135. Plaintiffs assert Sanger was instead pursuing a "hunch" and was therefore not acting within the normal scope of his duties as represented in the warrant application. *Id.* ¶ 138.

A warrant is constitutionally deficient if the warrant "affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement" and "this false statement was essential to establishing probable cause." *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). "For purposes of qualified immunity, '[t]he issue is not whether the affidavit actually establishes probable cause, but rather whether the officer had an objectively reasonable belief that it established probable cause.'" *Mueller v. Tinkham*, 162 F.3d 999, 1003 (8th Cir. 1998) (alteration in original) (citation omitted). "A statement in an affidavit must be '"truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.'" *Davis v. City of Little Rock*, 122 F.4th 326, 330 (8th Cir. 2024) (quoting *Franks*, 438 U.S. at 165). "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct." *Id.*

Reckless disregard for the truth requires Plaintiffs to show Defendants "entertained serious doubts" about the truth of the statement. *Davis*, 122 F.4th at 331. A reasonable DCI investigator might believe the investigative steps Sanger undertook were part of the normal scope of their duties and so would have a reasonable belief that a statement describing the investigation as within the normal scope of their job duties was true. Therefore, Plaintiffs fail to allege Defendants knowingly or recklessly included a false statement in the warrant affidavit. *Cf. Long v. Boucher*, 706 F.Supp.3d 1329, 1339–41 (D. Utah 2020). Plaintiffs cannot overcome qualified immunity on these grounds either. Therefore, Defendants are entitled to qualified immunity.

The Court next addresses Defendants' seizure of some of Plaintiffs' and Intervenors' data. "The Fourth Amendment protects against unreasonable searches and seizures of 'persons, houses, papers, and effects' by government actors in both civil and criminal contexts." *Bulfin v. Rainwater*, 104 F.4th 1032, 1038 (8th Cir. 2024) (citation omitted). "A seizure of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Id.* (citation omitted). "[N]ot every governmental interference with a person's property constitutes a seizure of that property under the Constitution." *United States v. Va Lerie*, 424 F.3d 694, 702 (8th Cir. 2005) (en banc).

Defendants argue they did not meaningfully interfere with any possessory interests Plaintiffs and Intervenors had in the location information disclosed by GeoComply. ECF No. 41-1 at 57–59; ECF No. 43-1 at 44–45. Defendants also assert the location information was left in "plain view," such that even if a seizure occurred, it was reasonable. ECF No. 41-1 at 59; ECF No. 43-1 at 45–46. In response, Plaintiffs and Intervenors argue they "had a privacy interest in their location data and personal cell phones, both of which were compromised." ECF No. 50 at 30; ECF No. 53 at 41.

Plaintiffs' and Intervenors' claims regarding the alleged unreasonable seizure of the

GeoComply data fail as a matter of law for two reasons. First, to the extent Plaintiffs and Intervenors have possessory interests in the information recorded by GeoComply, Plaintiffs and Intervenors do not allege how they were deprived of their ability to access or use that information. As such, Defendants did not meaningfully interfere with Plaintiffs' and Intervenors' possessory interests. *Cf. Arizona v. Hicks*, 480 U.S. 321, 324 (1987) (finding "the mere recording of the serial numbers [on stereo equipment] did not constitute a seizure" because it did not meaningfully interfere with a possessory interest).

Second, Plaintiffs' and Intervenors' arguments stem from the idea that their *privacy* interest in the GeoComply data create a *possessory* interest in the GeoComply data. Accepting such an argument obviates any meaningful distinction between an unreasonable search and an unreasonable seizure in the context of the Fourth Amendment. *Cf. Texas v. Brown*, 460 U.S. 730, 747 (1983) (Stevens, J., concurring) ("The [Fourth] Amendment protects two different interests of the citizen—the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter."). Therefore, the Court determines Plaintiffs' and Intervenors' alleged privacy interests in GeoComply's data do not establish a sufficient basis for a possessory interest, as understood under the Fourth Amendment.

Accordingly, the Court grants Defendants' motions to dismiss as to Plaintiffs' Counts II and IV and Intervenors' Count II. The Court declines the opportunity to address Defendants' remaining arguments.

### E.    Failure to Intervene in Violation of the Fourth Amendment

Plaintiffs and Intervenors allege Defendants violated the Fourth Amendment by failing to intervene to prevent Defendants' alleged unconstitutional searches and seizures. ECF No. 32 ¶¶ 576–01; ECF No. 33 ¶¶ 330–47. The underlying constitutional violation supporting this claim is the unconstitutional search of Plaintiffs' geolocation history. *Bloodworth v. Kansas City Bd. of*

*Police Commissioners*, 89 F.4th 614, 628 (8th Cir. 2023) ("To prevail on a claim of failure to intervene . . . , [a plaintiff] must prove an underlying constitutional violation."). Defendants counter, asserting that a failure to intervene claim may only be asserted when the underlying constitutional violation is excessive use of force. ECF No. 41-1 at 66–67. The Eighth Circuit has stated "there is no clearly established law regarding a duty to intervene outside of the excessive force context." *Andrews v. Schafer*, 888 F.3d 981, 984 n.4 (8th Cir. 2018) (citing *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013)).

The Court does not decide whether Plaintiffs have adequately pled a claim for failure to intervene because even if such a claim was cognizable, Defendants would be entitled to qualified immunity. *Andrews* and *Hess* make clear there is no clearly established law supported by either controlling authority or a consensus of persuasive authority establishing liability for a supervisor's failure to intervene when a subordinate uses novel technological search tools to collect historical geolocation information without a warrant. *See Andrews*, 888 F.3d at 984 n.4; *Hess*, 714 F.3d at 1052. Defendants are therefore entitled to qualified immunity.

The Court grants Defendants' motions to dismiss as to Plaintiffs' Count V and Intervenors' Count III.

F.    **Request For Leave to Amend**

In a single sentence, Intervenors request the opportunity to amend their complaint to cure any defects. ECF No. 50 at 45. When it has been greater than twenty-one days since a responsive pleading was served, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15. A court may deny leave to amend "if there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment."

*Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 922 (8th Cir. 2013) (citation omitted). If a party moves for leave to amend a pleading under Rule 15(a)(2), this district's local rules require the party file a motion describing the changes sought and attaching the proposed amended pleading. LR 15. The local rules also suggest but do not require the party attach a redlined version of the proposed amended pleading. *Id.*

The Court denies Intervenors' request for leave to amend. An amendment to Intervenors' complaint would not solve the qualified immunity defenses discussed above and would thus be futile. *Cf. Reuter*, 711 F.3d at 922. As such, justice does not require the Court grant Intervenors' request for leave to amend and the request fails to comply with the local rules.

## V.    CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 41, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Intervenors' Complaint, ECF No. 43, is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 5th day of November, 2025.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE